1  VINCENT MILLER (SBN 291973)
   *vincent@vincentmillerlaw.com*
2  MICHAEL MILLER (SBN 112751)
   *michael@vincentmillerlaw.com*
3  NICK SAGE (SBN 298972)
   The Law Offices of Vincent Miller
4  16255 Ventura Boulevard, Suite 625
   Encino, CA 91436
5  Telephone: (213) 948-5702
6  Attorneys for Plaintiff Lt/ Joseph Garrido

7              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
8              **FOR THE LOS ANGELES COUNTY - CENTRAL DISTRICT**

9  JOSEPH GARRIDO,                          )    CASE NO: 22STCV33687
                                            )
10                                          )    **FIRST AMENDED COMPLAINT FOR:**
                                            )    1)  **UNLAWFUL RETALIATION:**
11            Plaintiff,                     )        **LABOR CODE § 1102.5**
                                            )        **(WHISTLEBLOWER LAW);**
12 v.                                        )    2)  **DEPRIVATION OF CIVIL RIGHTS**
                                            )        **UNDER 42 U.S.C. §1983**
13                                          )    3)  **VIOLATION OF CIVIL CODE § 52.1**
   COUNTY OF LOS ANGELES, a municipal )        **(BANE ACT)**
14 entity, ALEX VILLANUEVA, an individual, )   4)  **DEFAMATION/SLANDER/LIBEL**
   JOSEPH WILLIAMS, an individual,          )        **PER SE;**
15 CATRINA KHASAEMPANTH, an             )    5)  **FALSE LIGHT**
   individual, THOMAS GIANDOMENICO, an )
16 individual, OSCAR BARRAGAN, an           )
   individual, WILLIAM MORRIS, an           )
17 individual, and DOES 1-10, individuals,   )
                                            )
18            Defendants.                    )
                                            )
19                                          )
                                            )
20 ────────────────────────────────────      )

21

22                          **Jury Trial Demanded**

23

24

25

Electronically Received 11/28/2022 05:40 PM

1

## **INTRODUCTION**

2

3

4

5

6

7

8

    1.      Plaintiff Lieutenant Joseph Garrido is an exemplary, 31-year veteran employee of Defendant County of Los Angeles ("County"). He consistently received outstanding performance evaluations for years. Having been a volunteer and employee of the Los Angeles County Sheriff's Department since the age of 16, Plaintiff has earned numerous commendations. Numerous times the evaluations commended Plaintiff for his expertise, tactical knowledge, diligence, outstanding manners, and verbal and writing skills. Plaintiff worked at elite units since 2003 and was assigned as a gang detective.

9

10

11

12

    2.      Plaintiff worked as a sergeant for eight years and served as a Canine/S.W.A.T. Sergeant at the Special Enforcement Bureau ("S.E.B.") for six and a half years before being promoted to the rank of Lieutenant in May 2017, thereafter assigned at S.E.B. in May 2018. At the same time, Plaintiff was asked to be assigned to the Narcotics Division at the request of then-Captain (now Assistant Sheriff) Holly Francisco.

13

14

15

16

    3.      Since Plaintiff worked at S.E.B., he has been assigned to oversee both the Canine Services Detail and Special Enforcement Detail. In January of 2021 he was asked to work the position of Operations Lieutenant and was assigned as Acting Captain on several occasions. In addition, Plaintiff held and worked the positions of Sheriff Explorer, Community Services Officer, Reserve Deputy, Deputy, Field Training Officer, Gang Detective, Sergeant and Lieutenant.

17

18

19

20

    4.      Lt. Garrido is, by all objective accounts, a highly competent and dedicated law enforcement official, with a passion for protecting residents, and a "stand-up guy," who cares for and respects and speaks up for his personnel including the K-9 dogs who regularly put their lives on the line to fight crime and bring the bad guys to jail.

21

22

23

24

25

    5.      Lt. Garrido is a whistleblower who on several occasions reported and resisted illegal conduct, including fraud by County's Los Angeles County Sheriff's Department ("LASD") as officials sought to deprive numerous employees in the S.W.A.T. unit of earned "Explosive breacher" pay. Due to the reporting by Plaintiff, LASD was forced to pay over $3 million in wrongfully withheld pay to these employees. LASD leaders were incensed at Plaintiff. Defendant Sheriff Alex Villanueva ("Villanueva") promoted those participating in the fraud.

6.      Lt. Garrido also reported the death of a K-9, Spike, who died of overheating in the care of his handler, Sgt. Dan Tobin. Sgt. Tobin left Spike in a hot car for several hours. Obsessed with not getting "bad media" that could hurt his re-election as sheriff, Villanueva was not transparent about the beloved dog's death, made no announcement of Spike's death, and did not pay tribute for his service to LASD and the community. Spike was not just a dog; he was a cop who found evidence and protected the public. He should have been honored and given respect for his service and his death should have been properly and honestly investigated.

7.      When Spike died, Lt. Garrido learned of the death from an officer at another law enforcement agency. Lt. Garrido contacted Defendant (then Captain) Joseph "Joe" Williams ("Williams") to confirm the death.  Lt. Garrido cautioned Captain Williams to not cover up the incident and to ensure he investigated the killing of Spike. Defendant Williams (promoted to Commander and Chief by Villanueva as he has faithfully carried out illegal acts for the sheriff) promised to do a proper investigation, as Williams was fully aware that Spike was not just a beloved animal, but also considered a fellow deputy.

8.      However, Williams did not conduct any investigation into Spike's painful death and covered it up. There was no documentation of an investigation and no discipline for Sgt. Tobin. Tobin was not given a new dog by LASD because that would have required paperwork documenting what happened to Spike. The City of Long Beach had a similar death of a K-9 prior to this incident at LASD. In contrast to LASD, The Long Beach Police Department ("LBPD") took the death seriously, was transparent with the public, and launched a criminal investigation into the conduct of the officer handling the dog. After the District Attorney ("DA") declined to file a case against the officer, LBPD still not bury the matter and shirk its responsibilities and initiated an administrative investigation into the role the officer played in the death of the dog.

9.      The cover up of the killing of Spike is consistent with other cover ups done by Sheriff Villanueva and LASD, including Villanueva's cover up of the use of excessive force, and cover up of violence against residents and deputies. Villanueva has expressed an obsession with avoiding "bad media" for himself and LASD, as he focused on re-election soon after getting elected four years ago. Captain Williams would not have covered up the killing of Spike without orders from the sheriff's office. And, given that Spike was a fellow cop who found evidence, and protected

the community, there is zero possibility the sheriff as the head of LASD would not have been
informed of Spike's horrifying death. It is alleged upon information and belief that Sheriff Alex
Villanueva directed Williams to quash the investigation into the killing of Spike to avoid "bad
media." for himself and LASD.

10.     Shockingly, Villanueva did not even do a tribute, internally at LASD and/or
publicly, for Spike, and talk of Spike's years of loyal service before his tragic death. Recently,
"Dare," a K-9 serving the city of San Bernardino passed away and the City put out a tribute to her,
acknowledging her years of service to the department and community, and highlighted that she was
a partner, and a fellow cop to her handler. KTLA posted a tribute to Dare in a manner that they and
LASD should have posted on behalf of Spike and have done tributes for other crime fighting dogs
like "K-9 Ox" who died of natural causes. But LASD shamefully hid what happened to Spike and
did not even acknowledge his passing at all.

11.     Lt. Garrido repeatedly maintained his integrity to stand up for what was the ethical
and the legal thing to do, and for that he faced the vengeful wrath of Alex Villanueva.

12.     Alex Villanueva has misused the powers of the Sheriff's office repeatedly,
including in how he has handled against whistleblower reports and lawsuits. Rather than serving
in the traditional role as sheriff and focusing on fighting crime and protecting residents,
Villanueva focuses on his elections. Villanueva improperly talks about litigation in public and
disparages his good employees, the whistleblowers, to all other employees in LASD and to the
public. Villanueva has recently resorted to the most gutter of tactics. As each new whistleblower
bravely speaks out, whether through public testimony under oath or by filing a lawsuit,
Villanueva improperly uses government monies and platforms for his political gain and
regurgitates the same social media postings on official government websites attacking the
whistleblower and the whistleblower's attorney for calling the sheriff out for his wrongful
conduct.

13.     These whistleblowers like Lt. Garrido are Los Angeles County employees who
work for Villanueva. These employees are highly regarded for their integrity and for their work in
protecting the residents of Los Angeles County. Yet, the sheriff shamelessly uses government
resources, government websites to improperly aide his re-election campaign and disparages these

employees, aiming to soil their reputations with their co-workers, their families, and the community, all while affecting their personal well-being. This is utterly disgusting.

14.    There are an estimated 24 whistleblowers, including Lt. Garrido, now currently suing the County of Los Angeles over harms caused by LASD, and Villanueva's hand has been in much of the wrongdoing and/or in covering it up. Villanueva has engaged in a long list of wrongdoing but in his official social media postings, Villanueva lies and says that all the whistleblowers are suing over the same thing. He also lies that the whistleblowers are bad performers in their jobs, and that they are suing him to avoid their own criminal prosecution!

15.    For instance, on October 5, 2022, Commander Allen Castellano filed a lawsuit against the sheriff and the County of Los Angeles. The District Attorney recently convened a grand jury with Villanueva as the suspect for obstruction of justice. But on October 6, 2022, Villanueva used the department's social media to lie about and disparage Commander Castellano for both the public and department members to see.  It was an abuse of power and a public display for others to take notice not to go against the sheriff. The sheriff put out a statement which included the following lies: *"The lawsuit filed by Allen Castellano is... the same false statements... outright lies contained in other lawsuits recently filed... he and others so critically failed in the performance of their duties... an effort to influence the outcome of the upcoming election... avoiding accountability or prosecution... what it is: an unlawful effort to coverup and avoid accountability.*

16.    All the whistleblowers are suing Villanueva and the County for a variety of offenses committed and for various forms of retaliation. For example, three high ranking LASD officials, including Commander Castellano, blew the whistle on Villanueva's cover up of use of excessive force reminiscent of the maneuver used by Derek Chauvin to murder George Floyd.

17.    According to his employees, behind the scenes, Villanueva laughs at whistleblowers; he makes them feel like they are the ones who have a problem for having ethics and morals; and he calls them stupid for not taking promotions in exchange for carrying out unethical and illegal activity that jeopardizes public safety. Villanueva is not a public servant like he is supposed to be. He has transitioned LASD to serve him personally in his narcissistic quest for power and personal service to feel vindicated for the years he spent in LASD unable to rise

through the ranks. Villanueva has admitted that he believed that Inspector General Max

Huntsman wanted to access his personnel files (as part of the Inspector General's duties to

provide oversight over him) and that is why he blocked him from LASD oversight. Undersheriff

Murakami admitted that they illegally placed a tracker on Max Huntsman's computer activity; this

is the basis for the fake criminal case they placed against Max Huntsman, as Villanueva runs

LASD without oversight or accountability like it's more a third-world dictatorship than a branch

of the County.

18.     When Villanueva was a deputy and sergeant in LASD, he was critical of the

corrupt practices of a previous sheriff. As lieutenant, Villanueva continued his criticism of LASD

leadership, accusing it of cronyism, racism, and corruption. However, when he became sheriff,

Villanueva took to the same corrupt practices with a naturalness like a duckling taking to water.

Some may find this ironic. But it's typical for third-world dictators who overthrow a corrupt

administration to become just as corrupt as their predecessors. These dictators attack those in

power and call them corrupt but their real issue is that they don't have the power. Once they get

the power, they rationalize and justify their corruption by cynically thinking anyone with the

power would do the same as them. Villanueva tells himself that if any of his opponents had the

power, they would be just as corrupt as himself. Villanueva's narcissism leads him to conclude

that he deserves the power so it's best in his hands.

19.     There are laws protecting whistleblowers like Lt. Garrido. The sheriff is supposed

to protect those whistleblowers, yet he has created a hostile environment for each employee who

had the courage to stand up to him. However, when a whistleblower works to his advantage, he

praises their bravery and immediately calls for an investigation into the matter. He did this with

the Metro employee who made a claim against Board supervisor Sheila Kuehl, a claim the sheriff

has been unable to prove for years but to help his re-election he recently staged a useless search

on the supervisor's house, once again wasting taxpayer's money.

20.     When a whistleblower sticks his/her neck out in the sheriff's department and

reports misconduct, a transparent Sheriff would acknowledge the seriousness of the allegations

and indicate that he will do an honest investigation into the allegations, and that he cannot

comment further on the allegations and litigation. Instead, the sheriff attacks the whistleblowers

and lies about them, trying to smear them to discredit their allegations, to assist his re-election campaign. It is ironic that the sheriff only has himself to blame if he loses re-election, because a loss would be directly connected to his reactions to whistleblower complaints and his further retaliation against them. The whistleblowers like Lt. Garrido are not running for sheriff against Villanueva; they are bravely sticking their necks out, standing up for what's right, knowing they will be further retaliated against for doing so. That retaliation, against good employees with inside knowledge of his misdeeds, is what has generated such negative publicity for the sheriff.

21.     When a whistleblower like Lt. Garrido encounters an illegal activity within LASD, they come to a crossroads in their career. They must choose between the path of their inherent moral conscious or the bustling path of the careers they love and devoted their lives to in LASD. When they chose the isolated path and speak out, what ensues is ostracization from colleagues, and in law enforcement that ostracization is deliberate and life threatening. That means criminal and/or administrative investigations against the employee, defamation, transfers out of assignments, demotions and sometimes termination. Their career path is all at once surrounded by a blue wall of silence. Anti-Retaliation laws were enacted for this very reason. After the employee exhausts all internal pleads for help, he/she is forced to seek external help and files a lawsuit. As if this wasn't a big enough burden to carry mentally, physically and emotionally, Sheriff Villanueva uses his office, his position, his platform, paid for by the government, to publicly defame these whistleblowers by calling them subpar employees and liars and criminals. His actions are disgusting and should be of grave concern to the citizens of Los Angeles County because if law enforcement whistleblowers are targeted, hunted, defamed for speaking out against violations of human rights, fraud, illegal activity then what is a regular citizen to expect?

22.     And, sadly, Defendant County officials stand idly by and do nothing to stop the sheriff's abuse of power and protect its employees and residents from his wrath. In fact, the County endorses and ratifies Villanueva's conduct by joining him in covering up his misdeeds and supporting and doubling down on his lies in litigation. The lack of accountability by the County encourages the sheriff to further abuse his office.

23.     The whistleblower here, Lieutenant Joseph Garrido, like all the whistleblowers, has his own unique story to tell, and a unique set of harms caused to him. In addition to being a whistleblower, Lt. Garrido's other "sin" to Villanueva was his expression of his first amendment rights, donating money to the unsuccessful campaign of a rival candidate for sheriff, Eli Vera.

24.     In September 2021, Villanueva demoted Eli Vera to Commander because he was running for Sheriff against him. Subsequently, Vera experienced further retaliation when his son was blocked from getting hired at the Sheriff's Department despite him completing the entire process of employment and receiving a conditional offer of employment and was only waiting on the academy date. Vera had concerns that when he announced his candidacy Villanueva would retaliate against him by not hiring his son in the Sheriff's Department. Unsurprisingly, one year went by and Vera's son was still not hired.

25.     Further acts of ugly retaliation were committed against Vera's family by the Sheriff and his proxies. Soon after Vera announced his candidacy, Villanueva sent criminal investigators to Vera's house unannounced to harass his wife, which is completely out of the protocols in contacting the family of active-duty members. Such an act of sending criminal investigators to Vera's house after he announced his candidacy was highly inappropriate, offensive and retaliatory as it was meant to embarrass and was an attempt to intimidate Vera and his family.

26.     Villanueva has a personal vendetta against Vera for running against him, so the retaliation did not stop there. When the purse of Vera's wife was stolen that contained her badge and a gun, a criminal investigation was launched against the suspect that led to the suspect's conviction. The case was simple and completed. But Villanueva bizarrely went after his own detective who investigated the theft of the purse by starting a criminal investigation against the deputy. Villanueva subjected the deputy to a fake criminal investigation apparently in the hopes he could concoct something against Vera through the investigation. After ICIB informed Villanueva that it could not find anything to use to fabricate a case against the detective and Vera, Villanueva wouldn't let it go, and directed the Captain of Major Crimes Bureau to initiate a fake IAB investigation into the detective.  Villanueva exacted revenge on several other LASD staff he assumed were supporting and voting for Vera, including cruelly blocking the earned promotion of

Vera's secretary, simply because she was assigned at LASD to be Vera's secretary and was presumed to be voting for him and supporting his candidacy.

27. Plaintiff is known to be a close friend and supporter of Eli Vera.

28. Plaintiff Lieutenant Joseph Garrido was most qualified to be promoted and was confirmed and approved for promotion to the Arson/Explosives Lieutenant position. Plaintiff was also qualified to be promoted to captain. After Lt. Joseph Garrido reported illegal conduct within LASD and donated money to Vera's campaign, the Defendants effectively demoted him by reversing his promotion. Villanueva and the County also initiated a false criminal investigation against Plaintiff, destroying his career, livelihood and slandering his name. The Defendants bombarded Plaintiff with harassment, retaliation, and bullying. Plaintiff reported the hostile work environment based on a series of acts against him that have occurred at work, only to draw more hostility toward him. He has been singled out and retaliated against by the Defendants.

29. Retaliation against Plaintiff is ongoing. Plaintiff demands that the County finally intervene and protect him and the other whistleblowers. This rigged criminal investigation has been ongoing for several months. The ICIB investigator, Defendant Sgt. WILLIAM MORRIS ("Morris") admitted to Plaintiff that the investigation was "probably" motived by retaliation. Yet, Sgt. Morris, under orders from Defendant Captain CATRINA KHASAEMPANTH ("Khasaempanth"), has carried on with the corrupt investigation, and defamed Lt. Garrido suggesting to his neighbors that he is a disgraced law enforcement official, a criminal who stole a vehicle. Sgt. Morris has a reputation for integrity; yet he followed orders to do a poisonous investigation out of fear of retaliation himself.

30. After the original complaint was filed in this matter, Villanueva and LASD engaged in further defamation of the Plaintiff and further covered up the killing of the police dog, Spike.

31. In response to the complaint, Villanueva illegally used the County-paid Nixle public notification system − utilized by police and other agencies to send out emergency notifications to the public − to lie about Lt. Garrido and his attorney Vincent Miller.

32. Also, in his response to the lawsuit being filed, Villanueva and Defendant Joe Williams and retired lieutenant Sue Burakowksi committed a felony, a conspiracy to obstruct

justice, as they drafted and released a fraudulent memorandum that further covered up the killing of Spike, and Villanueva hiding his death from the public and blocking an investigation into it.

33.    On top of the drafting of the memorandum being a crime, the authors did not do a competent cover up job. From the memo itself, an objective person can see that Spike died from negligence and Sergeant Tobin should have been investigated.  The memorandum by Defendant Williams contradicts what was written in the veterinarian's report.

34.    The purpose of the release of the memo was to try to discredit Plaintiff's allegations and to further harm his reputation.

35.    As a result of deprivation of his civil rights and the retaliation, and defamation. Plaintiff has suffered extreme distress, anxiety, back pain, and has been unable to go back to work for several months. He has been constructively terminated by the County.

36.    The County must be held accountable for allowing its good employees' lives to be destroyed. Lt. Joseph Garrido signs this verified complaint under oath and seeks to have the sheriff to also finally be held accountable for the damage he has done and continues to do to countless lives. The County is liable for all the wrongful conduct of Defendants Villanueva, Khasaempanth, Giandomenico, Barragan, Morris, and all other LASD employees.

## **JURISDICTION AND VENUE**

37.    This Court has jurisdiction over all state causes of action. Venue is proper because Defendants are located in the County of Los Angeles, and all the events, actions, or omissions giving rise to these claims occurred in the County of Los Angeles.

## **PARTIES**

38.    Plaintiff Joseph Garrido is a Lieutenant in LASD. Plaintiff reported the unlawful conduct in LASD and donated money to a sheriff's candidate and was retaliated against by the Defendants.

39.    Defendant Los Angeles County is a municipal entity that operates and operated LASD, which is an agency of the County.

40.    Defendants SHERIFF ALEX VILLANUEVA, CHIEF JOSEPH WILLIAMS, CAPTAIN CATRINA KHASAEMPANTH, COMMANDER THOMAS GIANDOMENICO

("Giandomenico"), CAPTAIN OSCAR BARRAGAN ("Barragan"), and SERGEANT WILLIAM MORRIS are employed by LASD and the County and is a resident of Los Angeles County. The County is liable for all his wrongful conduct and the misconduct of all its other employees' misconduct against the Plaintiff.

## STATEMENT OF FACTS

41.     In May 2018, Plaintiff was transferred to the S.E.B. from LASD's Compton Station at the request of the S.E.B. Unit Commander. Once assigned to the Special Enforcement Bureau, the Unit Commander made Plaintiff the sole lieutenant and supervisor to oversee the S.W.A.T. personnel. The S.W.A.T. unit, known as the Special Enforcement Detail (S.E.D.) had six teams, consisting of one sergeant and six to eight deputies. The Unit Commander quickly selected Plaintiff to handle the two required projects within his first sixty days.

42.     Before Plaintiff was transferred to S.E.B., he had a good relationship with Carl Mandoyan, who later became the Sheriff's driver. Mandoyan was involved in a domestic violence incident, which led to his discharge from service. When Villanueva got elected to Sheriff in 2018, he illegally rehired Mandoyan. The County successfully sued itself (Villanueva) and forced Villanueva to remove Mandoyan from employment. Even though Mandoyan is not officially employed by LASD, he unofficially remains one of LASD's top officials and decision-makers as adviser to Villanueva.

43.     In the early 2019, soon after the election, Mandoyan called Plaintiff and asked him if he was ready to be a Captain. Plaintiff told Mandoyan that he still had several projects he wanted to accomplish at S.E.B. and preferred a promotion within that unit as lieutenant over a promotion to captain of another unit. Plaintiff specifically indicated that because of his investigative and tactical background, he hoped to become the Arson/Explosives Detail Lieutenant.

44.     Around this time, Mandoyan's illegal rehire was drawing a lot of media attention. Plaintiff expressed his concerns to Mandoyan about the situation and how Mandoyan was handling the matter. Lt. Garrido later was informed by one of Villanueva's drivers that Mandoyan expressed anger towards Plaintiff for voicing his concerns with him. The driver described Villanueva's obsession with the Inspector General Max Huntsman, whose job it was to provide oversight over

the sheriff. The sheriff has refused to be transparent, and refused to let Huntsman do his job, as Villanueva has consistently been vindictive to anyone reporting wrongdoing. The sheriff was especially concerned Huntsman would release the contents of Villanueva's personnel file, because it contained a history of his wrongdoing at LASD, and it could lead to bad media. The driver reported that Villanueva would consistently tell him how badly he wanted to arrest Huntsman. One day, while he was driving the Sheriff, Villanueva turned and looked at him in the car and said, "I'm going to handcuff that asshole Max Huntsman one day." The Sheriff would also consistently ask his investigator, retired Homicide Detective Mark Lillienfeld, who is in charge of "investigations" (zero of which have resulted in anyone being indicted for a crime) for Villanueva's corrupt "Public Corruption Unit," about updates on their fake investigation into Huntsman.

45.    A short period of time later, Defendant Joe Williams was promoted by Villanueva to Captain of SEB. Williams was always known as a "Yes" man and was known for going out Injured on Duty ("I.O.D.") after being promoted at every rank so that he could have a period of time off and not have to make a decision.

46.    On or about November 14, 2019, an incident occurred during a tactical search in Saugus that Plaintiff was never made aware of until four days later, when Captain Williams said, "We are going to conduct a FULL investigation on this; it will be by the numbers." Since the person involved in the incident had already been identified, and the work completed, Plaintiff wasn't quite sure what would have to be investigated.

47.    Several weeks later, Plaintiff was notified that Captain Williams was angrily accusing him of covering up the incident. Plaintiff explained that he had no involvement and knew nothing about the incident, and he was not concerned.

48.    On or about December 16, 2019, while Plaintiff was in his office, he received a phone call. The caller apparently mistook Plaintiff Joe Garrido as Captain Joe Williams, and informed Plaintiff that phone records on a deputy at S.E.B were in the caller's possession as requested by Captain Williams. This unusual request made Plaintiff believe that some covert investigation was potentially being conducted and targeted at his S.W.A.T. personnel. Thereafter, Plaintiff contacted the Operations Personnel and advised them about the strange phone call that he intercepted and stated that he believed some of his personnel were potentially being affected in an

unwarranted investigation. Plaintiff was informed that it was regarding the Antelope Valley
incident and that they (Chief Ewell and Captain Williams) were specifically looking at Lt. Garrido
for wrongdoing. Garrido later inquired with Lt. Burakowski about the memorandum that he learned
she had written for Williams regarding the phone history. Burakowski confirmed that Ewell and
Williams were looking into the alleged wrongdoing and that she was ordered to write the
memorandum.

49.    Several months later, Plaintiff learned that Defendant Lt. Oscar Barragan had
started and circulated the false rumor about him covering up the incident, with the aim of getting
Plaintiff removed from S.E.B.

50.    Plaintiff's adherence to principles drew him more hostility from Villanueva's
servants. On or about December 30, 2019, after several critical firearms training issues with a newly
assigned deputy at S.E.B., and after communicating extensively with team members, Plaintiff
authored a lengthy memorandum stating that the deputy was a safety risk to deputies at the unit and
that the deputy should be removed from the unit based on his failure to safely pass his tactical
firearms training during his probationary period. Prior to emailing the memorandum to Williams,
Plaintiff consulted with County Counsel to ensure he was doing everything properly. The County
Counsel Attorney told Plaintiff they agreed that the deputy should be and could be removed from
the tactical position and unit.

51.    Williams was angry and nervous when he received an email from Lt. Garrido that
contained approximately a dozen memorandums from team members, several supervisors and Lt.
Garrido. Plaintiff explained to Williams that the said deputy had three unintentional discharges
during training and all within a short period of time, and this would make him a risk to residents
and to his own team members, as well as to himself. Team members felt the deputy was "unsafe"
and had told Plaintiff they would not make entry with him. Plaintiff advised Williams that he met
with the team in private and that every one of them felt the deputy was unfit and unsafe to work on
a S.W.A.T. team. Plaintiff further told Williams that if all team members documented their concerns
on paper, it was very concerning to him and that the troubled deputy should be removed from the
unit immediately before a resident or deputy got hurt or killed. But Williams resisted and went as
far as to try and trick Plaintiff and lied that he had already talked to County Counsel and that they

1   informed him that the deputy could not be removed. When Plaintiff asked which attorney he spoke
2   to, Williams said he couldn't remember. Of course, he could not remember the name of a make-
3   believe person.

4       52.      Several days later, Captain Williams told Plaintiff that he and Commander Ewell
5   both wanted to talk to Plaintiff about the matter. The next day, Plaintiff met with Williams and
6   Ewell and discussed the Deputy's issues. During the meeting, both tried to talk Plaintiff out of his
7   recommendation of removing the Deputy. Commander Ewell and Chief Williams told Plaintiff that
    although they agreed with his concerns, that alone would not allow them to remove the deputy and
8   that it would be impossible to move him to another unit. Lt. Garrido stood his ground and stated he
9   would not change his opinion or stance on the matter.

10      53.      Following the meeting, Captain Williams told Plaintiff that Plaintiff was no longer
11  involved in monitoring the progress of the deputy. The team sergeant and Deputy were told to report
12  directly to Operations and not to involve Plaintiff. Two weeks later, after being placed on formal
    remediation by the division chief, the deputy voluntarily requested a transfer from S.E.B. and was
13  assigned to Training Bureau. Plaintiff was later informed that the Sheriff's wife, Vivian Villanueva,
14  knew the deputy personally, had been blocking his transfer), and was angry that Plaintiff had
15  ultimately caused him to be removed from S.E.B.

16      54.      Retaliation against Lt. Garrido for protecting residents' and deputies' lives came on
17  or about January 15, 2020, when the Division Chief called Plaintiff and informed him that he
18  received a phone call from the Sheriff's office relaying to him that Plaintiff could not attend the
19  upcoming Super Bowl event in Miami, despite the fact that Plaintiff had been chosen to assist
    Inglewood Police Department with tactics for the event by the Division Chief and Inglewood P.D.,
20  had already been approved for the trip, and travel arrangements had been made and paid for by
21  LASD. The sergeant and deputy that Plaintiff had chosen to go were not removed and they attended
22  the event.

23      55.      At the direction of Captain Joe Williams, Sergeant Kevin Brown also began to
24  undermine Plaintiff's authority on tactical situations, something that had never occurred before. On
25  one occasion Sergeant Brown improperly and unsafely ordered members of his team to shoot a non-
    lethal projectile over a suspect's head who was uncooperative in surrendering. Sgt. Brown stated

he was trying to coerce him to surrender. Brown had also recently secretly began helping Captain Williams with a breaching pay lawsuit. As time went on, Plaintiff discovered that Brown was in collusion with Williams to fraudulently manipulate the breaching pay lawsuit and that he was selected for the prestigious Haz-Mat position for doing so.

56.     Starting December 2019 until February 2020, the Unit's Explosive breacher personnel (handling explosives to gain entry) were deeply involved in litigation and were in ongoing discussions with their ALADS union attorneys over a breaching pay bonus lawsuit that was filed against the Department by members of S.E.B. in 2015.  The lawsuit was regarding personnel at S.E.B. who had been handling and conducting full time explosive breaching duties since 1999 without compensation and LASD had avoided payment based on a county code. The bonus pay was approximately 11.58%.

57.     Plaintiff, as a S.W.A.T. Lieutenant, should have been invited to and allowed to attend some of the litigation meetings. But given Lt. Garrido's reputation for integrity, attention to detail, and competence, he was always purposefully kept out of the loop and told he did not have to attend. Plaintiff observed several closed doors, secret meetings amongst Captain Williams, Sgt. Kevin Brown and Deputy Ervin Francois. At the direction of Williams and the Sheriff, the Lt. Garrido was excluded from his duties in this matter.

58.     Plaintiff warned several deputies, individuals involved in the lawsuit to be careful of the matter and the persons representing the litigation.  He strongly felt that Sgt. Brown and Deputy Francois did not serve the plaintiffs' best interest in the matter and that they were helping Williams and Ewell limit how much personnel would be paid of their earned but unpaid bonus for their work.

59.     On or about January 25 and 26, 2020, Plaintiff spoke to the PPOA Union President Tab Rhodes about several supervisors at S.E.B. who could and should have also received the Breaching bonus and specifically met the requirements of the county code ("persons employed on the items of Deputy Sheriff [Item No. 2708], Sergeant [Item No. 2717], or Lieutenant [Item No. 2719], shall be entitled to compensation at a rate for schedules higher than that established for their positions in Section 6.28.140 of this code when they have successfully completed special training and are assigned on a full-time, permanent basis to explosives detail duty").

60.     There were several rosters in previous years when bonus wages were not involved. Each roster had included close to twenty-five to thirty breachers. These rosters also had several Sergeants and Lieutenants recorded on them. Plaintiff learned of this earlier in the year when he was exploring and validating the bonus code descriptions with other supervisors. Those documents were later fraudulently deleted from the Unit files.

61.     On or about February 26, 2020, Plaintiff sent a follow-up email to PPOA President Rhodes stating S.W.A.T. supervisors should also be eligible for the Explosives breaching bonus pay that the deputies had been in litigation on. The email was also addressed to the supervisors who wanted to be involved in the grievance. Plaintiff advised Captain Williams of his conversations with Rhodes that day.

62.     On or about March 2, 2020, Captain Williams held a supervisor meeting. In attendance were the top line staff of the S.W.A.T. unit. Williams told everyone intensely that there were only going to be 18 breachers (including one sergeant) who would get paid (although there were over twenty-five breachers at the time). Williams also stated that S.E.B. personnel could no longer attend future breaching schools until the litigation had ended. LASD breachers were not allowed to attend in 2019 also. Williams was asked if supervisors could continue transporting explosives like normal, and he said, "Yes." When the meeting ended, Plaintiff told Captain Williams that since he was the S.W.A.T. Lieutenant and was the direct supervisor of the breachers, that he would also qualify for the bonus. Williams said "Nope, the Arson Explosive Lieutenant will be the lieutenant to oversee the explosive breachers." Williams knew that the Plaintiff oversaw the Explosive breachers.

63.     Plaintiff's adherence to principles met further resistance from the Sheriff and his inner circle and servants. On or about June 4, 2020, Sergeant Pat Golden was assigned to the Canine Services Detail. Golden had no experience or training as a dog handler and had received 30 days suspension in the past for the use of excessive force. Nevertheless, upon his assignment to Canine as a sergeant, he was immediately given a tracking dog by Captain Williams without any training.

64.     His assigned dog "Rosie" was a bloodhound with large droopy ears. She was a successful veteran tracking dog for several years and was previously handled at the unit by both a deputy and a Sergeant.  She was trained on tracking and locating persons via scent. With the

previous Sergeant handler, the dog had performed a great service to the community and LASD and had located several missing persons and suspects. Rosie was praised/and deemed an asset to the unit by Williams and Ewell. Within three weeks of Sergeant Golden arriving to the unit, unbeknownst to Plaintiff until later one evening, "Rosie" was supposedly not working as expected.

65.     On the evening of June 4, 2020, Plaintiff received a call from Williams informing him that Rosie urinated over herself during a deployment possibly due to fireworks and they were getting a new dog for Golden. Plaintiff was never notified of the incident by Sergeant Golden despite the fact that Lt. Garrido was the Canine Lieutenant, and according to the unit Canine manual all Canine subordinates are to report directly to the Canine Lieutenant. Sergeant Golden circumvented the chain of command and reported directly to Williams.

66.     The next day, Plaintiff learned that Williams had another Lieutenant write a memorandum requesting $26,000 in funding for a new dog, with false statements in the memo stating that "Extensive" training was conducted to rectify "Rosie's" issues, but that she did not respond. Plaintiff was the Canine Lieutenant, and the memo should have been authored by him but because there were false statements, Williams had someone without knowledge of the situation write the fraudulent memo on his behalf. Williams knew that "Rosie" was sadly never given a chance to correct any alleged deficiencies.

67.     Because Plaintiff was never made aware of this, he asked Sergeant Golden for a memorandum explaining the extensive training that was conducted with "Rosie." Golden immediately became confrontational via email and put the entire removal of "Rosie" on Captain Williams, claiming he was the expert and knew about dogs. Captain Williams was an apprehension dog handler for S.E.B. but has no knowledge of scent dogs.

68.     In an email to Sergeant Golden, Plaintiff stated that it was the unit's fiscal responsibility to first attempt to correct Rosie, prior to spending $26,000 on a new dog which the handler had already wanted and researched without Plaintiff's knowledge. (During the time, the Sheriff was constantly crying to the Board of Supervisors about his lack of budget but did not seem to care about overspending here and elsewhere.)

69.    Lt. Garrido confirmed with Rosie's Vendor/Trainer and other handlers that Rosie's issues could be fixed and that no one contacted the vendor in order to attempt to correct Rosie's recent issues. Nothing was done in order to try to correct Rosie's behavior before disposing of her.

70.    Nevertheless, Commander Ewell and Captain Williams ultimately approved the purchase of a new dog for Sergeant Golden and the training. In the next year and a half, after acquiring his new dog and training, Sergeant Golden and new dog "Chucky" (Male, Shepard) never became skilled in trailing, more than likely because Sergeant Golden was never proactive like the previous sergeant and never provided "Chucky" with continuous urban searches which "Rosie's" handler did. Sergeant Golden felt missing person searches in order to save lives were not worth his efforts.

71.    On or about August 3, 2020, Captain Williams, in another retaliatory move, suggested to Plaintiff that he should take a break from Canine since Plaintiff oversaw both Canine and S.W.A.T. Plaintiff told Williams that he enjoyed Canine and did not need a break and that no other Lieutenant had worked Canine in the past and had the knowledge that he had. Williams did not want Plaintiff overseeing Sgt. Golden's and Chucky's progress and became upset after Plaintiff questioned him about why he wanted to remove him.

72.    Williams went on to say that he had chosen Sgt, Kevin Brown to be the new Haz-Mat Detail Sergeant who would take the place of the current supervisor upon his retirement in March of 2023. No resumes were requested and none of the other sergeants at the unit were even notified of the job opening prior to Williams making his selection.

73.    Plaintiff had previously spoken to retired Chief Hellmold and Captain Williams about his interest in the Arson Explosives Lieutenant position, and both Hellmold and Williams approved of him getting the position. Plaintiff again asked Captain Williams if he could start training for the Lt. Arson position. Williams said he could. A week later, the State Attorney General's Office requested an audit and an investigation into canine bites. Williams did not hesitate to give Plaintiff the task, based on his experience, despite the fact he wanted to give Plaintiff a "Break" several weeks prior. After the audit was completed, Ewell and Williams thanked Plaintiff for his hard work completing the audit.

74.     On or about August 5, 2020, Plaintiff learned of an Explosive breaching bonus pay litigation meeting from a plaintiff deputy who asked if he was attending. Lt. Garrido was never informed of such meeting. Defendant Williams told Plaintiff he couldn't give Plaintiff access because only certain people were allowed, even though Plaintiff was the S.W.A.T. Lt. who oversaw Breaching. Sgt. Brown and Deputy Ervin Francois were allowed to attend. The exclusion of Plaintiff from the meeting was a clear breach of the protocol.

75.     On or about September 28, 2020, a Los Angeles Superior Court judge ruled that Sheriff Alex Villanueva's attempt to reinstate former deputy Carl Mandoyan was unlawful. Sheriff Villanueva was enraged by this decision, his inability to keep Mandoyan employed at LASD, and the bad media for himself generated by the whole matter. Villanueva would reference the need to avoid "bad media" when he was shown video on the use of excessive force in March 2021. Villanueva would later get caught covering the incident up to avoid "bad media."

76.     The day after the Mandoyan news hit the media, on or about September 29, 2020, Plaintiff was informed that Arson/Explosives Sergeant Dan Tobin's beloved K-9 dog, "Spike," had sadly died in a tortured manner. Sgt. Tobin left his dog in the back seat of the patrol car for over four hours and the dog died from overheating. This occurred after a similar incident had happened in Long Beach. In that incident, the Long Beach Police Department ("LBPD") handled the matter properly with transparency. LBPD informed the media and promptly launched a criminal investigation into the handling officer. However, the incident at LASD would be covered up. Within the next twenty-four hours, Plaintiff received additional phone calls from Department members all asking if it was true about Tobin's dog dying.

77.     Sgt. Tobin had a sordid history of allegedly colluding with a corrupt Sheriff in furtherance of their unlawful conduct. During his tenure as an Internal Criminal Investigator, Sgt. Tobin was allegedly instructed by executives to help get deputy Robert Lindsey Jr. prosecuted because reportedly Lindsey's father and Ex-Commander Robert Lindsey Sr. had refused to participate in fraud, and they were retaliating against him. False allegations were made against Lindsey Jr. and another deputy, Charles Rodriguez in how they handled a drug arrest. During court proceedings, the suspect who was arrested and who had made a complaint about the two deputies was nowhere to be found. The prosecution was unable to move forward without the

Suspect/Witness testimony. Tobin told the D.A. that he would contact the suspect/witness's sister and offered a deal for him to testify against Lindsey Jr. and Rodriguez.

78.      Tobin reportedly went above and beyond a normal search for the witness, and his actions assisted the effort to frame Lindsey and Rodriguez, as he told the sister that if her brother (Suspect/Witness) testified in court that they would give her brother immunity and circumvent the immigration process and get him a visa in order for him to legally stay in the country (although the suspect had been arrested numerous times and admitted that the drugs found were his); only if he, in turn, testified against the deputies The suspect accepted the deal and testified in the trial.  The deputies, Lindsey Jr. and Rodriguez, were ultimately acquitted of all charges, but were relieved of duty without pay, and were emotionally and financially distressed for over five years. The awareness of Tobin's past misconduct added to the distress of team members in S.E.B over the cover up of Spike's death. Lt. Garrido contacted Williams and insisted that an investigation be conducted into Spike's death. Williams claimed that he would do a real investigation. Lt. Garrido and staff contacted all handlers in the K-9 unit reminding them about the care they must take to not kill their dogs through overheating them. Garrido also text messaged Williams an article about the dog dying from overheating in Long Beach. Lt. Garrido was concerned that a criminal investigation into the death of Spike would be illegally obstructed.

79.      On or about October 1, 2020, Plaintiff received several phone calls from personnel inquiring if Tobin had been placed under investigation but expressing their concerns that Williams and LASD would attempt to cover it up. Plaintiff told the callers that Captain Williams indicated that an investigation has been initiated, but that it was not in Plaintiff's Detail, so he did all he could do and did not know for sure. LASD never conducted any investigation and Lt. Garrido learned this in Fall of 2021 while working the Operations position.

80.      It is alleged, upon information and belief, that the orders for Williams to do a cover up of Spike's death came from the Sheriff, based on his concern of getting "bad media," the day after the court ruling on Mandoyan's termination.

81.      Plaintiff was further retaliated against by Villanueva, Williams, and LASD. In October 2020, Plaintiff was contacted by a Homicide Detective, initials R.L. R.L. worked at East Los Angeles Station as a deputy and was very close to the Villanuevas. R.L. asked how Plaintiff

knew Eli Vera. Plaintiff told him that he met Vera working a specialized team. R.L. told Plaintiff that Murakami wanted to initiate an investigation into Plaintiff, but that he (R.L.) told Murakami that he would handle it and talk to Plaintiff in person.

82.     R.L. went on to say that his son who was assigned to East Los Angeles Station, had tested for S.E.B., and not done well. R.L. told Plaintiff that someone told him that the sergeant who scored his test was told by the Plaintiff to give his son a low score to prevent him from coming to S.E.B. Plaintiff explained to R.L. that he had no idea who he was until that day and had no idea who his son was, nor that he had even tested for S.E.B. Plaintiff told him that he respected him for confronting him (Plaintiff) and assured him that Plaintiff had nothing to do with it.

83.     Believing the false allegations came again at Villanueva's direction, Plaintiff told R.L. to convey to Villanueva to stop accusing Plaintiff of wrongdoing. R.L. stared at Plaintiff, surprised he knew this came from Villanueva, and told Plaintiff, "You're a sharp man."

84.     On or about October 24, 2020, Captain Williams called Plaintiff in his office and asked if he was aware that two deputies were filing grievances for breaching bonus pay. Plaintiff told Williams that he was aware of it and supported the two deputies who had more seniority than others who were placed on the list by Brown and Williams. Williams told Plaintiff that the two breachers who were filing the grievance were not worthy of the raise. Plaintiff told him that they were both knowledgeable Explosive breachers and there was nothing documented to prove that they were not deserving of a raise and that he was basing his decision on what Sgt. Brown   told him without any proof. Williams continued to express anger over the deputies filing grievances over being cheated out of their pay.

85.     On or about November 8, 2020, while out on an injury, Captain Williams contacted Plaintiff regarding a meeting of supervisors with PPOA President Rhodes about Explosive breaching pay. Williams was informed that a group of supervisors discussed reasons why they should be granted the bonus pay and that the bonus pay did apply to Sergeants and Lieutenants. Captain Williams sounded disturbed that they met with the union representation and said it just didn't look good.  Williams ended by saying Ewell wasn't happy with the grievances and thought it made SEB look bad. Williams was also angry about Plaintiff's presence at the union meeting and attempted to intimidate him into not having further discussions with the union.

86.    On or about December 8, 2020, another explosive breaching meeting occurred, and Plaintiff was not invited to attend the meeting. On or about December 21, 2020, the majority of S.E.B. supervisors met and spoke about the breaching pay bonus. All in attendance agreed they should receive the bonus pay. This was in addition to the email that Plaintiff sent out on February 26, 2020, to Union President Tab Rhodes about their concerns of the pay bonus.

87.    On or about January 15, 2021, Plaintiff received information from Personnel Division stating that Sgt. Kevin Brown had been approved for the Explosive breaching pay bonus and awarded several years of back pay. Plaintiff was Sergeant Brown's direct supervisor and could have qualified for the pay just like the Arson/Explosives Lieutenant. There was also a copy of a bonus pay request form (446) attached to the email by personnel. The form was signed and dated by then Acting Chief Jack Ewell on January 19th, 2021.

88.    On or about February 1, 2021, approximately eleven supervisors including Plaintiff filed formal grievances requesting Explosive breaching pay bonuses. Based on the grievances, Sgt. Brown's approved Breaching bonus pay was cancelled, as Williams believed that if Brown were paid, LASD would have to pay everyone else. Lt. Garrido later asked Ewell why Brown's approved bonus pay was cancelled. Ewell replied, "He didn't want it." Plaintiff also asked Ewell why he signed his bonus request. He replied, "I sign lots of things, I don't remember signing it." Sgt. Brown is currently grieving the pay Chief Ewell told Plaintiff that Brown did not want.

89.    On or about February 2021, Williams returned from work from his alleged injury apparently only because Undersheriff Murakami called him and asked him "when are you coming back to work to get promoted?" Williams replied, "Tomorrow."

90.    On or about February 8, 2021, Plaintiff sent an email to Chief Ewell and Tactical Commander Robert Lewis, to thank them for Plaintiff's AP score of 100% for Captain and also asked to be considered for the Arson position. The next day, Williams met with Lt. Garrido and told him he wanted Plaintiff to work the Operations position. Plaintiff asked Captain Williams if he would still be the direct supervisor of the S.W.A.T. personnel, and Williams said "yes", and assured him that he would still be S.W.A.T. Lieutenant.

91.     Villanueva's plan remained to bring former East Los Angeles Station deputy and sergeant, Defendant Oscar Barragan, to S.E.B. Barragan was not wanted back at S.E.B. for various reasons including the fact he had displayed acts of cowardness. During a Hostage situation in Boyle Heights when he was assigned to S.E.B. as a deputy, he abandoned his contact team and retreated into a room when the suspect came out and began firing at team members.

92.     On or about February 11, 2021, Williams told Plaintiff to cover Canine, S.W.A.T. and Operations. This was odd that Plaintiff now had three collaterals after Williams told Plaintiff that he was overworked several months prior.

93.     On February 22, 2021, Williams threatened Plaintiff to not get any further involved in the breacher pay issue, saying that any supervisor here "could be moved at any time." Plaintiff advised Williams that in addition to withheld bonus pay,  personnel were concerned about the fact that Sgt. Pat Golden had wrongfully received a large sum of backpay of the breaching bonus for a period of time that he was not even assigned to S.E.B. Plaintiff also reported to Williams that Sgt. Brown improperly directed all breachers, minus the 17 breachers picked by him, to return their breaching bags and equipment although they were still performing explosive breaching duties.

94.     In or around this time, Captain Williams received dozens of grievances from the deputies asking for the delayed explosive breaching pay back earnings going back to 2014. Williams instructed Plaintiff to illegally tell the deputies that they could not file grievances. Plaintiff indicated that he could not do that, and would refuse to do that, as that was their legal and policy right to file grievances.  Williams again responded, "Deputies don't file grievances at S.E.B. and ALADS does not run S.E.B., these deputies need to stop crying and just go to work." Williams ultimately refused to accept the grievances from the ALADS representatives.

95.     Also in February 2021, Williams asked Plaintiff about the grievances filed by the supervisors for explosives breaching pay. Plaintiff informed Williams that the breaching program was widely known to have started in 1999, and that multiple rosters showed there were over 20 deputy breachers and multiple supervisors including lieutenants on the rosters. Williams disputed what Plaintiff said and stated, "Nope, never over 18 and never a lieutenant." Williams then asked, "Why didn't you tell me you were talking to PPOA about the grievances?" Plaintiff told Williams

he found it peculiar that Williams picked and chose who were more worthy of getting the bonus pay, and others were to remain quiet.

96.     The rosters were deleted from the S.E.B. files sometime after Plaintiff's meeting with Williams in order to prevent LASD from having documentation to support having to pay breachers their earned back pay. Several employees later tried to look for the files, but they were found to be erased. Brown and Francois were seen walking around the facility during the weekend and time of day when hardly any personnel were present. Sergeant Brown and Francois were seen obtaining breaching literature. Coincidentally, during the same time period and without knowledge that Brown, and Francois were seen collecting materials, Plaintiff went to one of the S.E.B. large dumpsters on the premises to throw something away. When Plaintiff looked inside the dumpster, he observed numerous literatures related to Explosive breaching inside of it. They were items apparently disposed of by Brown and Francois earlier that week in order minimize payment and to keep the Explosive Breaching Plaintiffs from having evidence to support their cause.

97.     On or about March 3, 2021, following the meeting with Captain Williams several deputies complained to Plaintiff about the fact that the attorneys for ALADS were indicating that LASD would only be paying back the explosive breaching pay retroactively to 2014. 2014 is the year Captain Williams and Commander Ewell had lied about, telling the County attorneys that the program went "Full-Time in 2014," and that before that, deputies were only "Part-time" breachers; therefore, did not meet the county code qualification." On the contrary, the program was always full time but only became an issue because of the pay.

98.     Some of the personnel now began to observe and realize that Sergeant Brown and Deputy Francois were withholding information from the ALADS attorneys on purpose to deprive breachers of backpay and were being told by Captain Williams and Commander Ewell that if they did it, they would be taken care of with promotions.

99.     Plaintiff advised one of the grieving deputies that he felt at the time that there was no possible way that the ALADS attorneys could not have been provided the historical breaching rosters and manuals by Brown and Francois that were available to everyone in the shared files. These items would prove that there were more than 20 breachers and show that the breaching program was active going back prior to 2014. The deputy asked Plaintiff if he could provide the

documents because no one could find them. The deputy wanted the documents so he could present them to the ALADS attorneys and confirm that they had indeed received the material from Francois and Brown. The deputy provided the ALADS attorney the documents and the attorney said that he had never heard of, seen or been given such documents. This proved that Brown and Francois, under orders from Williams, had fraudulently withheld the documents.

100.    After the deputy provided the documents to the ALADS attorneys, Chief Ewell and Commander Williams lied and declared that they did not approve these draft SEB manuals. However, Brown actually told the truth when confronted and authenticated the Draft manuals and described them as a "work in progress."

101.    The draft manuals and historical rosters were strong evidence that contradicted the county's then position that the number of employees that performed Explosive breaching was fixed at 18 in February of 2020. Based on those draft manuals, the judge ruled that deputies conducting Explosive breaching should be paid the bonus pay back to its inception in 1999 and not 2014 as Ewell and Williams lied and stated.

102.    In the next 45 days, the ALADS attorneys provided the court these newly acquired documents. The court ruled that all affected deputies (Approximately forty-five present and former breachers) should receive the backpay going further back than 2014. The pay that Williams and others at LASD had tried to fraudulently withhold from LASD employees and would be paid as a result of Lt. Garrido's efforts and whistleblowing, was over $3 million.

103.    On or about March 11, 2021, Plaintiff received information that a team member was seen not wearing their proper uniform in public. Plaintiff authored an email regarding uniform appearance to all S.W.A.T. personnel and a copy of the warrant policy of Knock and Notice, and who were under his direct supervision. After Plaintiff sent out the email, Captain Williams, who was promoted to Commander at the end of the week, questioned Plaintiff about the purpose of his email. Plaintiff explained to Williams the legitimate purpose for the email. Captain Williams angrily told the Plaintiff, "This shit is gonna to stop… "I've been dealing with your shit for two years." By "shit," Williams meant he was angered about having to pay more deputies' the explosive breaching back pay they had earned, and Lt. Garrido doing good work with integrity.

104.

105.    On or about April 2021, East Los Angeles Alumni Defendant Thomas Giandomenico was promoted by Villanueva to Captain of S.E.B. after being assigned to Undersheriff Murakami as his Aide. Giandomenico had previous experience at S.E.B. but was never respected in the unit.

106.    Plaintiff told Defendant Giandomenico that he remained very interested in going to Arson Explosives and hoped that he would still be selected for the position. Giandomenico told Plaintiff that Defendant Barragan, who had just been transferred to S.E.B., had asked him for the position too, despite him being unqualified for the position. In that conversation, Giandomenico made an odd and revealing reference to Eli Vera being Lt. Garrido's "buddy."

107.    In the next coming months, Chief Ewell assured Plaintiff that he was going to get the Arson job and not to worry. Plaintiff told Chief Ewell about the conversation with Giandomenico where he mentioned that Lt. Barragan was interested. Chief Ewell told Plaintiff "Lt. Barragan is going to have to wait his turn; you're next."

108.    Another act of retaliation against Plaintiff occurred on or about April 23,2021, within several weeks of Defendant Giandomenico's promotion and assignment as Captain, Giandomenico told Plaintiff that he was no longer the sole S.W.A.T. Lieutenant. The purpose of removing Plaintiff from the sole S.W.A.T. Lieutenant was so he would also lose future bonus breaching pay of the kind that he was grieving, because he was no longer the "FULL-TIME" S.W.A.T. Lieutenant as defined in the pay code. Giandomenico told Plaintiff that all S.W.A.T.-related matters would be discussed by all three lieutenants after Lt. Garrido had handled it with no issues for the past 3 years. On or about April 30, 2021, Plaintiff asked Giandomenico if he would be allowed to go to dive school, as this would certify him to get the 5.5 percent Dive bonus. Captain Giandomenico stated that, per Joe Williams, Plaintiff could not go until there was an opening. This was not past practice, and Plaintiff was once again deprived to go to any training to receive any bonus pay.

109.    On or around June 2021, Plaintiff received a citizen complaint regarding personnel supervised by Defendant Barragan. The complaint was made by a couple who alleged that personnel assigned to S.E.B. had used inappropriate techniques during a contact and arrest. Plaintiff quickly read the complaint and inferred, from his experience, that the accusations made appeared to be

1  outrageous, false, and self-serving. The complaint was easily disputed and easily investigated, but

2  policy and due process required that they seriously and fairly investigated, even if Plaintiff assumed

3  there was no merit to the allegations. Plaintiff assigned the complaint to Lt. Barragan. Several weeks

4  later, Plaintiff received the investigated complaint from Barragan for review.

5      110.    Barragan wrote short paragraphs about what transpired and ultimately said that the

6  deputies were not involved in wrongdoing. However, Barragan did not attempt to establish or

   document why the complainants' allegations were false. Plaintiff had been told numerous times by
7
   other Department members that Barragan was incompetent, never completed his paperwork on time
8
   and would always try to simplify paperwork or get others to complete his paperwork. His draft of
9
   the complaint confirmed everything that Plaintiff was told about him and lack of knowledge of

10  Department policy. The normal process is that after Operations asked for corrections, the person

11  handling the complaint returns it to Operations after the corrections are made. Plaintiff instructed

12  Barragan to make corrections.

       111.    On or about July 13, 2021, Defendant Barragan by-passed Plaintiff and sent the
13
   incompetently written complaint to Defendant Giandomenico. Captain Giandomenico, in turn,
14
   signed and submitted the complaint to Division as originally submitted to Plaintiff by Barragan and
15
   without any corrections, or Plaintiff's knowledge. Several weeks later, staff at the Division called
16
   the Plaintiff and asked if he had read the complaint because it was horribly written.  Lt. Garrido

17  confirmed that he had asked Barragan for corrections but had not seen it since.

18      112.    Captain Giandomenico told Division personnel he and Commander Williams were

19  both okay with the way Barragan submitted the complaint. Also, Barragan lied to employees that

   if he did what Plaintiff asked for and wrote too much, the complaint would go to I.C.I.B., resulting
20
   in a criminal investigation into the employees. Division personnel refused to sign off on the
21
   inadequate complaint. The complaint went back and forth for several months, and Plaintiff was not
22
   informed of the final version.

23      113.    Several weeks later, Plaintiff learned that Defendant Barragan was still lying and

24  telling the involved employees and others at S.E.B. that Plaintiff was trying to burn deputies by

25  making them write more. Barragan lied that he was saving the deputies from being relieved of duty.

114. On or about June 21, 2021, Plaintiff was forwarded an email from his subordinate Canine sergeant. The email was from a defense attorney representing the County of Los Angeles. He was informed that Plaintiff was the supervisor for an applicant of an injury claim. The applicant was Bernard Shockley who is the best friend and neighbor of Commander Williams.

115. The attorney stated that Deputy Shockley was claiming a new injury while he was out on an existing injury. During the injury report, Deputy Shockley claimed he was "forced" to care for his dog while out on injury and this supposedly caused him another injury. Plaintiff emailed the attorney that Deputy Shockley had been assigned to Canine since April of 2003 and has been absent from work regarding work-related injuries several times. Plaintiff told her that Shockley had never complained of caring for the dog in the past and that it was at the handler's discretion to keep the dog. Plaintiff also told her that Shockley had been in possession of his Cal-card and made purchases for his Canine since his absence in 2020. The card is used to purchase food and other items as well as veterinarian care.

116. Plaintiff recommended to Captain Giandomenico that they remove the canine from Deputy Shockley's possession, so that he did not allege any further injuries to himself from the dog. Giandomenico never responded to Plaintiff's guidance. Several months later, Deputy Shockley told Plaintiff that he was not returning to work pending his retirement and wanted to officially retire his dog.

117. Eli Vera announced he was running for Sheriff and Plaintiff donated $1,500 in his name to Eli Vera's Sheriff Campaign. Villanueva retaliated against Vera and his family for Vera running against him and would retaliate against the Plaintiff as well for exercising his free speech rights supporting Vera.

118. Villanueva has been retaliating against those that he believed supported his perceived rival, even after Vera did not make it into the runoff election against the Sheriff. For instance, Villanueva blocked Vera's secretary, Cynthia Gallegos, from an earned promotion simply because Villanueva assumed she was supporting Vera's election.

119. On or about August 6, 2020, a sergeant by the name of Joaquin Rincon was approved, vetted by Assistant Sheriff Robin Limon, Chief Ewell and Commanders Robert Lewis, Joe Williams, and Plaintiff and then removed by Villanueva because of his friendship with Eli Vera.

Joaquin Rincon had purchased uniforms and was given a loaner vehicle with equipment and had been training with S.E.B. members for approximately one year and passed a rigorous M-4 carbine tactical school. Joaquin Rincon was approved by both divisions for transfer but was ultimately removed and denied final transfer to S.E.B by Villanueva.

120.    Plaintiff learned that Lt. Barragan contacted East Los Angeles Alumni Sergeant Liz Aguilar, informing her that he did not want Joaquin Rincon coming to S.E.B. Lt. Barragan asked Aguilar to tell the Sheriff that Rincon was friends with candidate for Sheriff Eli Vera. Barragan told Aguilar that the plan would work, and that Chief Ewell and Commander Williams could not do anything to stop the plan if it came from the Sheriff. Chief Ewell was upset that Barragan sabotaged Rincon's well-deserved promotion. Aguilar has reportedly been out for about a year supposedly Injured on Duty, but has been actively working on Villanueva's campaign, while drawing pay from LASD.

121.    On or about August 2021, Plaintiff was informed that the Sheriff was going to "Initiate a case" on the Plaintiff and get him out of S.E.B. for standing up to corrupt practices too often, for supporting Eli Vera's campaign and for allegedly asking personnel at S.E.B. to support Eli for Sheriff.  Plaintiff laughed and said, "I never even say the word "Eli" at work."

122.    On or about August 2021, Defendant Giandomenico called a meeting with Lt. Burakowski, Lt. Barragan and Plaintiff. They were asked about the status of employees off work due to injuries, and the fleet of vehicles. Plaintiff stated that shortly after his arrival at S.E.B. in May of 2018, Lt. Burakowski asked him if he wanted to take over the fleet collateral. They discussed that it was past practice, allowed by unit commanders, that vehicles of personnel who were out on injuries kept their vehicles during their time off on medical leave. This was done so that they could store their gear in them, use them for travel to medical appointments and at worst, if a large-scale emergent incident occurred, they would have their gear readily available and possibly respond, even if off work on injury. Giandomenico said he was good with personnel keeping their vehicles for a period of 6 months and asked Lt. Garrido to give him a list of people who were out over 6 months on injuries and still possessed their cars.

123.    Plaintiff informed Giandomenico that Commander William's neighbor and best friend Canine Handler Deputy Bernard Shockley has been out over six months and warned him that

Commander Williams was not going to allow Giandomeinco to take back Shockley's car.
Giandomenico said he would handle it.

124.    Plaintiff provided Giandomenico a list of personnel that had been off for over six months. Approximately one hour after giving Giandomenico the list, he called Plaintiff to his office and said "Dawg, you were right, Williams won't let me take Shockley's car back." When Lt. Garrido asked Giandomenico about the others with cars over 6 months, he said "Don't worry about it."

125.    On or about September 7, 2021, Plaintiff advised Chief Ewell that he was receiving numerous complaints from the S.W.A.T. personnel that during Lieutenant Barragan's weekly S.W.A.T. duty, Barragan was unable to determine when and if S.W.A.T. personnel were needed. Personnel indicated they were being asked to respond to tactical incidents that they should not be participating in.  It was a running joke that the weeks the Plaintiff and another lieutenant, initials S.B. had the duty, the teams would actually be able to get their needed rest. These were incidents that S.W.A.T. should not be responding to and should be handled by the Station or specialized units requesting them. The requests were issues that could cause liability to the Bureau. Plaintiff showed Ewell several of the overtime summaries of the weeks that Barragan was covering the duty. Barragan was manufacturing work and creating safety risks, because he was unable to make sound decisions and wanted to get excessive overtime pay for himself. (Defendant Giandomenico told Plaintiff he always had a dislike for Lieutenant S.B., after she questioned him about misrepresenting his timesheets when they were working as peer lieutenants at S.E.B.   Giandomenico said he could not wait for S.B. to retire.)

126.    On or about September 10, 2021, Plaintiff spoke to Assistant Sheriff Bruce Chase who had worked at S.E.B. as a Deputy, Operations Sergeant, K-9, S.W.A.T., and Operations Lieutenant. Chase confirmed that it was past practice, since the Arson position operated under the umbrella of S.E.B., that the lieutenant with most seniority and experience should have first right of refusal to the bonus pay position of Arson Explosives Lieutenant. Chase spoke to Assistant Sheriff Robin Limon. Limon was the Assistant Sheriff assigned to Special Operations Division and to oversee S.E.B. The two Assistant Sheriffs agreed that Plaintiff was the best person to take over the Arson/Explosives Lieutenant position.

127.   On or about September 14, 2021, Plaintiff received a text message from Commander Joe Williams, stating that "the AED job will not be an issue. You should start training shortly. I'll ask Tom to move forward with the selection."

128.   Captain Giandomenico met and told the Plaintiff the same day, "Congratulations, you got the job, you're the next Arson Lieutenant," and added that he could start the necessary training for the position immediately.

129.   Giandomenico further stated that Plaintiff had worked hard for him, and that Lt. Barragan only wanted it for the bonus pay and overtime and that was one of the reasons why he chose Plaintiff. Defendant Barragan had a prior history of adjusting his normal hours to work overtime and was quickly removed as a Sheriff's driver when he was a sergeant during Sheriff McDonnell's term because he frequently was found fraudulently adjusting his timesheets and working over the monthly allotment of overtime, and in violation of policy.

130.   On or about September 16, 2021, Plaintiff completed his first mandatory online class for the position of A.E.D. Plaintiff completed all additional classes by October 10, 2021.

131.   On or about September 21, 2021, three days after Captain Giandomenico told Plaintiff that he had the Arson position, Plaintiff learned Captain Giandomenico requested Lt. Barragan to receive a Dive Bonus pay immediately and Chief Ewell approved it. This pay was a 5.5 % bonus that was typically only given to one Lieutenant at a time, although another Lieutenant who was out on an injury was still receiving the bonus. This was the bonus Plaintiff had asked for the last two years but was told that he could not get because Plaintiff was not allowed to attend Dive school. Now three out of four (Plaintiff was not one of the 3) other lieutenants were receiving bonus pays, although Plaintiff was handling Operations, S.W.A.T., and Canine.

132.   Lt. Barragan had not been re-certified as a Diver since his last assignment to S.E.B., as a deputy in 2015. He was only assigned to the unit for four months.

133.   On or around October 8th, 2021, Lt. Garrido received information that Sergeant John Hanson from Arson Explosives was attempting to choose personnel to replace vacancies before his retirement in March of 2022.  Hanson had a history of questionable conduct, including purchasing an S.E.B. anniversary item and selling it online for a large profit and had allegedly taken items from the SEB store without paying. When Lt. Garrido had learned of the possible taking of

items, he immediately called a county locksmith to change the lock, purchased and posted "authorized personnel only" signs on the interior glass window to the doors, and kept the only key in his office. Sgt. Hanson also removed his plates from his vehicle for several years so that he could avoid Fast Track toll fees during his commute to his residence in San Diego. When Lt. Garrido told Captain Williams about it, he disregarded him. Sgt. Hanson also took and drove an armored Suburban to a So-Fi Stadium event with several non-Department related friends, while off duty, reportedly as a favor for the Sheriff. Sergeant Hanson was never counseled or reprimanded for any of these and other incidents because of his relationship with Villanueva

134.    On or about November 6, 2021, Plaintiff contacted a Hazardous Materials Instructor so that he could register for one of the one-week mandatory class necessary to be the Arson Lieutenant. After several conversations, the instructor told Plaintiff that he could attend a class that started on February 6th, 2022. Once Plaintiff completed this class, he only needed two additional classes to certify Plaintiff as a Bomb Technician. On December 20th, 2021, Captain Giandomenico signed the training memo for the class, which read, "Lieutenant Garrido will replace Lieutenant Susan Burakowski upon her retirement in early 2022." In early November 2021, Chief Ewell asked in front of a group of participants if Plaintiff had started training for the Arson position. Plaintiff said that he was already taking courses for the AED job and "in motion."

135.    On or about November 16, 2021, Lt. Garrido was selected as the Branch Tactical Director for the upcoming Super Bowl in 2022, and Plaintiff immediately got to work carrying out his duties. This position led the tactics for security for the Super Bowl.

136.    On or about November 20, 2021, Plaintiff texted Defendant Giandomenico that he was scheduling the one-week training class for AED in January and explained that it was a prerequisite course for Arson prior to attending the 5-week FBI Bomb School in Alabama. The captain replied in approval.

137.    On or about November 24, 2021, the Plaintiff was informed that the Sheriff was upset with him for supporting Eli Vera, for donating to his campaign, and for reporting breaching pay fraud.

138.    On or about November 27, 2021, Carl Mandoyan called Plaintiff and, on behalf of the sheriff, asked Plaintiff three times why he donated $1,500.00 to Eli Vera's campaign. Garrido

1  told Mandoyan that Vera was his friend and his right to do so. Plaintiff had not spoken to Mandoyan
2  for over 2 years prior to the call.

3      139.    On December 8th, 2021, at the request of Sergeant John Hanson of the Arson
4  Explosives Unit, Villanueva went to S.E.B. for Lt. S.B. pre-retirement party. When the Sheriff
5  arrived, a department member heard Hanson greet the Sheriff and say, "We won't make Puerto
6  Rican jokes only Cuban jokes" and the Sheriff laughed. Hanson knew that Vera and Lt. Garrido
7  were both of Cuban descent and that Sergeant Hanson and the Sheriff were both of Puerto Rican
   descent.

8

9      140.    On or about December 13, 2021, after the Plaintiff's conversation with Mandoyan,
10 Villanueva asked Commander Williams to gather several resumes for the Arson/Explosives
11 Lieutenant position. Commander Williams never notified Plaintiff of this, even though Plaintiff was
12 already confirmed for the position. Villanueva stated during a press conference, he asked for
   personnel to speak to him before filing a lawsuit. Subsequently, on December 14, 2021, Lt. Garrido
13 emailed the Sheriff's Chief of Staff, Jorge Valdez several times, asking to meet with the Sheriff
14 regarding the Arson position. Villanueva never met or talked with Lt. Garrido.

15     141.    On or about December 16, 2021, Chief Ewell told Plaintiff not to worry about the
16 request for several resumes and to submit Plaintiff's resume to him and continue training.

17     142.    On or about December 20, 2021, Plaintiff sent an email to professional staff to
18 process his Arson/Explosives training in February 2022. It was then signed and approved by
19 Captain Giandomenico.

20     143.    On or about December 19, 2021, Lt. Garrido again was informed that Villanueva
   was not happy with Plaintiff for him supporting Vera for Sheriff. Ewell told Plaintiff to keep
21 training for the position.

22     144.    On or about January 4, 2022, Plaintiff responded to a phone call from Lakewood
23 Station regarding a barricaded suspect incident, which involved a resident stabbing his neighbor
24 with a knife and refusing to come out. Williams was impatient and asked for a S.W.A.T. team to
25 respond. Lt. Garrido asked for him to be patient because he believed C.N.T., and K-9 personnel
   could find a peaceful resolution. Ultimately the suspect surrendered to Canine personnel. This

demonstrated Williams' inexperience. The police operation was a success and Williams texted Plaintiff "You were right."

145. On the night of January 4, 2022, Plaintiff's back tightened up and he experienced a stress-induced amount of pain. Plaintiff remained on duty and on call until January 6th when he was taken off work per a doctor's order. The stress was due to the ongoing retaliation.

146. On or about January 5, 2022, because of the ongoing hostile actions by the Sheriff and Commander Williams against Plaintiff, Plaintiff called the Intake Specialist Unit and reported the Hostile Work Environment against him by Commander Williams and others.

147. On or about January 6, 2022, Plaintiff spoke to Chief Ewell about the hostile work environment report he made. Plaintiff told him that he had been harassed and retaliated against and that he did not get the Arson/Explosives position because of the Sheriff's retaliation. The Chief agreed that Plaintiff did not get the job because of the Sheriff.

148. Assistant Sheriff Chase was present during several occasions where the Sheriff stated that Plaintiff was supporting Eli Vera for Sheriff and that Plaintiff had given $1500 to his campaign. During one of the meetings, Chase told Villanueva that he still supported Plaintiff for the Arson position because Plaintiff was the most qualified.

149. On or about February 21, 2022, Defendant Giandomenico called Plaintiff about his injury. Lt. Garrido asked Giandomenico if anyone had been selected for the Arson Lt. position. Giadiaminco told Plaintiff that he had "heard" that Oscar Barragan was chosen for the Arson position and that he was just waiting to be vaccinated. (As Captain, Giandomenico would not have just "heard' of such a personnel move.) This placement of Barragan in Lt. Garrido's earned position was blatant retaliation by Villanueva, Giandomenico, and Barragan for Lt. Garrido's support of Eli Vera, as well and for the whistleblowing. In the same conversation, Giandomenico showed his hand that the Defendants were further retaliating against Plaintiff by initiating fake allegations and a fake investigation. In this same conversation, Giandomenico asked Plaintiff if he had the receipts for fuel purchases prior to January 4th.

150. Plaintiff advised Giandomenico that he would have to look for the gas receipts or could drive to the gas stations to get copies of them. Giandomenico told Plaintiff not to worry about it and that he would take care of it. During the conversation, Plaintiff told Giandomenico that he

was taking care of various documented and accepted work-related injuries and if the doctor placed
him off work duties for several more months, he would return the vehicle SH7616 to him.
Giandomenico replied, "That's a good call and would set a good example."

151.    On or about March 29, 2022, Assistant Sheriff Limon was framed and demoted by
the Sheriff after he was exposed for covering up excessive force.

152.    On or about March 31, 2022, Defendants Giandomenico and Barragan met with all
Arson personnel and announced to them that Lt. Barragan was Lt. Burakowski's replacement. Sgt.
Brown and Deputy Francois were given the two highest paid positions at S.E.B., Sergeant (Hazmat)
and Deputy (Only Explosive Breacher), for assisting Chief Ewell, Commander Williams, and
Captain Giandomenico with fraudulently withholding breacher pay documents, and only providing
certain documents to ALADS attorneys in order to deny numerous deputies of Explosive Breaching
backpay.

153.    On or about Spring of 2022, Defendant Joe Williams contacted veterinarian
Yolanda Cassidy about Lt. Garrido and the K-9 Spike who died of overheating in Sgt. Tobin's
patrol car. Williams expressed anger over Lt. Garrido reporting the cover up of the killing of Spike
and told Cassidy that he was calling her to warn her. Williams told Cassidy "Fuck Garrido."
Williams lied to Cassidy that Garrido was going to pull the veterinarian into the middle of the death
of Spike and cover up scandal. Ms. Cassidy reminded Williams that she did not treat Spike and did
not know anything about the incident. At that time, Cassidy did not know that Williams was going
to put her into the middle of it by writing a fraudulent memo claiming she did treat Spike and that
she made statements about his death.

154.    On or about April 1, 2022, following the demotion of Assistant Sheriff Limon,
Commander Williams was promoted to Chief of Court Services Division and Captain
Giandomenico was promoted to Plaintiff's Division as a Commander.

155.    On or about April 13, 2022, Plaintiff texted Commander Giandomenico that he
would be going out of town starting April 14th. Giandomenico acknowledged the Plaintiff and
replied "OK." The next day, just over 24 hours after the text, Giandomenico began to anxiously
text Plaintiff, stating "I have to get your car, brother." The Plaintiff told him he had already left.
Commander Giandomenico asked if Plaintiff's vehicle was in his front yard. Plaintiff replied "No,

it's in my garage." From this point forward and for several days, while Plaintiff was out of town, Commander Giandomenico continued to question Plaintiff about returning the vehicle, via text, asking when he was in fact returning it, after Plaintiff had already explained it to him. Giandomenico would not call the Plaintiff and just kept texting. Prior to this date, Giandomenico and Plaintiff had ongoing civil communications. What changed now was that Giandomenico was now under orders to assist in putting a fraudulent criminal case on Lt. Garrido.

156.    Distressed over the harassment, Plaintiff told the Giandomenico, "So, you're taking the Tahoe, after three months, to park and secure it deep in the lot. I find this odd, after I openly tell you I would be out of town before I leave and others are never asked to bring cars back and we couldn't even get Joe's (referring to Chief Williams) best friend's (referring to Deputy Bernard Shockley, IOD since 08/2020) back after a year and a half. Very unlike you. Odder after Eli gets an endorsement from PPOA and a week after a covered-up use of force hits the media and reveals scandal." (Lt. Garrido was unaware at this time about Williams calling Cassidy to angrily lie and complain the Plaintiff reporting the cover up of Spike's death.)

157.    It should be noted that Deputy Shockley drove over 2,000 miles during the first four months that he was off work due to his work-related injury (between 08/2020 and 12/2020). Deputy Shockley recently returned his vehicle to S.E.B., after being IOD two years. Captain Williams had also driven his S.E.B assigned County Tahoe while IOD for a period of 3 to 4 months. It was extremely odd that Commander Giandomenico approved and waited until Plaintiff left town to request the County car the following day, as if it was an emergency. To Plaintiff's knowledge, this has never occurred with any other employee of S.E.B. It was evident to Plaintiff that the Sheriff and his inner circle and servants were trying to frame and harass Plaintiff.

158.    On or about April 23, 2022, Plaintiff became aware that Department vehicles were being requested back to their prospective unit of assignment from personnel who were out on injuries, as an excuse for demanding return of Plaintiff's car. Plaintiff was later advised that there was a fake rumor circulating throughout the Department that Plaintiff was seen out of state pulling a boat with his department assigned Chevrolet Tahoe and that Sheriff Villanueva was one of the individuals spreading the rumor. At that time, Plaintiff dismissed the rumor because it was so outrageous.

159.    Later that evening, Plaintiff received a call from now retired Commander Eli Vera. During their telephone conversation, Plaintiff advised Mr. Vera about the false rumor that was being spread about Plaintiff's sighting out of state with his County Tahoe, towing a boat. Mr. Vera said he wasn't surprised to hear someone would start such a rumor, about anyone perceived to be supporting his campaign.

160.    Shortly thereafter, Vera told Plaintiff that he had spoken with Lieutenant Barragan who made a comment about wanting no part of Plaintiff being at the lake with the Tahoe. Mr. Vera understood this as Lieutenant Barragan not wanting to be blamed for what he knew to be a false allegation against Plaintiff.

161.    Plaintiff knew it was impossible for him (Plaintiff) to drive anywhere out of state and back with the mileage he accumulated since January 4, 2022. But the Defendants did not care about the facts.

162.    On or about April 26, 2022, after removing Plaintiff of the Arson position he was given in September, Sheriff Villanueva placed Lt. Barragan on the intend-to-promote list despite the fact that Villanueva knew that Barragan was woefully unqualified.

163.    Villanueva was aware that Defendant Barragan had a history of incompetence at LASD, a reputation that he was unable to make proactive arrests and was afraid of testifying in court. As a deputy at S.E.B., Barragan was known as a coward because he abandoned a team plan and retreated into an apartment room when the rest of the team continued to encounter an armed suspect who was firing at them during a hostage rescue situation. When he was assigned as a Sergeant at East Los Angeles, Barragan was relieved of his field supervisor assignment after moving two dead bodies into a gutter for no reason during a crime scene. Barragan was relieved of his supervisor duties by a now retired Commander with the initials R.W., during the double homicide incident. Commander R.W. stated that it was the worst supervised scene he had ever been involved in and that he had never experienced "such stupidity" by a department supervisor.

164.    As a Sergeant, Barragan briefly served as Sheriff James McDonnell's driver. Barragan was caught manipulating his time sheets to incorporate his "always wanted" overtime and was warned by the Sheriff's executive staff to discontinue doing it. When he continued, Sergeant Barragan was told that he could no longer represent the Sheriff and he was asked to leave the

prestigious assignment. During his tenure as a Lieutenant, Barragan was never entrusted with the role of Watch Commander. While assigned as a Lieutenant at Operations Safe Streets, Barragan was consistently late with uses of force documents, complaints and other administrative paperwork. At some point, Lieutenant Barragan attempted to hand off complaints to a Sergeant because he was too incompetent and lazy to handle them. The Sergeant refused to do Lt. Barragan's work. Lieutenant Barragan also failed to respond in a timely matter to deputy-involved shooting directly involving the Gang Surveillance team that he was assigned to supervise. Barragan was counseled about the issue.

165.    Barragan also frequently engaged in other misconduct at LASD. For example, in November 2020, Barragan falsified and submitted a memorandum to his unit commander requesting payment of 160 hours of his excess vacation time stating he was intending to retire in December of 2021. Lieutenant Barragan doctored the memorandum so that he could be paid 160 hours and not 80 hours that all Division Chiefs requested their personnel to get down to at the time. Barragan also continued to mishandle administrative paperwork, mis-manage calls and overtime while assigned to S.E.B. Personnel assigned to Operations Safe Streets and S.E.B personnel also acknowledge that Barragan is never found at work, just like his previous assignments. Barragan uses S.E.B. teams to serve warrants which do not fit the criteria for the use of a S.W.A.T. team but does so for his own personal gain to make it look like he is hard at work. This is not an employee you look to promote. The Sheriff is aware of all Barragan's misconduct and his incompetence but gave him the promotions because he would be loyal to him and help with his campaign.

166.    On or about April 28, 2022, Assistant Sheriff Limon filed a claim against the Department. In the allegation on page 8, Item #22, Limon stated, "A Lieutenant, initials J.G. was qualified and approved and vetted through the chain of command through the Chief and the Complainant for a promotion to a coveted position. J.G. attended the required training, but was improperly removed from the selection process, by the Sheriff in retaliation, in violation of First Amendment rights, because the Sheriff discovered he donated money to Eli Vera's campaign." Following the news of this lawsuit, Plaintiff received several phone calls about the statement in the claim which referred to Plaintiff Joseph Garrido as "J.G.," because it was well known at LASD the Sheriff had wrongfully retaliated against Lt. Garrido.

167.     On or about May 2022, Plaintiff went out of town as authorized by Commander Giandomenico. Chief Ewell, Giandomenico, and Barragan met with the Injury & Health Support Unit regarding Plaintiff's injury status. Plaintiff had only been out for four months. After the meeting, they fraudulently altered Plaintiff's "Schedule A" letter about off-duty protocols to January 10th, 2022, which was supposed to be sent via certified mail.  The Schedule A letter was never sent via certified mail. LASD lied about sending it to Plaintiff on January 10th, 2022.

168.     Following this meeting, Villanueva directed a fake administrative investigation to be done into Lt. Garrido. The allegation was that Plaintiff took his assigned Tahoe, the county vehicle, out of state and towed a boat with it. An IAB investigation memorandum was filed, signed by Chief Ewell.

169.     On or about May 8, 2022, two new lieutenants began working at S.E.B. Within the next two months, the Sheriff through his subordinates placed four lieutenants at S.E.B. As there were only four lieutenant items at S.E.B., the addition made Plaintiff the fifth and redundant lieutenant. LASD did this purposely to constructively terminate Plaintiff. Many units around the LASD were understaffed of lieutenants and it is feasible to run S.E.B. efficiently with 3 lieutenants, since it had been done for the past three years.

On May 11, 2022, Plaintiff filed a tort claim for damages based on retaliation for whistleblowing and for financial contribution to Eli Vera's campaign against the County. On the same day, he discovered that Sheriff Villanueva, Commander Giandomenico, and Captain Barragan colluded with upgrading Plaintiff's initial fake administrative investigation to a false criminal investigation, stating that he had stolen the county car, towed a boat and stole gas to drive it out of state. ICIB Captain Defendant Catrina Khasaempanth reportedly recognized the corrupt nature of the ICIB referral and expressed reluctance to participate in something so blatantly retaliatory and without merit. Commander Giandiaminco and Captain Barragan both personally met with Captain Khasaempanth and attempted to coerce her to initiate the fake criminal investigation based only on mileage, with no supervisor inquiry and knowing that all S.E.B. members when I.O.D. keep their vehicles and use them to travel to and from department related business. Khasaempanth also questioned the validity of a purported anonymous informant. Giadiaminco and Barragan went over Chief Ewell's head and directly to

Undersheriff Murakami in order have him order Khasaempanth to initiate the fake investigation. Chief Edwin Alvarez joined in and demanded that Khasaempanth take the fake ICIB case, reportedly suggesting that Khasaempanth was being insubordinate with her concern over committing a crime for Villanueva and LASD. None of the parties involved took a second to verify that it was impossible for the plaintiff to travel out of state within the mileage he travelled over the four months that he was off on medical leave. Khasaempanth took the false criminal investigation knowing it was rigged and did not meet the requirements of a criminal investigation. Plaintiff is unaware of a false rigged case of this nature having ever been initiated before in the history of S.E.B. The investigation was upgraded to a criminal investigation from a fake IAB in further retaliation against Plaintiff for filing his tort claim.

170.    An IAB investigation memorandum was filed, written by Defendant and signed by Chief Ewell sometime prior, after learning that former Assistant Sheriff Limon spoke about Plaintiff in her claim.

171.    On or about May 19, 2022, the newly assigned, unexperienced Lt. Cabrera was transferred to S.E.B. and given the Arson/Explosives Lieutenant bonus position by Barragan.

172.    On or about May 23, 2022, Plaintiff felt that it was necessary for him to write a statement because of all the false accusations made against him, as he was afraid that the Sheriff and his agents were framing him as they framed Assistant Sheriff Limon, Chief Lajuana Haselrig, Commander Allen Castellano, and others. Plaintiff emailed a memorandum to Assistant Sheriff Holly Francisco and the County Counsel, setting the record straight with facts.

173.    The next day on May 24, 2022, following Plaintiff's lengthy memorandum, Plaintiff learned Detective William Morris from the "Internal Criminal Investigations Bureau" contacted neighbors. Defendant Morris walked the street Plaintiff lived on and contacted every resident on his block. Morris first lied to Plaintiff's neighbors that he was investigating a stolen boat, and then lied that he was investigating a stolen car. He then told others he was investigating a stolen boat being towed by a SUV. One neighbor told Plaintiff that Morris became nervous after the resident questioned him.

174.    Plaintiff drove down the street in search for Morris and contacted him. He waited until Morris completed talking to a resident. Once Morris was on the street and walking to his car,

Plaintiff contacted Morris and introduced himself. Plaintiff asked Morris if he received the memorandum that he sent Assistant Sheriff Holly Francisco twenty-four hours ago. Morris told Plaintiff he knew nothing about a memorandum. Plaintiff could not believe the memorandum was not shared with Morris since he was assigned to investigate the alleged crime. But of course, this was not a real investigation, and facts did not matter to Villanueva and LASD. In addition, Morris had a reputation for integrity as an investigator, and LASD and the other Defendants were not truthful with Morris about the investigation.

175.    Plaintiff asked Morris to follow him to his house and videotaped him as soon as he arrived at Plaintiff's house. Plaintiff provided Morris with a copy of the memorandum, and Morris reiterated that he had never seen it. Plaintiff asked Morris on video if he had seen any boats near the house and or in the opened and visible garage. Morris said "No."

176.    Morris informed Plaintiff that he was a subject of a criminal investigation. Plaintiff advised Morris that the issue was above his pay grade. Morris replied, "I suspect that." Plaintiff then pointed at a Vera for Sheriff sign and said it has to do with that, Morris said "probably so." Morris went on to say, "I don't get to pick my cases and I sure as hell wouldn't want this case." As Morris left, Plaintiff pointed out his truck that was well equipped for towing. Plaintiff emailed the memorandum to Morris that night and he acknowledged he received it. County Counsel also confirmed they received Plaintiff's email and attachment G.

177.    On June 2, 2022, Plaintiff received information that a neighbor was telephoned by Morris of ICIB. Under orders from LASD leadership, Morris offered the neighbor a $300.00 bribe in exchange for her username and password to her Ring video account. Morris also emailed and texted the neighbor. The neighbor called Morris "a liar" and told him to not contact her anymore. Such a bribe to a citizen was a highly unusual move by an investigator. This goes to show how badly Villanueva wanted to embarrass and "falsely" arrest Plaintiff and destroy his reputation.

178.    On or about June 21, 2022, neighbors contacted Plaintiff and told him that Morris had sent certified letters out stating that he was investigating a stolen car and was requesting video surveillance footage. When Plaintiff checked his mailbox, Morris had also sent his family a letter by mistake.

179. On or about June 28, 2022, Lt. Garrido's attorney sent a "Cease and Desist" letter to LASD executives regarding the fake investigation and defamation of Plaintiff. As another form of retaliation and hostile work environment, on or about July 1, 2022, Plaintiff received information that Villanueva and S.E.B. executive staff again lied and made a false report to the California Department of Insurance stating that Plaintiff's work-related and accepted injuries were fraudulent.

180. On or about July 10, 2022, after receiving four days suspension for tactics earlier in the year, and with a record of misconduct for which he was relieved of duty, Lt. David Auner was given by Villanueva the Arson Explosive Lieutenant position. Lieutenant Cabrera was removed from the position without cause. This is the third Lieutenant in less than six months to be given the Arson/Explosives position. Plaintiff, who had the most experience, was never contacted.

181. On or about August 1, 2022, since Plaintiff's evaluation was due in May, he contacted Personnel and requested them to contact S.E.B. and ask for the overdue evaluation.

182. On or about August 6, 2022, Lt. Garrido's attorney sent an email letter to Undersheriff Murakami, Assistant Sheriff Holly Francisco, Chief Edwin Alvarez, and ICIB staff stating that a false investigation was initiated against Plaintiff and that anyone involved could be aiding in a false criminal investigation and be held liable.

183. On or about August 16, 2022, Plaintiff finally received his 2021-2022 Evaluation, several months late, written and signed by Commander Giandomenico and signed by Chief Jack Ewell. After years of getting excellent evaluations for his outstanding work, Lt. Garrido was rated down two levels to a "Competent" from an "Outstanding." Giandomenico lied in the evaluation that in mid-December he told Lt. Garrido that he was not getting the Arson position, that Lt. Garrido then became disgruntled and that Giandomenico counseled him on his behavior.

184. The evaluation was cluttered with false statements. Plaintiff had received Outstanding evaluations for the past 10 years that he had been assigned to S.E.B. It should be noted that in late January of 2022, while out on an injury, Giandomenico gave Plaintiff the highest appraisal rating possible of 100% for the captain examination. In or around December 24th, 2021, then Captain Giandomenico gave Plaintiff a custom-made Christmas gift and card that read "I have enjoyed getting to know you and I appreciate your hard work." In 2017, prior to promoting to Lieutenant, Giandomenico also wrote Lt. Garrido's evaluation when he was a sergeant at SEB. In

that evaluation, Giandomenico gave Lt. Garrido an outstanding rating and stated "as one of the most experienced team leaders at SEB, Sergeant Garrido was regularly relied upon for his guidance and support throughout the year. SEB will miss Sergeant Garrido's depth of knowledge and learning skills that was amassed over numerous years in the tactical environment.  It will be extremely difficult to replace him and his honest and thorough input." Jack Ewell, then Captain, also wrote, "Joe, Thanks for all your hard work to make SEB a better place, Jack."

185.    Plaintiff has had outstanding evaluations from SEB from 2011 to 2021. In the 2020 to 2021 Evaluation which Captain Williams wrote and then Commander Ewell signed, it stated that Plaintiff was rated outstanding. Williams stated Plaintiff "was always thorough when approving tactical plans," which completely contradicts the evaluation in 2022. Furthermore, the current rigged 2022 evaluation was only sent to Plaintiff upon his request to Personnel Division after he learned that it was over four months late.

186.    Like all the adverse actions against Plaintiff, Villanueva directed this dishonest evaluation in retaliation against Plaintiff. On October 13th, 2022, Plaintiff received his Captain Appraisal for promotion which he applied for this past Summer while out since January 6, 2022, on a work-related and approved injury. Plaintiff was given a score of 96.36%, by Giandomenico although Captain Giandomenico appraised him at 100% on or about February of 2022 while I.O.D. Plaintiff's score was retroactively lowered, although he had been on I.O.D. status since January 6th, 2022, and had never returned to work. The rigged appraisal given to Plaintiff on October 13, 2022, is a violation of the AP guide. The Appraisal given to the Plaintiff by Giandomenico is in direct conflict with the evaluation authored by Commander Giandomenico and signed by Chief Ewell.

187.    On or about August 22, 2022, Plaintiff's attorney contacted investigator Morris of ICIB who stated that Plaintiff is under investigation for misuse of a county vehicle and theft of gasoline. Morris also told the attorney that he had interviewed various Department personnel and executives and that no one seems to know the origin of the Anonymous Informant. Of course, they don't know the origin, because Villanueva fabricated that there was an Anonymous Informant in the first place.

188.    While the Plaintiff remained off work due to the stress caused by Villanueva and LASD's retaliation, Plaintiff found out all his items in the Canine office were boxed up without notice and his Canine position was taken from him and given to a newly assigned Lieutenant.

189.    On or about September 2022, Plaintiff found out that his plaque in the gym was vandalized and spray painted by Villanueva's crew with Captain Barragan's knowledge. Plaintiff's attorney sent an email about the retaliation to Chief Alvarez. In response, instead of removing the paint or replacing the plaque, Defendant Barragan ordered that all plaques be removed to blame Plaintiff to other personnel so they will resent Lt. Garrido in furtherance of the retaliation.

190.    Thereafter, Plaintiff found out that investigator Morris completed numerous interviews including of executives in an unsuccessful purported attempt to locate the origin of the fabricated Anonymous Informant.  Morris attempted to interview Chief Alvarez and Captain Khasaempanth about their knowledge of the fabricated anonymous informant. If there had really been such an informant, Alvarez and Khasaempanth would have both known the source. Subsequently, Khasampanth and Alvarez both refused to be interviewed. Khasaempanth ordered Morris to focus on the fake crime alleged to have been committed by Lt. Garrido, and not on who made it up.

191.    On or about September 21, 2022, Plaintiff contacted the California Attorney General's offices to report the illegal retaliation by Villanueva and LASD.

192.    Captain Khasaempanth had the completed fake criminal investigation on her desk since the first week of October 2022 but knew that the allegation was fake and was nervous of the repercussions. She reportedly feared that Giandiaminco and Barragan were going to conspire against her in order to save their positions and cover themselves from potential criminal prosecution in order to avoid consequences from the new administration, if Villanueva were to lose the election in November. Initiating a fake criminal and falsifying department documentation and conspiring together is a crime in itself.

193.    On or about October 18, 2022, after the original complaint was filed in this matter, Villanueva and LASD engaged in further defamation of the Plaintiff, telling lies with the intended purpose to damage Plaintiff's reputation, and further covered up the killing of the police dog, Spike.

194.    In response to the complaint, Villanueva illegally used the County-paid Nixle public notification system – utilized by police and other agencies to send out emergency notifications to the public – to lie about Lt. Garrido and his attorney Vincent Miller.  Under Nixle's Terms of Service, the Sender MAY NOT: (a) act in an unwanted, threatening, harassing, abusive or offensive manner toward any recipient; (b) use any of the Services for political, commercial or advertising purposes; (d) post, submit or otherwise do anything with the Services, Content, or Web Site that is unlawful, harmful, tortious, defamatory, profane, obscene, libelous, or hateful to the average user; (k) transmit fraudulent, deceptive, or misleading communications." Villanueva broke the law on all counts as Villanueva lied that Several months after a criminal and administrative investigation began regarding alleged misconduct by Joseph Garrido, he has filed a lawsuit and claimed whistleblower status. Absent from this lawsuit is any explanation as to why Mr. Garrido supposedly witnessed misconduct yet took no action for years until after he was under investigation. Although we look forward to challenging these lies in the proper venue, a court of law, we will address one of these blatant and demonstrably false lies now.

195.    At this time, Villanueva's crimes went much deeper in regard to his cover up of the killing of Spike, as he put forth a fraudulent, backdated memorandum and lied that "Among the many false statements contained within this lawsuit, we will focus on the tragic death of a Department K-9 named "Spike." Please read the October 6, 2020, memorandum regarding the supervisory inquiry into this unfortunate tragedy which details the incident and the actions which took place to prevent it from happening again. Exploitation of a tragic loss like this in pursuit of financial gain is what we have come to expect from Attorney Vincent Miller, and we look forward to vigorously challenging this case in Court."

196.    Villanueva linked his posting to the fraudulent memorandum, written in response to the lawsuit, on or around October 18, 2022, but backdated two years to 2020. Villanueva and those who purported to draft the memorandum, Chief Williams and Lt. Sue Burakowski, pretended they conducted an inquiry into the death of Spike, and saw no reason to refer the matter to ICIB for a criminal investigation. By concocting this memo, Villanueva and the others committed a felony, in a conspiracy to obstruct justice. In their memo, Villanueva and the others fabricated reasons to exonerate the sergeant handler from negligence. In the memo, the authors

fabricate quotes from a veterinarian, Yolanda Cassidy, whom they falsely state saw and treated Spike. The memo fabricates Ms. Cassidy stating that the dog might not have died just from heat, but also perhaps from vomiting, and possibly from a pre-existing condition.

197. The veterinarian, Ms. Cassidy, soon emerged to confirm the memo was fraudulent, that she did not say what was attributed to her, and she, in fact, did not even see the dog.

198. The fake memo also states that the car's air conditioner was low of freon, and states that this shows the sergeant was not negligent, and further investigation was not needed.

199. The most remarkable aspect of this memo is not that Villanueva and the others committed fraud in an effort to hide their cover up of the killing of Spike, and their failure to properly investigate it, and hold the sergeant accountable for negligence. Villanueva has done these kinds of acts before, including with the cover up of the excessive use of force and a similar fraudulent memo. The most remarkable aspect in the killing of Spike is the sheer incompetence in trying to do a cover up through this memo, as the memo itself proves negligence on the part of the sergeant.

200. If the car's air conditioning system was truly low on freon, the sergeant would have noticed the air conditioner was struggling and not cooling the car well long before Spike died. Indeed, the car's maintenance record shows there was no mechanical problems or freon leaks. Without proper investigation, we will never really know the full truth, but from the circumstances, it appears that after Spike died, the sergeant panicked and emptied the freon out of the car, in search of a cover story, albeit not a very good one. The car's maintenance record shows there were no mechanical failures and no leak of freon. Sgt. Tobin is quoted in the fake memo as stating that he saw Spike in the morning and the air conditioner was working perfectly, then three hours later after finding Spike dead, the air conditioner was suddenly not working. This is implausible.

201. Despite the memo author's efforts to throw up a smokescreen as to the cause of death by suggesting contributing factors to Spike's death (by quoting a veterinarian who denounced the authors' lies), the memo acknowledges that Spike died from overheating in the car. In addition, the actual veterinarian record confirms that Spike died from overheating in the car.

202.    Further, the memo acknowledges no investigation was done, when there clearly needed to be a criminal investigation into the sergeant. (But Villanueva and others did initiate a fake criminal investigation over the plaintiff allegedly taking his county vehicle out of state and stealing gasoline). The question was not whether negligence had been committed. The question is whether the negligence rose to the level of a crime, or whether the sergeant should have just been disciplined, up to termination, through an IAB investigation. In addition, the sergeant made false statements in the course of an inquiry and should be held accountable for that. Sgt. Tobin also needs to explain what he did with Spike's body. Procedure is for the veterinarian to dispose of bodies, but Tobin suspiciously took Spike's body.

203.    Villanueva and LASD and the County need to answer for why they hid Spike's death, an sent so far as committing crimes to cover it up. They also need to answer for retaliation against Lt. Garrido for reporting it.

204.    In November 2022, Villanueva conceded that he lost the election to Chief Robert Luna. Reportedly, on or around in or around November 2022, Commander Giandiaminco and Captain Barragan became very nervous about Villanueva losing the election and they schemed to blame Captain Khasaempanth for initiating what they all knew to be a fake investigation.

205.    The wrongful conduct of the Defendants has caused Plaintiff extreme emotional distress and related symptoms to the point that he is unable to work. Plaintiff was demoted through the reversal of an earned promotion and wrongfully accused of a petty crime that he did not commit. The Sheriff and LASD continue to subject Plaintiff to their fake, rigged, criminal investigation, as Sgt. Morris and Villanueva and others destroy his reputation with knowingly false statements. Plaintiff was, by all objective accounts, a smart, highly principled, and highly qualified employee on a track to a series of promotions, to captain, then commander, if not for the unlawful retaliation and constructive termination.

**THE WRONGFUL CONDUCT COMMITTED BY THE DEFENDANTS HAS BEEN CONTINUOUS AND ONGOING**

206.    All of the acts of violation of state laws and policies, making false statements, harassment, and retaliation are timely under the continuing violation doctrine because, commencing

in 2019 and continuing through the filing of this complaint, the Defendants subjected the Plaintiff to a series of adverse actions that were similar-in-kind, i.e., were motivated by the same discriminatory or retaliatory animus, even if otherwise different actions, occurred with reasonable frequency, and did not acquire permanence at the earliest until the Plaintiff filed his complaint here. Defendants therefore remain liable for this entire course of conduct, including acts predating any statutory period in as much as at least one, and, here, many, of the acts occurred within the statutory period.

207.    Sheriff Villanueva and his agents are employed by the County of Los Angeles, in the Los Angeles County Sheriff's Department. Villanueva is responsible for managing, supervising, and disciplining employees in LASD.

208.    Villanueva is responsible for the unlawful conduct. He is also obligated to take disciplinary action for misconduct and to protect LASD employees, including Plaintiff, against threats, intimidation, hostile work environment, and retaliation in all forms.

209.    Plaintiff is informed and believes and thereupon alleges that Defendants, whether individual, corporate, associate or otherwise, are unknown to Plaintiff at this time, who therefore sues said Defendants by such fictitious names. Plaintiff will amend this complaint to show their true names and capacities, together with appropriate charging language, when such information is ascertained. Plaintiff will file DOE amendments, and/or ask leave of court to amend this Complaint to assert the true names and capacities of these Defendants when they have been ascertained.

210.    Plaintiff is informed and believes, and upon, such information and belief alleges, that each Defendant designated as a DOE was and is in some manner, negligently, wrongfully, or otherwise responsible and liable to Plaintiff for the injuries and damages hereinafter alleged and that Plaintiffs' damages as herein alleged were proximately caused by their conduct.

211.    Plaintiff is informed and believes, and thereupon alleges, that at all times material herein that the Defendants, including the Doe Defendants, each and all of them, were the agents, servants and employees, or ostensible agents, servants or employees of Defendant County of Los Angeles, who owns, controls, supervises, manages and is responsible for the Los Angeles County Sheriff's Department, and the County of Los Angeles is therefore directly and vicariously liable for the conduct of LASD, its official, and other employees, all of the Defendants were acting within

the course and scope of said agency and employment or ostensible agency and employment, except on those occasions when Defendants were acting as Principals, in which case, said Defendants, including Defendant County, and each of them, were negligent in the selection, hiring and use of the other Defendants.

212. Plaintiff has complied with and/or exhausted any applicable claims, statutes and/or administrative and/or internal remedies and/or grievance procedures or are excused from complying therewith. Plaintiff filed a government claim with the County of Los Angeles and files this lawsuit in less than 6 months after it was denied by the County. Accordingly, Plaintiff has timely exhausted his administrative remedies.

### FIRST CAUSE OF ACTION FOR
### UNLAWFUL RETALIATION: LABOR CODE § 1102.5
### (WHISTLEBLOWER LAW)
### (BY PLAINTIFF AGAINST DEFENDANT COUNTY OF
### LOS ANGELES)

213. Plaintiff re-alleges and incorporates by reference the allegations in the preceding 212 paragraphs.

214. Cal. Labor Code § 1102.5 prohibits retaliation against any employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, or to a superior in the employer's organization, so long as the employee has reasonable cause to believe that the information discloses a violation of law or regulation. This statute reflects the "broad public policy interest in encouraging workplace whistleblowers to report unlawful acts without fearing retaliation." *Green v. Ralee Eng. Co.* (1998) 19 Cal.4th 66, 77-78.

215. The Court in *Yanowitz v. L'Oreal USA, Inc.* held that "In determining whether there was an adverse employment action to show discrimination or retaliation, courts look at the totality of circumstances and not just at each isolated act. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1055 ("we need not and do not decide whether each alleged retaliatory act constitutes an adverse employment action in and of itself."); Adverse employment actions can include demotions,

reassignments, refusals to promote, unwarranted evaluations, tolerating harassment by co-workers, reprimands and/or suspensions. (*Yanowitz,* supra, 36 Cal.4th at 1061.) "Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of , [the FEHA]." (Id. at 1054-1055.) "[A] hostile work environment can constitute [an] , adverse employment action." (Id. at 1054.)

216.    "The retaliatory motive is 'proved by showing that plaintiff engaged in protected activities, that his employer was aware of the protected activities, and that the adverse action followed within a relatively short time thereafter.' The causal link may be established by an inference derived from circumstantial evidence, 'such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision.' (*Morgan v. Regents of University of Cal.* (2000) 88 Cal.App.4th 52, 69.)

217.    Plaintiff repeatedly spoke out about illegal conduct and refused to carry out practices and acts that would have been rule and law violations. Illegal acts reported by the Plaintiff included him reporting LASD's false statements in an effort to defraud its employees out of unpaid earned breacher pay. As a result of the Plaintiff's whistleblowing, the County was forced to pay over $3 million in pay that Villanueva and LASD tried to cheat to its employees out of breacher pay. Villanueva and LASD incensed over Plaintiff standing up for his co-workers. Another example of the illegal acts that Plaintiff blew the whistle on was Lt. Garrido reported the shameful killing of Spike, a K-9 police dog, and the intentional failure to investigate his death, and obstruction of justice.

218.    The County retaliated against Plaintiff when he spoke out about and blew the whistle on the County employees, and their illegal activity.

219.    The Defendants retaliated against the Plaintiff for disclosing violations of or noncompliance with County, state and/or federal labor laws to person(s) with authority over him

1  and/or to other employees who had authority to investigate, discover, or correct the violations or
2  noncompliance, which they had reasonable cause to believe had taken place.

3      220.    Retaliation against Plaintiff included a demotion through the reversal of his
4  promotion. The County also subjected Plaintiff to a fake, rigged ICIB criminal investigation and a
5  fraudulent lowering of his rating on his annual performance evaluation. The County also destroyed
6  Plaintiff's stellar reputation by making intentionally false statements, including by telling his
   neighbors that Lt. Garrido had stolen a vehicle. The Defendants further retaliated against Plaintiff
7  by constructively terminating him, as he is too distressed by unrelenting, vicious retaliation to return
8  to work.

9      221.    At all times herein mentioned, the Defendant County had actual and/or constructive
10  knowledge of the retaliatory conduct levied against the Plaintiff by Defendants County and
11  Villanueva. The County ratified the conduct of its employees as it gave no discipline and did no
12  intervention to stop any of the wrongful actions of the employees. In fact, LASD responded to the
    Plaintiff blowing the whistle by initiating a fake criminal investigation against him, encouraging
13  hostile work environment towards Plaintiff and constructively terminating his services.

14
15      222.    After the Plaintiff filed his original complaint, Villanueva engaged in further
16  defamation against the Plaintiff, lying about his allegations, and drafting and posting a fraudulent
    memo in furtherance of the County's cover up of the death of Spike.

17      223.    The Plaintiff was retaliated against in multiple ways by the Defendants, with
18  hostility, and a series of adverse employment actions, including targeting the Plaintiff for blowing
19  the whistle, and for relieving the Plaintiff of duty, and instead of doing a legitimate investigation,
    the Defendant initiated a rigged, fake criminal investigation into him.
20
        224.    The Defendants destroyed Plaintiff's career at LASD.
21
        225.    As a direct, foreseeable, and proximate cause of Defendants' retaliatory conduct
22  and failure to act, Plaintiff suffered humiliation, embarrassment, anxiety, mental anguish, physical
23  pain, and symptoms of extreme distress.

24      226.    Plaintiff was a Canine Lieutenant and by all objective accounts a highly qualified
25  employee of LASD who would be on a fast track to promotion, to captain, then commander, were
    it not for the retaliation against him. Subsequently, Plaintiff has lost substantial future income.

227.    As a further legal result of the above-described conduct of Defendants, Plaintiff has and will continue to incur attorneys' fees and in costs amount according to proof.

228.    Defendants' actions were ratified by managing agents, and were willful, malicious, fraudulent, and oppressive, and were committed with wrongful intent to harm Plaintiff in conscious disregard of his rights.

229.    Plaintiff timely exhausted administrative remedies.

**SECOND CAUSE OF ACTION FOR**

**DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. §1983**

**(BY DEFENDANT COUNTY OF LOS ANGELES, ALEX VILLANUEVA, JOSEPH WILLIAMS, CATRINA KHASAEMPANTH, THOMAS GIANDOMENICO, OSCAR BARRAGAN, and DOE DEFENDANTS 1-10)**

230.    The Individual Plaintiff Deputies re-allege and incorporate by reference the allegations in the preceding 229 paragraphs.

231.    Relevant portion of 42 U.S.C § 1983 states that " Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…" *42 U.S.C. § 1983.*

232.    Under Section 1983, the County and individual Defendants Alex Villanueva, Catrina Khasaempanth, Thomas Giandomenico, Oscar Barragan, and DOE Defendants are liable for subjecting the Plaintiff to conduct that occurred under color of state law, and this conduct deprived him of rights, privileges, or immunities guaranteed under the 1st Amendment of the Constitution of the United States of America.

233.    The Defendants deprived the Plaintiff of his 1st Amendment rights, as they retaliated against Lt. Garrido for donating money to the political campaign of Sheriff's candidate Eli Vera. Villanueva made it clear to Lt. Garrido and to other witnesses that he was enraged by his

1  support of a candidate running against Villanueva and that he and LASD would viciously retaliate

2  against him for doing so.

3      234.    The Defendants blocked Lt. Garrido's promotion and demoted him, and under the

4  direction of Villianueva, Catrina Khasaempanth, Thomas Giandomenico, and Oscar Barragan

5  subjected Plaintiff to a fake, rigged criminal investigation through ICIB. Investigator Sgt. William

6  Morris maliciously spread false stories about Plaintiff, leading his neighbors to conclude that Lt.

   Garrido was a disgraced law enforcement official who is a criminal.

7      235.    Villanueva and Khasaempanth, Thomas Giandomenico, and Oscar Barragan

8  illegally retaliated against Eli Vera and his family because Vera ran against Villanueva for Sheriff.

9  Villanueva maliciously retaliated against several employees because he assumed they were voting

10 for, supporting, and/or associating with Vera. Lt. Garrido was one of victims of Villanueva's

11 extreme and outrageous wrath.

12     236.    As a direct, foreseeable, and proximate cause of Defendants' deprivation of Lt.

13 Garrido's civil rights, the Plaintiff suffered extreme mental anguish, anxiety, and distress, physical

   pain, and humiliation. The Plaintiff was required to and did employ and will in the future employ

14 physicians and health care providers to examine, treat and care for him, and did, and will in the

15 future, incur medical and incidental expenses. The exact amount of full expenses is unknown to the

16 Plaintiff at this time.

17     237.    The Plaintiff has also suffered a loss of earnings in an amount which has not yet

18 been determined, but which will be added by amendment when it is ascertained. The Defendants

19 constructively terminated the Plaintiff as he is too distressed from the deprivation of civil rights and

   retaliation to return to work. Lt. Garrido has been constructively terminated.

20     238.    The Plaintiff is entitled to punitive damages against Alex Villanueva in an amount

21 to be determined by proof at trial.

22     239.    The Plaintiff timely exhausted his remedies.

23

24

25

### THIRD CAUSE OF ACTION FOR

### VIOLATION OF CIVIL CODE § 52. 1 (BANE ACT)

### (BY PLAINTIFF AGAINST DEFENDANTS COUNTY OF

### LOS ANGELES, ALEX VILLANUEVA, JOSEPH WILLIAMS, CATRINA

### KHASAEMPANTH, THOMAS GIANDOMENICO, OSCAR BARRAGAN AND

### DOES 1-10)

240.   Plaintiff re-alleges and incorporates by reference the allegations in the preceding 239 paragraphs.

241.   Civil Code Section 52.1, the Tom Bane Civil Rights Act, prohibits anyone who by threats, intimidation, or coercion interferes with the exercise or enjoyment of rights secured by the state or federal Constitutions or laws without regard to whether the victim is a member of a protected class. (*Civil Code § 52.1*)

242.   To obtain relief under Section 52.1, a plaintiff does not need to allege that a defendant acted with discriminatory animus or intent; liability only requires interference or attempted interference with the plaintiff's legal rights by the requisite threats, intimidation, or coercion. *Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 841-843. "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." (*Austin B. v. Escondido Union Sch. Dist.* (2007) 149 Cal.App.4th 860, 883.)

243.   Plaintiff is informed and believes, and upon such information and belief alleges that Defendants intentionally interfered with, or attempted to interfere with, his civil rights by threats, intimidation, or coercion.

244.   Plaintiff has the right to free speech, to be free from discrimination, coercion, harassment, and retaliation.

245.   Defendants threatened Plaintiff against the exercise of his rights. He was repeatedly threatened for reporting and standing up to illegal conduct and for his support of Sheriff's candidate Eli Vera's campaign. Defendants carried out their threats. For example, on February 22, 2021, Joe Williams threatened Plaintiff by saying that any supervisor here "could be moved at any time."

After Lt. Joseph Garrido reported illegal conduct in LASD, and he was found to be supporting the Vera campaign, he was demoted. And he was falsely accused, and a fake criminal investigation was initiated against him. The fake criminal investigation was rigged to destroy Plaintiff's livelihood and reputation. Plaintiff was being singled out and retaliated against.

246.     As a direct, legal and proximate result of the Defendant's conduct, Plaintiff's career in law enforcement was constructively terminated and he has not returned to work since the Defendants maliciously framed him with false allegations, fake criminal investigation and brutally retaliated against him. Plaintiff has suffered immense damages, including extreme emotional distress, as well as lost wages and other employment benefits and other economic damages, in an amount to be proven at trial. Plaintiff was constructively terminated as he is too distressed to return to work.

247.     Defendants' conduct was a substantial factor in causing Plaintiff's harm.

248.     Plaintiff is informed and believes, and thereupon alleges, that the supervisors who made wrongful conduct against Plaintiff was acting as the agent of Defendants, some of them, or all of them.

## FOURTH CAUSE OF ACTION FOR
## DEFAMATION/SLANDER/LIBEL PER SE
## (BY PLAINTIFF AGAINST DEFENDANTS COUNTY OF
## LOS ANGELES, ALEX VILLANUEVA, CATRINA KHASAEMPANTH, WILLIAM
## MORRIS, AND DOES 1-10)

249.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding 248 paragraphs.

250.     *Cal. Civil Code § 46(i)(iii)(v)* provides that slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which: charges any person with crime, or with having been indicted, convicted, or punished for crime; tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or

business that has a natural tendency to lessen its profits; or which, by natural consequence, causes actual damage.

251.    Defamation is an invasion of the interest in reputation. The tort involves the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage. (Civ. Code, §§ 45, 46; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts § 471, pp. 557-558.) Publication means communication to some third person who understands the defamatory meaning of the statement and its application to the person to whom reference is made. Publication need not be to the "public" at large; communication to a single individual is sufficient. (*Cunningham v. Simpson* (1969) 1 Cal. 3d 301, 306 [81 Cal. Rptr. 855, 461 P.2d 39]; 5 Witkin, Summary of Cal. Law, supra, Torts, §§ 471, 476, pp. 557-558, 560-561.) (*Smith v. Maldonado* (1999) 72 Cal. App. 4th 637, 645 [85 Cal. Rptr.2d 397])

252.    Here, the fake and corrupt investigation, and the maliciously false statements made by the investigator, Defendant William Morris, against Plaintiff has caused him and his family undue stress. The fake investigation was done in order to defame Plaintiff and to make it look like he is a disgraced law enforcement official, caught in a criminal act.

253.    After Lt. Joseph Garrido reported illegal conduct in LASD, he was falsely accused, and a fake criminal investigation was initiated against him by Defendants Villanueva, Khasaempanth, Giandomenico, and Barragan. The allegations that Lt. Garrido "stole gasoline" and secretly took an LASD vehicle out of state for a personal vacation is defamatory. The motive behind the investigation was retaliation and that there was no merit to the allegations.

254.    The fake criminal investigation and their false allegations against Plaintiff was made to criminally prosecute him and to destroy his livelihood and reputation.

255.    In the course of what he knew to be a fraudulent and illegal investigation, under direction and orders from Defendant Khasaempanth, Defendant Morris made statements in writing and verbally to Plaintiff's neighbors to further destroy Plaintiff's reputation. On or about May 24, 2022, Morris told Plaintiff's neighbors that he was investigating a car and a boat being stolen by Lt. Garrido. On June 21, 2022, Morris wrote a letter to neighbors falsely telling them Lt. Garrido stole a vehicle. Morris also attempted to bribe neighbors for their Ring camera footage to drive

home his and Villanueva's false message to the neighbors that Lt. Garrido was a disgraced law enforcement official who had taken to crime and was under a real investigation.

256.    Plaintiff was being singled out and retaliated against and the criminal investigation and false allegations were made to destroy Lt. Garrido's name and reputation. As a result of the fake criminal investigation and false allegations, Plaintiff's name and reputation, which he has worked for over thirty-one years to maintain, has been permanently sullied.

257.    After the original complaint was filed in this matter, Villanueva and LASD engaged in further defamation of the Plaintiff and further covered up the killing of the police dog, Spike.

258.    In response to the complaint being filed, Villanueva illegally used the County-paid Nixle public notification system – utilized by police and other agencies to send out emergency notifications to the public – to lie about Lt. Garrido and his attorney Vincent Miller. Villanueva lied that "Several months after a criminal and administrative investigation began regarding alleged misconduct by Joseph Garrido, he has filed a lawsuit and claimed whistleblower status. Absent from this lawsuit is any explanation as to why Mr. Garrido supposedly witnessed misconduct yet took no action for years until after he was under investigation. Although we look forward to challenging these lies in the proper venue, a court of law, we will address one of these blatant and demonstrably false lies now."

259.    Villanueva committed further crimes in his cover up of the killing of Spike, as he lied that "Among the many false statements contained within this lawsuit, we will focus on the tragic death of a Department K-9 named "Spike." Please read the October 6, 2020, memorandum regarding the supervisory inquiry into this unfortunate tragedy which details the incident and the actions which took place to prevent it from happening again. Exploitation of a tragic loss like this in pursuit of financial gain is what we have come to expect from Attorney Vincent Miller, and we look forward to vigorously challenging this case in Court."

260.    The drafting and release of the memorandum referred to by Villanueva, and posted by him, was fraudulent. Villanueva and those who purported to draft the memorandum and pretended to conduct an inquiry into the death of Spike committed a felony, in a conspiracy to obstruct justice. In their memo, Villanueva and the others fabricated reasons to exonerate the

sergeant handler from negligence. In the memo, the authors fabricate quotes from a veterinarian whom they falsely state saw and treated Spike. The veterinarian soon stepped forward and confirmed the memo was fraud, as she did not say what was attributed to her, and she, in fact, did not even see the dog. The memo also states that the car's air conditioner was low of freon, and states that this shows the sergeant was not negligent, and further investigation was not needed.

261.    Villanueva and LASD and the County need to answer for why they buried Spike's death. And why they retaliated against Lt. Garrido for reporting it, and maliciously lied about the Plaintiff to cover their tracks.

262.    Plaintiff's career in law enforcement is over, as he was constructively terminated and he has not returned to work since the Defendants maliciously framed him with false allegations, fake criminal investigation, and brutally retaliated against him.

263.    Due to Defendants' wrongful conduct, false and malicious defamatory statements made to the public against Plaintiff, his reputation was severely damaged. Plaintiff's ability to further his career within the LASD and to be hired elsewhere has been destroyed. Plaintiff suffers from a loss of substantial future earnings.

264.    The Defendants knew that the fake criminal investigation and false accusations against Plaintiff were blatantly false as the Defendants maliciously sought out to destroy Plaintiff's name and reputation as part of Defendants' retaliation. The statements constitute Slander Per Se and Libel Per Se of Plaintiff and damaged him in his trade, profession, and occupation.

265.    Defendant made the aforesaid defamatory statements with the intent to injure Plaintiff's good name and reputation and to interfere with his career and employment, in that Defendants harbored ill-will toward Plaintiff for blowing the whistle on several instances of illegal and other wrongful conduct and for exercising his free speech rights to donate money to the Eli Vera campaign for Sheriff.

266.    The aforesaid defamatory statements have harmed Plaintiff's reputation; such statements tend to injure and injured Plaintiff in his occupation. Plaintiff's future employment prospects have been destroyed. Plaintiff suffered general and actual damages, including exemplary and punitive damages, in an amount which far exceeds the jurisdictional minimum of this Court, and which will be proven at trial.

267.    Defendants' fake criminal investigation and false accusations not only were a substantial factor in causing harm to Plaintiff's professional reputation and career, but also caused him shame, mortification, and hurt feelings. Plaintiff has been constructively terminated as he is too distressed to return to work.

268.    The Defendants are protected by no privileges that would allow them to escape liability for their malicious allegations against Plaintiff.

269.    The County is vicariously liable for the conduct of the Defendants and their employees.

270.    Plaintiff is entitled to punitive damages against the individual Defendants.

## FIFTH CAUSE OF ACTION FOR

## FALSE LIGHT

### (BY PLAINTIFF AGAINST DEFENDANTS COUNTY OF LOS ANGELES, SHERIFF ALEX VILLANUEVA, CATRINA KHASAEMPANTH, THOMAS GIANDOMENICO, OSCAR BARRAGAN, WILLIAM MORRIS, and DOES 1-10)

271.    Plaintiff re-alleges and incorporates by reference the allegations in the preceding 270 paragraphs.

272.    As part of Defendant Villanueva's retaliation against Plaintiff for blowing the whistle on Villanueva's attempt to defraud employees out of breacher pay and his cover up of the killing of Spike, and for Plaintiff's support of the Eli Vera campaign, the Sheriff maliciously lied and framed Plaintiff and put him in a false light to make it look like he engaged in a criminal act of "stealing gasoline." Investigator Defendant Morris conducted what he knew to be an illegal investigation based on false allegations. Defendants Villanueva and Morris are personally liable for putting the Plaintiff in a false light, and the County is vicariously liable for their misconduct.

273.    In the course of what he knew to be a fraudulent and illegal investigation, Defendant Morris made statements in writing and verbally to Plaintiff's neighbors to further destroy Plaintiff's reputation. On or about May 24, 2022, Morris told Plaintiff's neighbors that he was investigating a car and a boat being stolen by Lt. Garrido. On June 21, 2022, Morris wrote a letter to neighbors falsely telling them Lt. Garrido stole a vehicle. Morris also attempted to bribe neighbors for their

1    Ring camera footage to drive home his and Villanueva's false message to the neighbors that Lt.

2    Garrido was a disgraced law enforcement official who had taken to crime and was under a real

3    investigation.

4    274.    Plaintiff was being singled out and retaliated against and the criminal investigation

5    and false allegations were made to destroy Lt. Garrido's name and reputation. As a result of the

6    fake criminal investigation and false allegations, Plaintiff's name and reputation, which he has

     worked for over thirty-one years to maintain, has been permanently sullied.

7    275.    Plaintiff's career in law enforcement is over, as he was constructively terminated

8    and he has not returned to work since the Defendants maliciously framed him with false allegations,

9    fake criminal investigation, and brutally retaliated against him.

10    276.    After the original complaint was filed in this matter, Villanueva and LASD

11    engaged in further defamation of the Plaintiff and further covered up the killing of the police dog,

12    Spike.

13    277.    In response to the complaint, Villanueva illegally used the County-paid Nixle

      public notification system – utilized by police and other agencies to send out emergency

14    notifications to the public – to lie about Lt. Garrido and his attorney Vincent Miller.  Under

15    Nixle's Terms of Service, the Sender MAY NOT: (a) act in an unwanted, threatening, harassing,

16    abusive or offensive manner toward any recipient; (b) use any of the Services for political,

17    commercial or advertising purposes; (d) post, submit or otherwise do anything with the Services,

18    Content, or Web Site that is unlawful, harmful, tortious, defamatory, profane, obscene, libelous,

19    or hateful to the average user; (k) transmit fraudulent, deceptive, or misleading communications."

20    Villanueva broke the law on all counts as Villanueva lied that… Several months after a criminal

      and administrative investigation began regarding alleged misconduct by Joseph Garrido, he has

21    filed a lawsuit and claimed whistleblower status. Absent from this lawsuit is any explanation as to

22    why Mr. Garrido supposedly witnessed misconduct yet took no action for years until after he was

23    under investigation. Although we look forward to challenging these lies in the proper venue, a

24    court of law, we will address one of these blatant and demonstrably false lies now.

25    278.    Villanueva's crimes went much deeper in regard to his cover up of the killing of

      Spike, as he lied that "Among the many false statements contained within this lawsuit, we will

focus on the tragic death of a Department K-9 named "Spike." Please read the October 6, 2020,
memorandum regarding the supervisory inquiry into this unfortunate tragedy which details the
incident and the actions which took place to prevent it from happening again. Exploitation of a
tragic loss like this in pursuit of financial gain is what we have come to expect from Attorney
Vincent Miller, and we look forward to vigorously challenging this case in Court.

279.    The drafting and release of the memorandum referred to by Villanueva was
fraudulent. Villanueva and those who purported to draft the memorandum and pretended to
conduct an inquiry into the death of Spike committed a felony, in a conspiracy to obstruct justice.
In their memo, Villanueva and the others fabricated reasons to exonerate the sergeant handler
from negligence. In the memo, the authors fabricate quotes from a veterinarian whom they falsely
state saw and treated Spike. The memo has the veterinarian stating that the dog might not have
died just from heat, but also perhaps from vomiting, and possibly from a pre-existing condition.
The veterinarian confirmed the memo was fraud, as she did not say what was attributed to her,
and she, in fact, did not even see the dog. The memo also states that the car's air conditioner was
low of freon, and states that this shows the sergeant was not negligent, and further investigation
was needed.

280.    The most remarkable aspect of this memo is not that Villanueva and the others
committed fraud in an effort to hide their cover up of the killing of Spike, and their failure to
properly investigate it, and hold the sergeant accountable for negligence. The most remarkable
aspect is that the incompetence in trying to do a cover up through this memo, as the memo itself
proves negligence on the part of the sergeant.

281.    If the car's air conditioning system was really low on freon, the sergeant would
have noticed the poorly operating air conditioner long before Spike died. In addition, the car's
maintenance record shows there was no mechanical problems or freon leaks.

282.    Also, despite the memo author's efforts to throw up a smokescreen by suggesting
contributing factors to Spike's death (by quoting a veterinarian who denounced the authors' lies),
the memo acknowledges that Spike died from overheating in the car. The memo acknowledges no
investigation was done, when there clearly needed to be a criminal investigation into the sergeant.
The question was not whether negligence had been committed. The question is whether the

negligence rose to the level of crime, or whether the sergeant should have just been disciplined, up to termination, through an IAB investigation. Villanueva and LASD and the County need to answer for why they buried Spike's death. And why they retaliated against Lt. Garrido for reporting it.

283.    Prior to the frame up and intentionally false statements by the Defendants, Plaintiff had a stellar reputation as an excellent employee rising up the ranks and deserving of future promotions. All that has been destroyed by the Defendants. Subsequently, Plaintiff suffers from a loss of substantial future earnings.

284.    Defendants knew that the statements were blatantly false at the time they made them, as they maliciously sought out to destroy Plaintiff's reputation as part of the Defendants' retaliation.

285.    The aforesaid defamatory statements made by the Defendants were and are false and malicious and not privileged. Defendants made said statements knowing the falsity thereof.

286.    Defendants made the aforesaid defamatory statements with malice and with the intent to injure Plaintiff's good name and reputation and to interfere with his employment.

287.    Defendants' false statements not only were a substantial factor in causing harm to Plaintiff's professional reputation and career, but also caused him shame, mortification, and hurt feelings.

288.    Defendants published their false statements with malice intended to injure Plaintiff.

289.    The aforesaid defamatory statements have harmed Plaintiff's reputation; such statements have a tendency to injure and have injured Plaintiff in his occupation, his future business and employment prospects have been severely harmed, and Plaintiff will have to incur substantial expense, in order to redress the harm he has suffered, all to Plaintiff's general and actual damages, including exemplary and punitive damages (against Villanueva and Morris, in an amount which far exceeds the jurisdictional minimum of this Court, and which will be proven at trial.

290.    The County is vicariously liable for the misconduct and false statements by the individual Defendants, all employees of LASD and the County.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court:

1.      For special damages for the Plaintiff, including but not limited to, lost earnings, benefits and/or out-of-pocket expenses in an amount according to proof at the time of trial, all in an amount set forth above and/or according to proof at the time of trial;

2.      For Plaintiff further special damages, including but not limited to, lost future earnings, benefits and other prospective damages in an amount set forth above and/or according to proof at the time of trial, in the minimum of $5 million.

3.      For Plaintiff general damages, including for pain and suffering, in an amount set forth above and/or according to proof at the time of trial, and at a minimum of $8 million;

4.      For interest: Pre-Judgment and Post-Judgment at the maximum legal rate;

5.      For costs of suit; and attorney's fees under § 1021.5, 42 U.S.C. § 1988, and any other applicable law;

6.      The Plaintiff further prays that this Court grant such other and further equitable relief as it may deem just and proper.

November 28, 2022

THE LAW OFFICES OF VINCENT MILLER

*Vincent Miller*

_____

VINCENT MILLER, Attorney for Plaintiff

**JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all issues so triable.

DATED: November 28, 2022

THE LAW OFFICES OF VINCENT MILLER

*Vincent Miller*

_____

By VINCENT MILLER

Attorney for Plaintiff Joseph Garrido