VINCENT MILLER (SBN 291973)
*vincent@vincentmillerlaw.com*
NICK SAGE (SBN 298972)
*nick@vincentmillerlaw.com*
The Law Offices of Vincent Miller
16255 Ventura Boulevard, Suite 625
Encino, CA 91436
Telephone: (213) 948-5702
Attorneys for Plaintiff Lt. Joseph Garrido

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH GARRIDO,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES, a municipal entity, ALEX VILLANUEVA, an individual, JOSEPH WILLIAMS, an individual, THOMAS GIANDOMENICO, an individual, and OSCAR BARRAGAN, an individual,<br><br>　　　　　　Defendants. | Case No. 2:23-cv-00011-SPG-E<br><br>Superior Court Case No: 22STCV33687<br><br>**FOURTH AMENDED COMPLAINT FOR:**<br><br>1) **UNLAWFUL RETALIATION: LABOR CODE § 1102.5 (WHISTLEBLOWER LAW);**<br><br>2) **DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. §1983** |

**<u>Jury Trial Demanded</u>**

## <u>SUMMARY OF ALLEGATIONS</u>

1.       Plaintiff Joseph Garrido was a lieutenant in Defendant County's Sheriff's Department ("LASD"). Lt. Garrido worked in LASD's Special Enforcement Bureau "(SEB"), with his duties including being Operations Lieutenant, supervising S.W.A.T. staff, and the Canine Services Detail. Lt. Garrido was by all objective accounts an outstanding employee of 31 years who always had excellent performance evaluations with a plethora of commendations for his service.

2.       Executives informed Plaintiff that he was qualified to be promoted to a captain position, and he scored 100% on the Captain's Exam. However, Plaintiff was more interested in remaining a lieutenant in SEB, but to be promoted to a higher-ranking Arson Explosives Detail (AED) Lieutenant position, with a significant pay raise. All executives and staff in SEB acknowledged that Lt. Garrido was qualified for this position. Plaintiff was informed in 2021 by executives in SEB that he would be promoted to the position. On September 14, 2021, Defendants Joseph Williams and Thomas Giandomenico confirmed to Plaintiff that he got the promotion, and they authorized him to start training for the position. Plaintiff was approved to replace the lieutenant who was slated to retire in early 2022.

3.       Soon after, Plaintiff reported to supervisors that fraud and wage theft were being committed by executives at LASD; he also reported other unlawful conduct, including the killing of a police dog and a cover up of the death. Plaintiff further filed a wage claim, a grievance for pay that was unlawfully withheld from him. Additionally, Plaintiff expressed his support for and donated money to the campaign for Sheriff by Eli Vera ("Vera"), who was viewed at the time by Sheriff Alex Villanueva ("Villanueva") as his toughest opponent in his re-election campaign.

4.       Out of retaliation, LASD and the individual Defendants, Villanueva, Williams, Giandomenico, and Oscar Barragan ("Barragan") blocked and reversed Plaintiff's promotion. Starting in 2021, Plaintiff was subjected to a series of adverse employment actions, including a

demotion with loss of pay, a downgraded performance evaluation, the blocked promotion, culminating in the Plaintiff being constructively terminated by the County for reporting illegal conduct, making the wage claim, and supporting Vera's candidacy for Sheriff.

5.    Defendant County is a municipal entity. Defendant Villanueva was sheriff of LASD, and his fellow individual Defendants Captain Barragan, Chief Williams, and Captain Giandomenico were all employees for LASD. Defendants Villanueva, Barragan, Williams, and Giandomenico, as well as non-Defendants Captain Catrina Khasaempanth, Chief of Staff John Satterfield, and Undersheriff Timothy Murakami all took part in retaliation against Plaintiff.

**PLAINTIFF WAS RETALIATED AGAINST FOR REPORTING OVER $3 MILLION IN BREACHER PAY THAT WAS ILLEGALLY WITHHELD FROM EMPLOYEES, FOR SUCCESSDING IN GETTING DEPJUTIES' OWED BREACHER PAY PAID TO THEM, AND FOR FILING HIS OWN GRIEVANCE ALONG WITH OTHER SUPERVISORS FILING GREIVANCES ON BREACHER PAY**

6.    Plaintiff discovered that LASD had failed to pay personnel "explosive breacher" pay and bonuses to which they were entitled. Plaintiff believed that LASD was cheating numerous employees out of millions of dollars in earned wages in an intentional wage theft. Plaintiff believed the withholding of the pay was in violation of *California Labor Code 200* including *204*, and *Labor Code 510*, and *Penal Code 487m Grand Wage Theft* and *AB1003*.

7.    Several times starting in April 2019, and through summer and fall of 2019, Plaintiff reported LASD's illegal withholding of "breacher pay" to Defendant Williams, who was a Captain at the time. Williams got increasingly angry over Plaintiff's reporting of the theft of breacher pay.

8.    In the fall of 2019, Plaintiff reported to Chief Jack Ewell that breacher pay was being illegally withheld from numerous employees and that he was considering filing a grievance.

In response, Williams fabricated allegations that Plaintiff mishandled a tactical incident and covered up an accidental discharge. Williams also tried to open a fake investigation into Plaintiff Lt. Garrido, but it didn't go anywhere.

9.      On or about February 25 and 26, 2020, Plaintiff reported his concerns of the withholding of breacher pay to the president of the law enforcement personnel's union, the Los Angeles County Professional Peace Officers Association ("PPOA"), and to Captain Williams. (PPOA represents employees at the rank of sergeant and above.) Plaintiff again reported to Chief Ewell that he was thinking of filing a grievance for his own unpaid breacher bonus, and that several other supervisors would be filing grievances as well. In response, less than a week later, Williams removed Plaintiff as the lieutenant overseeing breaching personnel. In addition, Defendants Villanueva and Williams began excluding Plaintiff from meetings regarding breacher pay, including meetings held on August 5 and December 8, 2020. On November 8, 2020, Williams contacted Plaintiff and angrily confronted him, trying to intimidate him into not doing any further reporting on breacher pay, including to PPOA.

10.     In February 2021, Williams threatened Plaintiff a second time to not get any further involved in the breacher issue, telling Plaintiff that he can be moved at any time. In February 2021, after Plaintiff reported to Williams that there were more than 20 deputy breacher personnel and multiple supervisors being cheated of pay, several rosters showing the number of breacher personnel including Lieutenants were subsequently deleted from SEB's files. Plaintiff alleges upon information and belief that the files were deleted under orders from Defendants Villanueva and Williams.

11.     Soon after, Plaintiff discovered documents related to owed breacher pay in an SEB dumpster garbage bin. The plaintiff was told by a deputy that two deputies helping Williams with the breaching lawsuit were seen on a Saturday sneaking around the facility going through breaching

literature.  When asked what they were doing, they said they were "helping Joe" referring to Joe

Williams. Plaintiff also discovered LASD officials had fraudulently submitted false information to

attorneys handling litigation related to the breacher pay issue. Deputies Mark Schultz and Steve

Longan informed Plaintiff that Ewell and Williams were only paying for breacher pay starting in

2014. Defendant Williams and Chief Jack Ewell wrote a declaration and committed perjury, falsely

stating that the breacher program did not begin until 2014, when they in fact knew it started in 1999.

In addition, the Defendants deleted data to hide that breacher work went back before 2014. Plaintiff

believed that this fraud by LASD officials was in violation of *Penal Code 118.1 PC* for deliberately

putting false information in a report, and also *118 PC* for committing perjury. Plaintiff then

retrieved documents proving the fraud, and that the breacher pay was owed, and arranged for the

documents to be given to the deputies' union, Association for Los Angeles Deputy Sheriffs

("ALADS"), and to their attorneys. (ALADS represents deputies, while PPOA represents

employees of higher rank) The attorneys submitted these documents to the judge handling the

litigation. Due to the Court receiving the documents and information from Plaintiff, the Court

ordered over $3 million in breacher pay to be paid to employees dating back to 1999.

12.    In February 2021, Plaintiff also reported theft of public dollars, under *Penal Code

42*, to Williams, when Plaintiff discovered that LASD had paid breacher pay to an employee who

did not work the hours he was paid for by LASD. Plaintiff also refused to commit a crime for

Williams who told Plaintiff to lie to deputies that they could not file grievances for owed breacher

pay. Williams told Plaintiff, "Take these grievances and give them back to the deputies, this is

S.E.B., we don't file grievances and tell them to get back to work", informing Plaintiff that Plaintiff

would no longer supervise employees who had breaching duties.

13.    Plaintiff then informed the supervisors' union, PPOA, about the breacher pay owed

to the supervisors and filed a grievance for his own owed breacher pay, along with other supervisors

who filed grievances along with the Plaintiff. Williams confronted Plaintiff about speaking with the unions and reporting information on owed breacher pay to them. On March 11, 2021, Williams walked into the Plaintiffs office and said, "This shit is going to stop… I've been dealing with your shit for two years." Defendants Villanueva and Williams were angered by Plaintiff reporting the fraud and wage theft, and Plaintiff's filing his own grievance for his own owed breacher pay. In an immediate response to Plaintiff's reporting, Defendant Giandomenico who was assigned to SEB in April of 2021, informed Plaintiff that Plaintiff would no longer be the sole S.W.A.T. lieutenant. This was a demotion by Williams and Giandomenico as the reduction of his hours in S.W.A.T. cost Plaintiff his own losses in breacher pay. Giandomenico and Williams also gave Plaintiff extra assignments to overwhelm him with work, and never gave new Lt. Barragan any work.

14.    In further retaliation against Plaintiff for reporting the breacher pay wage theft and for filing his own grievance on unpaid wages and the filing of grievances by other supervisors, Defendants Williams and Giandomenico blocked Plaintiff, on April 30, 2021, from getting Dive training so he would lose a 5.5% pay bonus and gave the Dive training and bonus to Barragan, who was newly assigned as lieutenant.

15.    Plaintiff's reporting of fraud and wage theft, as well as his own claim for wages owed him in breacher pay would lead Villanueva, Williams, Giandomenico, and Barragan to further retaliate against Plaintiff by blocking and reversing his earned promotion and by creating a fraudulent, illegal criminal investigation into Plaintiff. The extreme stress from the retaliation and failure of the department to investigate wrongdoing eventually led to the constructive termination of the Plaintiff, who officially stopped working for LASD as of March 31, 2024.

16.    The retaliation against Plaintiff for reporting wage theft and fraud on the breacher pay would become intertwined with retaliation against him for reporting the negligent killing of canine Spike, a member of LASD's K-9 unit, and the subsequent cover up of the killing of Spike

and the failure to investigate the death. In addition, the retaliation for the aforesaid reporting would also become intertwined with Plaintiff supporting, donating money to, and voting for Sheriff candidate, Eli Vera.

**IN ADDITION TO THE ADVERSE EMPLOYMENT ACTIONS TAKEN AGAINST PLAINTIFF FOR REPORTING FRAUD AND THE WAGE THEFT, AND FOR FILING BREACHER PAY GRIEVANCES, PLAINTIFF WAS AT THE SAME TIME ALSO RETALIATED AGAINST FOR REPORTING THE NEGLIGENT KILLING OF K-9 SPIKE, AND THE OBSTRUCTION OF AN INVESTIGATION AND THE COVER UP OF SPIKE'S DEATH**

17.     The retaliation against Plaintiff over the breacher pay overlapped with the retaliation against Plaintiff for reporting the negligent killing of canine Spike and his reporting of the obstruction and cover up of his death. To this day, LASD and County's District Attorney ("DA") have failed to do any investigation into the death of Spike and the cover up of the killing and failure to do any investigation. LASD claimed that there was no need to do any investigation.

18.     As a member of the K-9 unit, the beloved Spike was considered the equivalent of a deputy. On or about September 29, 2020, Spike's handler, one Sgt. Tobin, left Spike alone for several hours in his patrol vehicle on a very hot day, causing Spike to die from overheating. Substantial evidence points to negligence, perhaps rising to the level of criminal negligence, as the cause of death. Plaintiff believed the handling sergeant who caused Spike's death may have violated *Penal Code 597.7* for leaving the animal in unattended vehicle under conditions that endangered the dog's well-being.

19.     As the Operations Lieutenant and supervisor of the Canine Services Detail, Plaintiff should have been immediately informed of Spike's death. He was not. Upon learning of Spike's

death from an outside police agency, on or about September 29, 2020, Plaintiff promptly reported the death to Defendant Williams. Plaintiff was familiar with Defendant Williams' lack of integrity, and he implored Captain Williams to not cover up the death and to do an honest investigation. Williams falsely promised Plaintiff that he would not cover it up.

20.     Plaintiff followed up his phone call with Williams with a text showing a screenshot regarding the City of Long Beach losing a K-9 to overheating in a patrol car, to show Williams an example of right way to handle the matter, with an announcement of the dog's death and criminal and administrative investigations into the dog's death and handler's role in it. Plaintiff hoped to motivate Williams and LASD to do the right thing.

21.      Defendant Sheriff Villanueva was obsessed with not getting "bad media" that he thought could hurt his re-election as Sheriff. It is alleged upon information and belief that he worked with Williams to cover up Spike's death. Williams and one Lieutenant Susan Burakowski then worked together to concoct a fake inquiry memo that would exonerate the handler of negligence. The inquiry memorandum contained the conclusion that no investigation was necessary. The Defendants hid the first draft memo and did not file it anywhere. Also, in an unprecedented move for LASD and other police agencies dealing with a K-9 death, Villanueva made no announcement of Spike's death and did not honor him. The matter would be completely buried by the Defendants. Plaintiff subsequently reported to LASD what he believed to be a cover up and obstruction of justice (in violation of *Penal Code 148*) regarding the death of Spike.

22.     From September 2020 until the fall of 2021, Plaintiff made note of the fact that Sheriff Villanueva made no announcement honoring Spike, and that Plaintiff had received no reports that the death of Spike had been investigated. During that time, Plaintiff grew increasingly concerned that Villanueva, Williams, and LASD were committing the crime of obstruction and covering up the death. On or about summer of 2021, after Williams, Giandomenico and Burakowski

failed to investigate and cover up a major fire on LASD's Wayside jail grounds, Plaintiff reported to Commander Robert Lewis that he was likewise concerned about a cover up of Spike's death, with no announcement or inquiry.

23.     In the fall of 2021, Plaintiff inquired with staff in SEB about Spike and was informed that Williams and Villanueva had indeed committed the crime of obstruction, with zero investigation being done. Plaintiff investigated and saw that there was no record of an inquiry being done entered into the data files, proving that no real inquiry had been done.

24.     Williams was informed that Plaintiff had made inquiries into the lack of investigation, and Plaintiff had reported his concerns to Commander Lewis, and Williams and Villanueva were further enraged against Plaintiff.

25.     In the Spring of 2022, Defendant Williams contacted veterinarian Dr. Yolanda Cassidy and angrily told her that Plaintiff was asking questions about Spike and warned Dr. Cassidy to stay away from Plaintiff Garrido. Williams stated, "Fuck Garrido, it's just a dog!" Dr. Cassidy worked closely with LASD's K-9 unit and treated many of the dogs working for LASD. However, she never treated Spike. What Dr. Cassidy did not know was that Williams and Lt. Burakowski had used Dr. Cassidy's name in the fake inquiry memo, falsely stating that Dr. Cassidy had treated Spike and that she opined that Spike may have died of natural causes. Williams warned Dr. Cassidy that Plaintiff might file a lawsuit and pull her into it. Dr. Cassidy was confused as she didn't yet know of the fake inquiry memo and that it would come to light. The fact that LASD fabricated her role would expose the criminal conduct of its executives.

26.     Also, in the Spring of 2022, Defendants Villanueva, Barragan, and Giandomenico, along with one John Satterfield, Sheriff Villanueva's Chief of Staff, Georgina Glaviano-Dunne, a constitutional policy advisor to Villanueva, and ICIB Captain Catrina Khasaempanth initiated what they knew to be a fraudulent criminal investigation into Plaintiff.

27.    In response to Plaintiff filing his lawsuit here in October 2022, Villanueva and Defendant Joe Williams retired Lt. Susan Burakowski, and Defendant Oscar Barragan committed a felony, a conspiracy to obstruct justice, as they drafted and released a fraudulent memorandum that further covered up the killing of Spike, and Villanueva and the other Defendants hiding the dog's death from the public and blocking an investigation into it.

28.    On top of the drafting of the memorandum being a crime, the authors did not do a competent cover up job. From the memo itself, an objective person can see that Spike died from negligence and Sergeant Tobin should have been investigated, confirming that concerns reported by Plaintiff's were well founded. The memorandum by Defendant Williams contradicts what was written in the actual veterinarian's report. In addition, the memo fabricates the veterinarian who actually treated Spike. Veterinarian Yolanda Cassidy recently filed her own lawsuit, because she never even saw and treated Spike. The fake memo attributes false quotes to Dr. Cassidy about why the dog died.

29.    The fake memo also states that the car's air conditioner was severely low on Freon, and states that this shows the sergeant was not negligent, and further investigation was not needed. If the car's air conditioning system were truly low on Freon, the sergeant would have noticed the air conditioner was struggling and not cooling the car well long before Spike died. Indeed, the car's maintenance record shows there was no mechanical problems or Freon leaks. Without proper investigation, we will never really know the full truth, but from the circumstances, it appears that after Spike died, the sergeant panicked and emptied the Freon out of the car, in search of a cover story, albeit not a very good one. Sgt. Tobin is quoted in the fake memo as stating that he saw Spike in the morning and the air conditioner was working perfectly, then three hours later after finding Spike dead, the air conditioner was suddenly not working. This is implausible. Sgt. Tobin also took the dog's body, so that no autopsy could be done.

30.    Despite the memo authors' efforts to throw up a smokescreen as to the cause of death by suggesting contributing factors to Spike's death (by quoting a veterinarian who later denounced the authors' lies), the memo acknowledges that Spike died from overheating in the car. Plaintiff was right about the need to fully investigate the matter. And his accurate reporting of the death of Spike and the cover up of it is part of what led to retaliation against him, including with his promotion blocked and a false criminal investigation perpetrated against him.

**IN ADDITION TO THE DEFENDANTS RETALIATING AGAINST PLAINTIFF BASED ON HIS REPORTING FRAUD AND WAGE THEFT AND HIS WAGE CLAIM, AND THE GRIEVANCES, AND HIS REPORTING THE DEATH OF SPIKE AND THE COVER UP, THE DEFENDANTS ALSO RETALIATED AGAINST PLAINTIFF FOR VOTING FOR AND DONATING MONEY TO SHERIFF CANDIDATE, ELI VERA**

31.    Defendants Villanueva, Barragan, Giandomenico, Williams, Villanueva's Chief of Staff John Satterfield, and Undersheriff Murakami retaliated against Plaintiff for exercising his free speech rights, and for supporting and donating money to Eli Vera who ran for sheriff against Villanueva. Villanueva was not the first sheriff who retaliated against employees for supporting a sheriff candidate. Retaliation against employees in LASD for supporting sheriff candidates has been a long-standing pattern and practice in the department, dating back decades to the Sheriff Baca and Undersheriff Tanaka era.

32.    In April 2021, after Vera announced he was running for sheriff, Villanueva and his associates began retaliating against Eli Vera and his family members, and supporters. Vera would go on to receive the endorsement of the employee's union PPOA, and Villanueva perceived Vera as the biggest threat to his re-election. Villanueva held Big Five meetings every week with Satterfield, Murakami, and Assistant Sheriffs. During those meetings, Villanueva, Satterfield and

Murakami regularly had angry side conversations about which LASD employees donated money to the Vera campaign. Their comments were witnessed by the Assistant Sheriffs.

33.    Multiple LASD employees were retaliated against for supporting Eli Vera. For example, one of these employees was Deputy Kristine Corrales. When the sheriff and his wife, Vivian Villanueva, and an associate of the sheriff, concluded that Corrales was supporting Vera, they demanded Corrales' supervisor force Corrales to a less prestigious unit, a demotion. When Corrales' supervisor stood up for Corrales, Villanueva's associate and others went after Corrales' supervisor and fraudulently lowered her score on the promotional Lieutenant's exam. Another example is Sergeant Joaquin Rincon, who was promoted to a special team, and started training in Plaintiff's unit, SEB. When Defendants Giandomenico and Barragan discovered Rincon was supporting Vera, Barragan and Giandomenico got Rincon's promotion reversed by Defendant Villanueva. Another example was Eli Vera's secretary, Cynthia Gallegos, whose promotion was also blocked, and she was forced to a less prestigious unit, because Villanueva and associates assumed she was supporting Vera.

34.    The retaliation by the individual Defendants against employees for supporting a sheriff's candidate, Vera, was nothing new to LASD. James Hellmold (demoted from Assistant Sheriff by Sheriff John Scott to Chief for supporting Sheriff Lee Baca) is just one of dozens of employees retaliated against over the recent decades for supporting Sheriff's candidates. Captain Chuck Antuna was one of 8 LASD employees who won their trial in 2015 against the County for being retaliated against by Sheriff Baca for supporting a rival sheriff's candidate. Plaintiff was in a long line of victims of punishment for exercising their First Amendment rights.

35.    In April 2021, Plaintiff told Defendant Giandomenico that he wanted to be promoted to the AED Lieutenant position. Giandomenico responded by asking if Plaintiff were "friends with Eli Vera." Giandomenico suggested to Plaintiff that Giandomenico would block

Plaintiff's promotion, and told Plaintiff that, "your buddy Vera is going to be the next sheriff, and you will be the next captain here, and a chief one day", implying that in the short term this would justify blocking Plaintiff's promotion to AED Lieutenant, since Plaintiff's buddy would later take care of him. One week later, Giandomenico told Plaintiff that he would be constructively demoted, by adding two more Lieutenants to the S.W.A.T. team. Given that Plaintiff would no longer be the sole S.W.A.T. lieutenant, this would cost Plaintiff losses in breacher pay.

36.    While Plaintiff avoided talking politics at work, he placed a Vera for Sheriff sign on his front lawn at home and supported the Vera campaign. In August 2021, a department executive informed Plaintiff that Villanueva was angry for his reporting illegal conduct and for supporting Vera and was going to initiate a fake case against him to punish him for it.

37.    Defendants Barragan and Giandomenico were actively working on Villanueva's re-election campaign. Sergeant Rincon had been told he was being promoted to SEB and began training for the position and was given a car and told to purchase uniforms. However, on or about August 6, 2021, Barragan and Giandomenico agreed with each other to block Rincon's promotion because of his support of Vera. Barragan called Sergeant Elizabeth Aguilera, a close associate of Villanueva and his wife, Vivian Villanueva, telling her that Rincon was supporting Vera for sheriff, and asking that the sheriff reverse and block Rincon's promotion. Aguilera conveyed the information to the Sheriff and his wife, and the promotion was then blocked by Villanueva. Plaintiff reported the retaliation against Rincon to Chief Ewell. Shortly thereafter, a department member told Plaintiff that Villanueva and Barragan and Giandomenico was going to put a fake case on him for supporting Vera for sheriff.

38.    On September 2, 2021, Giandomenico again suggested to Plaintiff that because his "buddy" was going to be the next sheriff and promote him, Plaintiff did not need a promotion now.

39.     On or about November 23, 2021, Defendants Villanueva and Giandomenico met at SEB. They talked about Plaintiff supporting Vera, filing a pay grievance, and helping others with their breacher pay grievances.

40.     On November 24, 2021, Plaintiff was informed by a department member that Villanueva was upset with Plaintiff for supporting Vera and over reporting the breacher pay grievance issues.

41.     On or about November 27, 2021, one Carl Mandoyan, a close confidant and advisor and campaign strategist to Sheriff Villanueva and a major fundraiser for Villanueva's campaign, called Plaintiff and angrily confronted him about donating money to the Vera campaign. Mandoyan told Plaintiff that Villanueva was mad at him for supporting Vera. Mandoyan also told Plaintiff that Defendant Williams had worked to put a fake case on him. Soon after, Villanueva, Murakami, and Satterfield were witnessed by an assistant sheriff, Bruce Chase, in a Big Five meeting, angrily discussing Plaintiff's donation to the Vera campaign. Villanueva also told another Assistant Sheriff, Robin Limon, that he was angry about Plaintiff's support of Vera. Villanueva also told Limon that Plaintiff would no longer be promoted.

42.      In December 2021, another department executive told Plaintiff that Defendants Giandomenico and Barragan were planning to put a fake case on Plaintiff for supporting Vera and reporting the breacher pay and fraud and wage theft, and his wage claim. Plaintiff was warned, "they are going to get you soon, they are planning on how to get you and going to move you from SEB." Also, Villanueva called Defendant Williams and directed him to gather resumes for the position that was supposed to go to Plaintiff. Williams eagerly followed the orders.

43.     On or about December 20, 2021, Plaintiff found an unsolicited transfer request form and an announcement for a Lieutenant position at Fleet Services Division (an unfavorable

assignment and step down) in his mailbox. This was a message from Defendants that he as a supporter of Vera did not belong in SEB. Vera used to be the chief of Fleet Services Division.

44.    On or about January 4, 2022, Plaintiff was informed by a department member that Defendants Villanueva, Barragan, and Giandomenico were plotting to put a fake case on him for supporting Vera and for reporting the breacher pay and filing a grievance on it and that they were going to embarrass him and move him out of SEB.

45.    On January 5, 2022, Plaintiff reported a hostile work environment to LASD leadership against Williams and other executives. On January 6, 2024, Plaintiff told Chief Ewell that he had been retaliated against because of his support of Vera. The Chief agreed with Plaintiff and told him that Sheriff Villanueva blocked his promotion, with the understanding that sheriffs do not normally get involved with this type of promotion, at the lieutenant level. So, it was very revealing that the sheriff made the unusual effort, intervening in what would not normally be on a sheriff's radar. But Villanueva pursued supporters of Vera with a vindictive vengeance. Plaintiff reiterated to Ewell that Williams was also an agent of the Sheriff. Soon after, Plaintiff's plaque in the gym was vandalized and "J.G., the snitch," was written on an ink board. Barragan (now captain) and Giandomenico (now commander) used the gym daily and would have seen and had access to the vandalized plaque daily.

46.    In early 2022, Undersheriff Murakami told Assistant Sheriff Chase that a case would soon be opened against Plaintiff, with the allegation that he took the company vehicle to Lake Havasu, Arizona. Chase, cognizant of the anger expressed by Villanueva towards Plaintiff over supporting Vera, and the practice of fake cases being put on LASD employees, was skeptical and asked Murakami if they had proof of wrongdoing. Murakami lied to Chase and claimed to have photos. There were no photos. A simple look at the odometer and the miles driven while Plaintiff

was out on medical leave would have immediately shown the Defendants that it would have been impossible for Plaintiff to have driven the vehicle out of state.

**PLAINTIFF WAS SUBJECTED TO A SERIES OF ADVERSE EMPLOYMENT ACTIONS IN DIRECT RESPONSE TO HIM REPORTING ILLEGAL CONDUCT, FILING A WAGE CLAIM, AND SUPPORTING ELI VERA FOR SHERIFF**

47.    Plaintiff was subjected to a series of adverse employment actions that culminated in his constructive termination.

48.    In early 2021, in retaliation for Plaintiff reporting fraud and wage theft regarding breacher pay, Defendants Giandomenico and Williams demoted Plaintiff as they removed Plaintiff as the sole S.W.A.T lieutenant. This resulted in losses in breacher pay for Plaintiff.

49.    On April 30, 2021, in retaliation for reporting the breacher pay wage theft and for filing his grievance on unpaid wages, Defendants Williams and Giandomenico blocked Plaintiff from getting Dive training so he would lose a 5.5% pay bonus and gave it to newly assigned defendant Barragan.

50.    Plaintiff had the most seniority for the AED Lieutenant position and standard practice at SEB was for him to have right of first refusal for the position. In September 2021, executives confirmed to Plaintiff that he received the promotion to AED Lieutenant, and he began training, as he was slated to officially take over the position upon another lieutenant's retirement in early 2022. However, after Villanueva's advisor, Mandoyan, confronted Plaintiff over donating money to the Vera campaign, Villanueva told an assistant sheriff he was blocking the promotion. Despite Giandomenico signing a December 2021 memo stating that Plaintiff was replacing the current Lieutenant and could attend a week-long training for the position, Villanueva, Barragan, Giandomenico, and Williams blocked the promotion, with Williams seeking resumes of other, less-

qualified candidates in December 2021. On May 19, 2022, after Villanueva promoted Defendant Barragan to Captain from the AED lieutenant position, another employee was given the promotion to AED that had been previously given to Plaintiff. Plaintiff's promotion was blocked due to his support of Vera, and his reporting of the fraud and wage theft, and his wage claim, as well as for him reporting the crimes around the death of Spike the cover up.

51.      Defendants were not content with just punishing Plaintiff by blocking his promotion. They plotted to fabricate allegations against Plaintiff to justify opening a rigged investigation into him, to retaliate against him and to try to discredit him as a whistleblower.

52.      On January 6, 2022, Plaintiff went off duty on doctor's orders, based on the stress from the ongoing retaliation. This would be the last day the Plaintiff would ever work for LASD. Villanueva, Satterfield, attorney Georgia Glaviano-Dunne (Constitutional Policy Adviser to Villanueva), and Defendants Barragan and Giandomenico conceived fake allegations against Plaintiff, without concern over how flimsy and petty the allegations were, and how easy it would be to instantly disprove the allegations. Defendants fabricated the existence of an anonymous informant that Plaintiff had driven a company vehicle to Lake Havasu.

53.      From January to April 2022, the Defendants Giandomenico, Barragan, and Villanueva continued to plan fake allegations against Plaintiff in retaliation for his support of Vera and for his reporting the fraud and wage theft and making a wage claim. In early May 2022, Defendant Villanueva ordered a fake Internal Affairs Bureau ("IAB") investigation to proceed against Plaintiff, and Chief Ewell signed the memorandum to officially authorize the investigation.

54.      On or about April 28, 2022, Assistant Robin Sheriff Limon filed a tort claim against the Department. In her claim, Limon stated, "A Lieutenant, initials J.G. was qualified and approved and vetted through the chain of command through the Chief and the Complainant [Limon] for a promotion to a coveted position. J.G. attended the required training but was improperly removed

from the selection process by the Sheriff in retaliation, in violation of First Amendment rights, because the Sheriff discovered he donated money to Eli Vera's campaign." Following the news of this lawsuit, Plaintiff received several phone calls about the statement in the claim which referred to Plaintiff Joseph Garrido as "J.G.," because it was well known at LASD the Sheriff had wrongfully retaliated against Plaintiff.

55.     On May 8, 2022, Defendants hired an extra lieutenant at SEB, bringing the total not counting Plaintiff to four, and LASD only budgeted for four. As the 5th Lieutenant, the message from Defendants was loud and clear, that there was no place for Plaintiff in SEB or LASD. Never in the history of LASD had there been five Lieutenants at SEB, while other units needed Lieutenants. By taking away Plaintiff's authority through the addition of unnecessary Lieutenants, LASD attempted to force Plaintiff out of SEB.

56.     On May 11, 2022, Plaintiff filed a tort claim for damages based on retaliation for whistleblowing on breacher pay and Spike, for his wage claim, and for financial contribution to Eli Vera's campaign against the County. Plaintiff's tort claim was based on him reporting several violations of laws and statutes including intentional Wage Theft in violation of *California Labor Code 200* including *204*, and *Labor Code 510*, and *Penal Code 487m Grand Wage Theft* and *AB1003*, fraud and false statements to the Court, in violation of Penal Code 118.1 PC for deliberately putting false information in a report and also *118 PC* for committing perjury, as well Plaintiff reporting concerns about monies being paid to an employee who did not earn it, a theft of public dollars, a crime under *California Penal Code 424*, as well as embezzlement under *U.S.C. section 641*; also, Plaintiff reported that Spike's death may have *violated Penal Code 597.7* for the handler leaving the animal in unattended vehicle under conditions that endangered the dog's well-being, and the cover up and obstruction of justice (in violation of *Penal Code 148*) regarding the death of Spike.

57.    Right after the County and LASD received the tort claim, on the same day of May 11, 2022, Defendants Villanueva, Giandomenico, and Barragan with the assistance of ICIB Captain Catrina Khasaempanth, upgraded the fake administrative investigation into a fake criminal investigation against Plaintiff. Khasaempanth knew this was not a legitimate investigation and saw that Barragan did not write up the fake charges well enough to pull off the plan. Khasaempanth guided Defendant Barragan on how to rewrite his initiation of the ICIB into Plaintiff to fraudulently make the document look legitimate on the surface. The plaintiff was accused of stealing gasoline by taking his company vehicle to Arizona to tow a boat, without permission. (Khasaempanth had proven herself to Villaneuva and Undersheriff Murakami to be willing to engage in wrongful and criminal conduct to frame employees, as she had recently taken a lead role in framing a whistleblower who reported a captain and others for timecard fraud, cheating on the lieutenant's exam, and discriminatory hiring practices when Khasaempanth had served as Lieutenant Aide to Murakami. In contrast, Captain Jason Shriner had demonstrated integrity as unit commander over ICIB. So, shortly before framing Plaintiff with the fake criminal investigation, Villanueva transferred Shriner out of ICIB as Captain and made Khasaempanth the Captain over ICIB to carry out the dirty work of framing of the Plaintiff. Khasaempanth's promotion to Captain was "well-earned.")

58.    Sergeant William Morris ("Morris") was assigned to investigate the allegations against Plaintiff for ICIB. Morris discovered that the investigation never should have been initiated as it was based on fake and easily disproven charges. Morris and LASD supervisors discovered that the anonymous informant was pure fabrication by the Defendants. Morris' investigation totally exonerated Plaintiff.

59.    When Morris came to Plaintiff's neighborhood to conduct the criminal investigation, Plaintiff advised Morris that the issue was above his pay grade. Morris replied, "I

suspect that." Plaintiff then pointed at a Vera for Sheriff sign and said it has to do with that, Morris said "probably so."

60.    Even though Plaintiff was ultimately exonerated, the fake ICIB investigation destroyed Plaintiff's reputation, within LASD and with his neighbors being misled to believe that he was a disgraced law enforcement official being investigated for stealing a boat.

61.    On or about August 16, 2022, Defendants further retaliated against Plaintiff with yet another adverse employment action. Plaintiff had received the highest possible rating of "outstanding" performance evaluations for over 10 years in a row and all years he was assigned to SEB. However, this time, Defendant Giandomenico backdated and downrated the evaluation to "competent," and made several false statements about Plaintiff in the evaluation. Giandomenico, by policy against conflict of interest, was not even supposed to do Plaintiff's evaluation since Plaintiff had filed a grievance against him.

62.    In April 2024, after Plaintiff was forced to retire due to the stress from the retaliation, LASD acknowledged that Giandomenico's downgrading of Plaintiff was improper. LASD then struck two of the false statements from Giandomenico, included a commendation that had been purposely left out by Giandomenico, and raised Plaintiff's evaluation to "very good." This rating was still not proper, as Plaintiff should have been rated as "outstanding", but the changes were at least an admission by the County that its executives had retaliated against Plaintiff.

63.    In July 2022, the individual Defendants filed a fraudulent claim against the Plaintiff with the California Department of Insurance, lying that Plaintiff was faking an injury.

64.    Plaintiff filed his original complaint here in October 2022. In response to the complaint, Villanueva illegally used the County-paid Nixle public notification system – utilized by police and other agencies to send out emergency notifications to the public – to lie about Plaintiff to damage his reputation.

65.     In October 2022, Sergeant Morris completed his ICIB investigation into Plaintiff, with a total exoneration of Plaintiff. However, ICIB Captain Khasaempanth ordered Sgt. Morris to fraudulently alter the investigation report, in order to hide her liability and collusion in the fake investigation into Plaintiff. Morris believed fraudulently altering the report would be a crime and refused to commit crimes with Khasaempanth and would not make the changes demanded by her. Khasaempanth refused to do her job and sign off on the report.

66.     Eventually after Plaintiff wrote several emails and memorandums to executives proving his innocence backed by evidence, in or about May 2023, Commander Rodney Moore signed off on the report in the captain's stead and Plaintiff was officially exonerated.

67.     In December 2023, Defendant Barragan continued his obsession with retaliating against Plaintiff. Barragan attempted to initiate a second fake criminal investigation into the Plaintiff. (A bank made an error in withdrawing money from a wrong account, and quickly apologized for doing so; yet Barragan seized on it to try to use it against Plaintiff.). This time, LASD Executives quickly dismissed Barragan's efforts and did not allow him to initiate another fake investigation and warned him to recuse himself from anything to do with Plaintiff.

68.     On March 30, 2024, due to the severe distress from the retaliation, Plaintiff stopped working for LASD and the County, constructively terminated by the County. Plaintiff suffered millions of dollars in lost salary due to the termination.


**THE COUNTY OF LOS ANGELES RATIFIED ALL THE MISCONDUCT OF VILLANUEVA AND THE OTHER DEFENDANTS, AS THE COUNTY DID NO INVESTIGATION AND HELD NO EMPLOYEES ACCOUNTABLE FOR THE FRAMING LT GARRIDO AND ALL OTHER RETALIATION AND CRIMES COMMITTED AGAINST THE PLAINTIFF**

69.     The County ratified all the misconduct committed against the Plaintiff as well as all the misconduct and crimes reported by the Plaintiff.

70.     The Plaintiff reported the killing of Spike, the K-9 canine officer who was left in a boiling hot car by his handler with no air conditioner and died a tortured death. The County did no investigation of the killing. The County produced a false police report, posting it online and announcing to the media a fake inquiry letter, with quotes from a fabricated veterinarian. After media outlet, WitnessLA, wrote a story about the crime of the cover up of Spike's death, it was awarded "crime story of the year." However, LASD's ICIB and the County's District Attorney did no criminal investigation. Nor did LASD even do an IAB administrative investigation into the death of Spike and the cover up of it.

71.     The Plaintiff reported the theft of $3 million in employee wages and perjury and fraud in supporting a cover up of the failure to pay the employees what was owed to them. The County did no investigation. LASD's ICIB and the County's District Attorney did no criminal investigation. Nor did LASD even do an IAB administrative investigation.

72.      Several LASD officials and supervisors, including the individual defendants blocked Plaintiff's promotion and participated in the framing of Plaintiff. Sgt. William Morris was assigned to investigate Plaintiff. He discovered that the officials and supervisors concocted that there was an anonymous informant claiming that Plaintiff stole gasoline by taking an LASD vehicle to Arizona. Morris also found the allegations were made up out of thin air and that there never should have been a criminal investigation. A one-minute inquiry would have shown that Plaintiff could not have driven the vehicle to Arizona based on the odometer. Inspector General Max Huntsman reviewed the investigation and made the party admission on behalf of the County that Plaintiff was completely innocent from the beginning and that the criminal investigation was carried out as retaliation. However, when Sgt. Morris turned in his report in October 2022 to close it out,

Captain Catrina Khasaempanth refused to sign off on it, and demanded that Morris commit fraud and alter the report.

73.    On or about January 2023, Sgt. Morris met with the newly appointed Undersheriff, April Tardy, as Khasaempanth continued to refuse to sign off the investigation report. Sgt. Morris reported to Undersheriff Tardy about the fraudulent conduct by Barragan, Giandomenico, Villanueva, Williams, and Khasaempanth in initiating and the maintaining the investigation against Plaintiff when they knew that he was innocent before they initiated the criminal investigation. Sgt. Morris also reported that Khasaempanth was demanding he commit crimes to alter his investigation report and hide the captain's role in it. Tardy responded by claiming that Khasaempanth would be properly and quickly transferred from ICIB, to minimize future harm that she could cause. However, that transfer of Khasasempanth never happened.

74.    Inspector General Max Huntsman and others repeatedly called on LASD to do an investigation the framing of Plaintiff and the killing and cover up of Spike, but LASD refused.

75.    In the Spring of 2023, Plaintiff has numerous conversations and exchanges of text messages with Chief of Staff, Jason Skeen, where Plaintiff reminded Skeen that he was a victim of retaliation, for his support of Vera and for being a whistleblowing. Plaintiff asked Skeen for him and Sheriff Luna, and LASD officials to investigate the false police reporting by the individual Defendants and others. Skeen acknowledged that the individual Defendants needed to be investigated for the crimes and other wrongful conduct, when Skeen stated, "those are serious allegations." However, LASD never followed up with any investigation and never held any of the individual Defendants, and the other tortfeasing LASD employees, accountable for their misconduct. Not a single employee to this day has been held accountable for the retaliatory criminal and other misconduct toward the Plaintiff.

76.     Other than Villanueva who was voted out of office, all the wrongdoers against Plaintiff were allowed to remain in supervisory positions without any consequences or scrutiny. And to make clear that it was approving and supporting the framing of an innocent, highly decorated lieutenant, the Plaintiff, and the other retaliatory acts, on June 7, 2024, Defendant Barragan was rewarded by LASD for his retaliation against Plaintiff with a promotion to commander.

77.     Recently, the California State Attorney General announced that it is forcing reform on LASD. If the County does not settle with the DOJ, the DOJ will sue the County and force change through litigation. The failure of LASD to investigate the wrongdoing against Plaintiff and other whistleblowers, the failure to hold any of the wrongdoing supervising employees accountable, and the failure to reform and end LASD's corrupt customs and practices, demonstrates that the County is unable to police itself. Intervention by the DOJ is necessary to end the County's status quo of corruption and ratification of illegal and wrongful conduct.

## JURISDICTION AND VENUE

78.     This Court has jurisdiction over both causes of action. Venue is proper because Defendants are located in the County of Los Angeles, and all the events, actions, or omissions giving rise to these claims occurred in the County of Los Angeles.

## PARTIES

79.     Plaintiff Joseph Garrido was a Lieutenant for LASD until being terminated by the County.

80.     Defendant Los Angeles County is a municipal entity that operates and operated LASD, which is an agency of the County.

81.     Defendants SHERIFF ALEX VILLANUEVA, CHIEF JOSEPH WILLIAMS COMMANDER THOMAS GIANDOMENICO, and CAPTAIN OSCAR BARRAGAN were or are employed by LASD and the County and are residents of Los Angeles County. The County is

liable for all their wrongful conduct and the misconduct of all its other employees' misconduct against Plaintiff.

## THE WRONGFUL CONDUCT COMMITTED BY THE DEFENDANTS HAS BEEN CONTINUOUS AND ONGOING

82.      All the acts of violation of state and federal laws and policies, making false statements, harassment, and retaliation are timely under the continuing violation doctrine because, commencing in 2020 and continuing through the filing of this complaint, the Defendants subjected Plaintiff to a series of adverse actions that were similar-in-kind, i.e., were motivated by the same retaliatory animus, even if otherwise different actions, occurred with reasonable frequency, and did not acquire permanence at the earliest until Plaintiff filed his third amended complaint here. Defendants therefore remain liable for this entire course of conduct, including acts predating any statutory period in as much as at least one, and, here, many of the acts occurred within the statutory period.

83.      Sheriff Villanueva and his agents, including the other individual Defendants, were or are employed by the County of Los Angeles, in the Los Angeles County Sheriff's Department. Villanueva was responsible for managing, supervising, and disciplining employees in LASD.

84.      Villanueva was responsible for unlawful conduct. He is also obligated to take disciplinary action for misconduct and to protect LASD employees, including Plaintiff, against threats, intimidation, hostile work environment, and retaliation in all forms.

85.      Plaintiff is informed, believes, and thereupon alleges that Defendants, whether individual, corporate, associate or otherwise, are unknown to Plaintiff at this time, who therefore sues said Defendants by such fictitious names.

86.     Plaintiff has complied with and/or exhausted any applicable claims, statutes and/or administrative and/or internal remedies and/or grievance procedures or are excused from complying therewith. Plaintiff filed a government claim with the County of Los Angeles and filed this lawsuit less than six months after it was denied by the County. Accordingly, Plaintiff has timely exhausted his administrative remedies.

<u>FIRST CAUSE OF ACTION FOR</u>

<u>UNLAWFUL RETALIATION: LABOR CODE § 1102.5</u>

<u>(WHISTLEBLOWER LAW)</u>

<u>(AGAINST DEFENDANT COUNTY OF</u>

<u>LOS ANGELES)</u>

87.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding 86 paragraphs.

88.     *California Labor Code § 1102.5* prohibits retaliation against any employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, or to a superior in the employer's organization, so long as the employee has reasonable cause to believe that the information discloses a violation of law or regulation. This statute reflects the "broad public policy interest in encouraging workplace whistleblowers to report unlawful acts without fearing retaliation." *Green v. Ralee Eng. Co.* (1998) 19 Cal.4th 66, 77-78.

89.     The Court in *Yanowitz v. L'Oreal USA, Inc.* held that "In determining whether there was an adverse employment action to show retaliation, courts look at the totality of circumstances and not just at each isolated act. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1055 ("we need not and do not decide whether each alleged retaliatory act constitutes an adverse employment

action in and of itself."); Adverse employment actions can include demotions, reassignments, refusals to promote, unwarranted evaluations, tolerating harassment by co-workers, reprimands and/or suspensions. (*Yanowitz,* supra, 36 Cal.4th at 1061.) "Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of [the FEHA]." (Id. at 1054-1055.) "[A] hostile work environment can constitute [an] , adverse employment action." (Id. at 1054.)

90.    "The retaliatory motive is 'proved by showing that plaintiff engaged in protected activities, that his employer was aware of the protected activities, and that the adverse action followed within a relatively short time thereafter.' The causal link may be established by an inference derived from circumstantial evidence, 'such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision.' (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69.)

91.    Plaintiff Lieutenant Joseph Garrido is a whistleblower and was punished severely with multiple adverse employment actions by the Defendant County of Los Angeles ("County") for reporting what Lt. Garrido believed to be crimes and violations of statutes. Lt. Garrido observed and reported that LASD was cheating numerous employees out of millions in earned wages and engaging in intentional Wage Theft in violation *of California Labor Code 200* including *204, Labor Code 510, Penal Code 487m Grand Wage Theft* and *AB1003*. Lt. Garrido also reported after he witnessed LASD lie about stealing the wages as they committed fraud and made false statements

to the Court, in violation of *Penal Code 118.1 PC* for deliberately putting false information in a report and also *118 PC* for committing perjury. Lt. Garrido also reported concerns about monies being paid to an employee who did not earn it, which would be a theft of public dollars, a crime under *California Penal Code 424* (as well as embezzlement under *U.S.C. section 641*).

92.    Lt. Garrido also reported the killing of a police dog Spike and the cover up of the killing. Lt. Garrido believed the handling sergeant who caused Spike's death may have violated *Penal Code 597.7* for leaving the animal in unattended vehicle under conditions that endangered the dog's well-being. Lt. Garrido also reported to LASD for what he believed to be a cover up and obstruction of justice (in violation of *Penal Code 148*) regarding the death of Spike. After Lt. Garrido reported these crimes, in addition to violating *1102.5*, LASD officials violated *Labor Code 8547* and for not protecting employees for reporting fraud and violations of law, and *Labor Code 6310* by blocking Lt. Garrido's promotion.) After Lt. Garrido continued to report law and statute violations, the County engaged in additional crimes, including *Penal Code 148* and *118.1*, concocting a fake police report and memo to further cover up the killing of Spike.

93.    Plaintiff repeatedly spoke out about illegal conduct and refused to carry out practices and acts that would have been rule and law violations. As a result of Plaintiff's whistleblowing, the County was forced to pay over $3 million in pay that Villanueva and LASD tried to cheat to its employees out of breacher pay. Villanueva and LASD were incensed over Plaintiff standing up for his co-workers. The County retaliated against Plaintiff when he spoke out about and blew the whistle on the County employees, and their illegal activity.

94.    Defendants retaliated against Plaintiff for disclosing violations of or noncompliance with County, state and/or federal labor laws to person(s) with authority over him and/or to other employees who had authority to investigate, discover, or correct the violations or noncompliance, which they had reasonable cause to believe had taken place.

95.    Retaliation against Plaintiff included a demotion, a blocking of bonus pay, and the blocking and reversal of his promotion. The County also subjected Plaintiff to a fake, rigged ICIB criminal investigation and a fraudulent lowering of his rating on his annual performance evaluation. The County also destroyed Plaintiff's stellar reputation by making intentionally false statements, including by telling his neighbors that Lt. Garrido had stolen a vehicle. The Defendants further retaliated against Plaintiff by constructively terminating him, as he is too distressed by unrelenting, vicious retaliation to ever return to work. Lt. Garrido's last day of employment at LASD and the County was March 31, 2024.

96.    At all times herein mentioned, Defendant County had actual and/or constructive knowledge of the retaliatory conduct levied against Plaintiff by Defendants County and Villanueva and the other individual Defendants. The County ratified the conduct of its employees as it gave no discipline and did no intervention to stop any of the wrongful actions of the employees. In fact, LASD responded to Plaintiff blowing the whistle by initiating a fake criminal investigation against him, encouraging a hostile work environment towards Plaintiff, and constructively terminating his services. The County did no investigation into the misconduct and made no effort to hold the bad actors accountable. LASD and the County refuse to break from its long-standing practice and culture of retaliating against whistleblowers and employees for exercising their First Amendment rights. The ratification of the misconduct against Lt. Garrido has been carried out across two administrations, from one sheriff to another. The retaliation started under Sheriff Villanueva but continued under the Luna administration. The same is true for the ratification, as all the bad actors were left in their executive positions without scrutiny or consequences. Defendant Baragan was recently promoted to Commander, despite there being no investigation into his wrongful and illegal conduct, and as a reward for his retaliation against the Plaintiff.

97.     After Plaintiff filed his original complaint, Villanueva engaged in further defamation against Plaintiff, lying about his allegations, and drafting and posting a fraudulent memo in furtherance of the County's cover up of the death of Spike.

98.     Defendants destroyed Plaintiff's career at LASD.

99.     As a direct, foreseeable, and proximate cause of Defendants' retaliatory conduct and failure to act, Plaintiff suffered humiliation, embarrassment, anxiety, mental anguish, physical pain, and symptoms of extreme and severe distress.

100.    Plaintiff was a Canine Lieutenant and by all objective accounts a highly qualified employee of LASD who would be on a fast track to promotion to captain, then commander, were it not for the retaliation against him. Plaintiff was constructively terminated. Subsequently, Plaintiff has lost substantial future income.

101.    As a further legal result of the above-described conduct of Defendants, Plaintiff has and will continue to incur attorneys' fees and in costs amount according to proof.

102.    Defendants' actions were ratified by managing agents and were committed with wrongful intent to harm Plaintiff in conscious disregard of his rights.

103.    Plaintiff timely exhausted administrative remedies.


<u>SECOND CAUSE OF ACTION FOR</u>

<u>DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. §1983</u>

<u>(AGAINST DEFENDANTS COUNTY OF LOS ANGELES, ALEX VILLANUEVA,</u>

<u>JOSEPH WILLIAMS, THOMAS GIANDOMENICO, and OSCAR BARRAGAN)</u>

104.    Plaintiff re-alleges and incorporates by reference the allegations in the preceding 103 paragraphs.

105.    A Relevant portion of *42 U.S.C § 1983* states that " Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…" *42 U.S.C. § 1983.*

106.    Plaintiff's constitutional rights were clearly established at the time Defendants' retaliation occurred. Under the First Amendment of the Constitution, Plaintiff has the right to free speech, and the right to petition the Government for redress of grievances. As to his speech right, "it was established prior to 1985 that government employees had a right under the First Amendment, though not an unlimited right, to speak on matters of public concern." *Frank v. Relin*, 1 F.3d 1317, 1328 (2d Cir.1993); also see *Szoke v. Carter*, 974 F. Supp. 360, 369 (S.D.N.Y.1997). Plaintiff is a private citizen who merely exercised his constitutional right of speech on matters of public concern. Additionally, Plaintiff also has the constitutional right of due process under the 14th Amendment.

107.    The plaintiff exercised his right of speech and right to petition when he reported the fraud and wage theft of breachers pay and filed a wage claim, a matter of public concern relating to fair employment, and asked the LASD to redress the grievance. The Plaintiff's grievance for stolen breacher pay was a matter of public concern, and not merely a matter of his own private income. Lt. Garrido's grievance was related to and grew out of LASD's illegal withholding of breacher pay for numerous deputies, and LASD's fraudulent statements made to try to cover up the wage theft of $3 million. Intertwined with Lt. Garrido reporting the fraud and succeeding in getting the owed breacher pay paid to the deputies, Lt. Garrido also reported the fraud and theft to the supervisor's union, PPOA, and to supervisors represented by PPOA. Lt. Garrido and the other

supervisors proceeded to file their own grievances for the illegally withheld breacher pay. Lt. Garrido was retaliated against for all his efforts to the breacher pay, reporting the fraud and wage theft, filing his own grievance along with the other supervisors filing their grievances. As a whole, the reporting by Plaintiff on other's behalf, as well as his own behalf, and the multiple filings of grievances, is very much of public concern. You cannot separate out Plaintiff's wage claim from the other breacher pay issues and the motivation for Lt\. Garrido's actions, and for the Defendants' motivations to retaliate against Lt. Garrido.

108.    Plaintiff also exercised his speech right through his support for Eli Vera's candidacy for Sheriff, which is also a matter of public concern in connection to a fair election. While exercising his rights, Plaintiff did not interfere with official function of the government.

109.    Defendants deprived Plaintiff of his 1st Amendment speech and petition rights and his 14th Amendment due process rights, as they retaliated against Lt. Garrido for supporting and donating money to the political campaign of Sheriff's candidate Eli Vera. Villanueva made it clear to Lt. Garrido and to other witnesses that he was enraged by his support of a candidate running against Villanueva and that he and LASD and Defendants Barragan and Giandomenico would viciously retaliate against him for doing so. Defendants additionally violated Plaintiff's First Amendment rights and due process rights when they retaliated against Plaintiff for reporting wage theft and filing a wage claim grievance for his unpaid earned pay.

110.    In addition to a long-established practice and custom of LASD retaliating against whistleblowers, LASD has a long history of the practice and custom of retaliating against employees for donating money and/or voting for sheriff's candidates. Decades ago, Sheriff Lee Baca and Undersheriff Paul Tanaka were infamous for retaliating against LASD employees who they believed were expressing their First Amendment, Free Speech rights, supporting and voting for candidates who ran against the sheriff or who were running against the sheriff for re-election.

Baca and Tanaka "blackballed" employees denied earned promotions and gave unwarranted demotions, and rigged false investigations, based on employees' political affiliations. This practice of LASD retaliating against LASD employees for exercising their first amendment rights was firmly established as a custom at LASD during the Baca era, 1998-2014. For example, Captain Chuck Antuna was one of 8 LASD employees who their trial in 2015 against the County for being retaliated against by Sheriff Baca for supporting a rival sheriff's candidate. This practice and custom at LASD continued on through successive sheriffs and continues today.

111.    When Villanueva was elected sheriff in 2018, he took this practice and custom to an extreme level, and carried it out throughout his four-year tenure, as he and his associates (the individual Defendants here) went after whomever he felt opposed his re-election and was supporting candidates, against him for re-election. Villanueva was especially vindictive towards employees who he perceived were donating money and voting for candidate Eli Vera. At the time, Villanueva believed that Vera, another high-ranking LASD official, was the strongest challenger to his re-election campaign.

112.    Villanueva took wrongful action against perceived supporters of Vera with the purpose of stopping those and other employees' support of Vera. Multiple LASD employees were retaliated against for supporting Eli Vera, including Deputy Kristine Corrales, Sergeant Joaquin Rincon, and Secretary Cynthia Gallegos.  This practice and custom of retaliation against employees for supporting sheriff's candidates has been ongoing for decades.

113.    LASD is a branch of the County, and the County is liable for wrongdoing done by LASD. However, Villanueva and his associates were policy makers as the County allows LASD to operate on an "island," without transparency, setting policies and retaliating against employees with impunity, as if it is not accountable to the County. More importantly, whether Villanueva is technically a policy maker or not, the Defendant County ratified all the illegal conduct and

retaliation committed by the individual Defendants against the Plaintiff. The Plaintiff reported the killing of Spike, but the County did no investigation of the killing, and wrote a false police report to cover it up. No one, not even the County's District Attorney took any action on the Spike tragedy and scandal and cover up. The Plaintiff reported the theft of $3 million in employee wages and perjury and fraud in supporting a cover up of the theft. The County did no investigation.

114.    Several LASD officials and supervisors, including the individual defendants participated in the framing of Plaintiff. Sgt. William Morris and Inspector General Max Huntsman confirmed the Plaintiff was known to be 100% innocent to the Defendants engaged in crimes to frame the Plaintiff. When Sgt. Morris turned in his report in October 2022 to close it out and end any further effort to falsely charge and convict Lt. Garrido, Captain Catrina Khasaempanth refused to sign off on it, and demanded that Morris commit fraud and alter the report.

115.    Despite Chief of Staff Skeen and Undersheriff Tardy being aware of "serious allegations" and crimes in the framing of Garrido, and the blocking of his promotion, there has no investigation into the matter and not a day of discipline for the individual Defendants, Khasaempanth, and the other corrupt supervisors and officials in LASD.

116.    The County has also made no investigation into the custom and practice of retaliation against employees for sheriff's candidates. There has been no investigation and no investigation and no discipline despite the custom and practice continuing ion for decades. Not a single employee to this day has been held accountable for the retaliatory criminal and other misconduct toward the Plaintiff. Instead, on June 7, 2024, Defendant Barragan was rewarded by LASD for his retaliation against Lt. Garrido with a promotion to commander.

117.    One of the LASD employees that Villanueva vindictively retaliated against was Plaintiff Garrido. Villanueva was angered over Plaintiff reporting fraud and wage theft, for Plaintiff

and other supervisors filing a grievance, and for supporting Vera for sheriff. Villanueva blocked and reversed Plaintiff's promotion and ordered a fake criminal investigation into Plaintiff.

118. Individual Defendants violated Plaintiff's free speech rights under the First Amendment and Due Process rights under the 14th Amendment of the Constitution, and as with the retaliation for him being a whistleblower, reversing and blocking his earned promotion, and subjecting him to what all the individual Defendants knew to be a fake criminal investigation, with charges no reasonable person would think could be true.

119. Defendant Williams deprived Plaintiff of his First Amendment rights on multiple occasions. In the fall of 2019, when Plaintiff reported the breacher pay fraud, Williams fabricated allegations that Plaintiff mishandled a tactical search and tried to open a fake investigation on Plaintiff. In February 2020, when Plaintiff reported his concerns of breacher pay fraud again to Williams and told him of his intent to file his own wage claim through a grievance, and that other supervisors would be filing grievances, Williams removed Plaintiff as the lieutenant overseeing breaching personnel, costing him breacher pay, and began excluding Plaintiff from meetings regarding breacher pay. On November 8, 2020, Williams tried to intimidate Plaintiff into not doing any further reporting on breacher pay, including to PPOA. In February 2021, he again threatened Plaintiff to transfer him at any time to a less favorable position if he continued to get involved in the breacher issue and proceeded with his grievance. When Plaintiff refused to lie for Williams to deputies that they could not file grievances for owed breacher pay, Williams threatened him again, and confronted Plaintiff about speaking with the unions and reporting information on breacher pay. Williams also gave Plaintiff extra assignments to overwhelm him with work. To punish the Plaintiff for his and other supervisors' grievance and wage claims, Williams blocked Plaintiff on April 30, 2021, from getting Dive training so he would lose a 5.5% pay bonus. In his series of retaliations against Plaintiff, Williams also violated Plaintiff's due process right under the 14th Amendment by

retaliating against him for filing his wage claim, instead of hearing the grievance. Defendant Williams also participated in the retaliation against the Plaintiff for supporting Eli Vera by seeking out candidates less qualified than Lt. Garrido to give one of them the position that Lt. Garrido had been promoted to by LASD.

120.    Defendant Giandomenico also deprived Plaintiff of his First Amendment rights. In early 2021, as an immediate response to Plaintiff reporting fraud and wage theft, filing the grievance for his own owed breacher pay, along with other supervisors also filing for breacher pay bonuses under encouragement from Lt. Garrido, and for supporting and donating to Eli Vera's campaign, Giandomenico informed Plaintiff that Plaintiff would no longer be the sole S.W.A.T. lieutenant which cost Plaintiff losses in breacher pay. To punish the Plaintiff for his grievance and wage claim, Giandomenico blocked Plaintiff on April 30, 2021, from getting Dive training so he would lose a 5.5% pay bonus. Giandomenico implied to Plaintiff that he would block his promotion to the AED Lieutenant position because of Plaintiff's support of Eli Vera. On September 2, 2021, Giandomenico, for the same reason, suggested that Plaintiff would not get a promotion because of his support of Vera. Giandomenico and Barragan blocked and reversed Sergeant Joaquin Rincon's promotion to the SEB unit, because of Rincon's support of Eli Vera, and the Defendants were driven by the same motivation to block and reverse Lt. Garrido's promotion and put him under a concocted criminal investigation. Giandomenico along with the other individual defendants blocked and reversed Plaintiff's promotion because of Plaintiff's support of Vera. On or about August 16, 2022, Giandomenico backdated and downrated Plaintiff's performance evaluation, and made false statements about Plaintiff in the evaluation. Giandomenico by policy should not have done Plaintiff's evaluation, since Plaintiff had filed a grievance against him. In doing so, Giandomenico also deprived Plaintiff of his 14th amendment due process rights.

121.     Defendant Barragan also assisted Defendants Villanueva, Williams, Giandomenico, and other LASD employees retaliating against Plaintiff for his grievance and others' grievances, and support of Vera by blocking and reversing his earned promotion and by creating a fraudulent, illegal criminal investigation into Plaintiff. Barragan deprived Plaintiff of his First Amendment rights. Barragan helped others fabricate the existence of an anonymous informant that Lt. Garrido had driven a company vehicle to Lake Havasu. In December 2021, Defendants Giandomenico and Barragan planned to put a fake case on Plaintiff for supporting Vera and reporting the breacher pay issue and Plaintiff's wage claim, and they, along with Villanueva and other LASD executives followed through with the fake case. In December 2023, Barragan attempted to initiate a second fake criminal investigation into the Plaintiff, but this time was stopped by LASD leadership.

122.     The Defendants perpetrated a series of adverse employment actions against the Plaintiff for exercising his constitutional rights. The Defendants demoted the Plaintiff and denied him bonus pay. Despite Giandomenico writing a December 2021 memo stating that Lt. Garrido got a promotion, Villanueva, Barragan, Giandomenico, and Williams then blocked the promotion, with Williams seeking resumes of other candidates in December 2021.

123.     In a concerted effort from January to April 2022, Defendants Giandomenico, Barragan, and Villanueva continued planning fake allegations against Plaintiff in retaliation for his support of Vera and for reporting the fraud and wage theft and his wage claim. In early May 2022, Defendant Villanueva ordered the fake IAB investigation to proceed, and Chief Jack Ewell signed the memorandum to officially authorize the investigation.

124.     Right after the County and LASD received Plaintiff's tort claim for damages based on retaliation for whistleblowing on breacher pay and Spike, on the same day of May 11, 2022, Defendants Villanueva, Giandomenico, and Barragan, with the assistance of ICIB Captain Catrina

Khasaempanth, upgraded the fake administrative investigation into a fake criminal investigation against Plaintiff. Plaintiff was accused of stealing gasoline by taking his company vehicle to Arizona to tow a boat without permission. On May 19, 2022, the promotion that Lt. Garrido had received, before it was stripped from him, was given to another employee.

125.    The extreme stress from the retaliation eventually led to the constructive termination of the Plaintiff, who stopped working for LASD as of March 31, 2024.

126.    Under *Section 1983*, the County and individual Defendants Alex Villanueva, Joseph Williams, Thomas Giandomenico, and Oscar Barragan are liable for subjecting the Plaintiff to conduct that occurred under color of state law, and this conduct deprived him of rights, privileges, or immunities guaranteed under the 1st Amendment and 14th amendment of the Constitution of the United States of America.

127.    "In a §1983 qualified immunity analysis, a constitutional right is "clearly established" if every reasonable official would have understood that what he is doing violates that right at the time of his conduct." *Sampson v. County of Los Angeles by and through Los Angeles County Department of Children and Family Services* (974 F.3d 1012 at 8). "In determining whether a right was clearly established at the time of the conduct at issue in a § 1983 qualified immunity analysis, officials can still be on notice that their conduct violates established law even in novel factual circumstances where there are no prior cases with fundamentally similar or materially similar facts." (*Id.* at 12)

128.    Defendants here have no qualified immunity for their conduct. "Unlike absolute immunity, which shields the defendant no matter how egregious or intentional the conduct, qualified immunity shields only that conduct of a governmental official which he or she reasonably believed to be lawful in light of the clearly established law and facts of the case. *1594 [Citation.]" (*Bearman v. California Medical Bd.* 176 Cal.App.4th 1588, citing *Gensburg v. Miller* (1994) 31

Cal.App.4th 512, 519, fn. 2,37 Cal.Rptr.2d 97.) "When properly applied, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law from §1983 claims." *Julian v. Mission Community Hospital* (11 Cal.App.5th 360 at 28). "If it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted, then the defendant officer must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity; if not, however—i.e., if a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability". *Ziglar v. Abbasi* (582 U.S. 120 at 33) "An officer might lose qualified immunity even if there is no reported case directly on point, but in the light of pre-existing law, the unlawfulness of the officer's conduct must be apparent" (*Id.* at 31)

129.    Moreover, the Individual Defendants' alleged actions cannot be considered objectively reasonable. In *Ballou v. McElvain*, No. 20-35416 (9th Cir. 2022), the Ninth Circuit Court discriminatory investigation and stalling/denial of promotion are unconstitutional. The court citing two analogous cases, *Lindsey v. Shalmy*, 29 F.3d 1382, 1385-86 (9th Cir. 1994), and "so clearly covered by the focus on promotion in" *Bator v. State of Hawai'i*, 39 F.3d 1021, 1028 (9th Cir. 1994), "that any reasonable officer would recognize that discriminatorily conducting an investigation to stall a promotion as unconstitutional under the two cases, read in combination".

130.    Here in this case, Individual Defendants issued veiled threats to Plaintiff, took retaliatory personnel actions against him, and/or permitted instances of improper retaliation against him. Defendants deliberately blocked Lt. Garrido's promotion and demoted him, and under the direction of Villanueva, Joseph Williams, Thomas Giandomenico, and Oscar Barragan subjected Plaintiff to what they knew to be a fake, rigged criminal investigation through ICIB. In doing so, Defendants knowingly violated the law set forth in §1983. They knew what they did was wrong, and they still did it. Therefore, they are not subject to the protection of qualified immunities.

131.     Villanueva, Williams, Giandomenico, and Barragan illegally retaliated against Eli Vera and his family because Vera ran against Villanueva for Sheriff. Villanueva maliciously retaliated against several employees because he assumed they were voting for, supporting, and/or associating with Vera. Lt. Garrido was one of the victims of Villanueva's extreme and outrageous wrath. Villanueva and the other individual Defendants were the moving force behind the violation of Defendants' constitutional rights. Such violations have been the long-standing practice or custom which constitutes standard operating procedure at LASD and the County. As such, Defendant County is liable for their misconduct.

132.     As noted above, the County cannot escape liability for the misconduct of its supervisors and officials, as the County ratified all the misconduct against Plaintiff. The County did no investigation into the misconduct and made no effort to hold the bad actors accountable. LASD and the County refuse to break from its long-standing practice and culture of retaliating against whistleblowers and employees for exercising their First Amendment rights. The ratification of the misconduct against Lt. Garrido has been carried out across two administrations, from one sheriff to another. The retaliation started under Sheriff Villanueva but continued under the Luna administration. The same is true for the ratification, as all the bad actors were left in their executive positions without scrutiny or consequences.

133.     As a direct, foreseeable, and proximate cause of Defendants' deprivation of Lt. Garrido's civil rights, Plaintiff suffered extreme mental anguish, anxiety, severe distress, physical pain, and humiliation. The plaintiff was required to and did employ and will in the future employ physicians and health care providers to examine, treat and care for him, and did, and will in the future, incur medical and incidental expenses. The exact amount of full expenses is unknown to the Plaintiff at this time.

134.     Plaintiff has also suffered substantial loss of earnings due to the blocked promotion and constructive termination.

135.     The County is liable for the conduct of its employees.

136.     Plaintiff is entitled to punitive damages against Individual Defendants in an amount to be determined by proof at trial.

137.     Plaintiff timely exhausted his remedies.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court:

1.     For special damages for the Plaintiff, including but not limited to, lost earnings, benefits and/or out-of-pocket expenses in an amount according to proof at the time of trial, all in an amount set forth above and/or according to proof at the time of trial;

2.     For Plaintiff further special damages, including but not limited to, lost future earnings, benefits and other prospective damages in an amount set forth above and/or according to proof at the time of trial, in the minimum of $5 million.

3.     For Plaintiff general damages, including for pain and suffering, in an amount set forth above and/or according to proof at the time of trial, and at a minimum of $10 million;

4.     For interest: Pre-Judgment and Post-Judgment at the maximum legal rate;

5.     For costs of suit and attorney's fees under § 1021.5, 42 U.S.C. § 1988, and any other applicable law;

6.     Plaintiff further prays that this Court grant such other and further equitable relief as it may deem just and proper.

July 1, 2024

_Vincent Miller_
_____

Vincent Miller, Attorney for Plaintiff

## **JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all issues so triable.


DATED: July 1, 2024


_Vincent Miller_

Vincent Miller, Attorney for Plaintiff

1    **PROOF OF SERVICE BY MAIL AND EMAIL**

2    **STATE OF CALIFORNIA**       ]

3    **COUNTY OF LOS ANGELES**    ]      ] ss.

4

5    I am employed in the County of Los Angeles, State of California.  I am over the age

6    of eighteen and not a party to the within action; my business address is 16255
     Ventura Boulevard, Suite 625, Encino, CA 91436.

7         On July 1, 2024, I served the foregoing document described as PLAINTIFF'S

8    FOURTH AMENDED on the interested parties in by Email and Personal Service

9    ON:

10        PAUL D. KNOTHE
          pknothe@lcwlegal.com

11        JAMES PATRICK BONNIE
          jbonnie@lcwlegal.com

12        LIEBERT CASSIDY WHITMORE

13        A Professional Law Corporation
          6033 West Century Boulevard, 5th Floor

14        Los Angeles, California 90045

15        Telephone: 310.981.2000
          Facsimile: 310.337.0837

16

17   I declare under penalty of perjury under the laws of the State of California that the

18   above is true and correct.

19

20        Executed on July 1, 2024, at Encino, California.

21

22                     VINCENT MILLER

23

24

25