1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

JOSEPH GARRIDO,

                    Plaintiff,

        v.

COUNTY OF LOS ANGELES, a municipal entity; ALEX VILLANUEVA, an individual; JOSEPH WILLIAMS, an individual; THOMAS GIANDOMENICO, an individual; and OSCAR BARRAGAN, an individual,

                    Defendants.

Case No. 2:23-cv-00011-SPG-E

**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 133]**

    Before the Court is the Motion for Summary Judgment (ECF No. 133 ("Motion")) filed by Defendants Alex Villanueva ("Villanueva"), Joseph Williams ("Williams"), Thomas Giandomenico ("Giandomenico"), Oscar Barragan ("Barragan," or, together with Villanueva, Williams, and Giandomenico, the "Individual Defendants"), and the County of Los Angeles (the "County," or, together with the Individual Defendants, "Defendants"). The Court has read and considered the Motions and concluded that they are suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having

considered the parties' submissions, the relevant law, and the record in this case, the Court GRANTS, in part, and DENIES, in part, the Motion.

## I.    BACKGROUND[1]

### A.    Factual Background

Plaintiff Joseph Garrido ("Plaintiff") was employed by the Los Angeles Sheriff's Department ("LASD") from 1991 until his retirement in March 2024.  (JAF 1, 2, 176). Plaintiff was employed in the Special Enforcement Bureau ("SEB") and was promoted to Lieutenant in 2017.  (JAF 11, 12).   The organizational hierarchy in the LASD is, in descending order: Sheriff, Undersheriff, Assistant Sheriffs, Division Chiefs (Chiefs), Area or Unit Commanders, Captains, Lieutenants, Sergeants, Deputies, and Deputy Trainees. (JAF 4).

The County is a municipal government entity that employed all of the Individual Defendants.  (JAF 3).  Villanueva served as the elected Sheriff of the County from December 3, 2018, through December 4, 2022. (JAF 8).  Williams served as SEB Captain beginning in January 2019, where he supervised Plaintiff until being promoted to Commander in March 2021.  (ECF No. 146 at 21 ("Williams Declaration") ¶¶ 2, 4). Giandomenico then served as Plaintiff's direct supervisor until being promoted to acting SEB Commander in April 2022.  (JAF 78, 86).  Following Giandomenico's promotion, Barragan was promoted to acting SEB Captain in April 2022, where he served as Plaintiff's supervisor.  (JAF 9, 12, 78, 86).

---

[1] The following summarized facts are uncontroverted unless otherwise stated.  *See* (ECF No. 144 (Joint Appendix of Facts ("JAF"))).  When determining a motion for summary judgment, the Court considers only evidence admissible at trial, though the form may differ at the summary judgment stage.  *Godinez v. Alta-Dena Certified Dairy LLC*, No. CV 15-01652 RSWL (SSx), 2016 WL 6915509, at *3 (C.D. Cal. Jan. 29, 2016).  The Court has reviewed the entire record, including the parties' JAF, objections, and evidence.  The Court discusses only the facts that are relevant to its decision.  To the extent the Court relies on evidence that is subject to an objection, the Court overrules the objection.  To the extent the Court does not rely on evidence objected to by the parties, the objections are overruled as moot.

Plaintiff brought this action against Defendants, alleging that he was retaliated against for (1) reporting $3 million in "breacher pay" that was illegally withheld from employees, helping deputies secure these payments, and filing his own grievance; (2) reporting the obstruction of an investigation and the coverup of the death of a canine (K-9) named Spike in the arson unit; and (3) donating campaign funds to, and supporting the campaign of, Eli Vera, a candidate who ran against Villanueva in the 2022 L.A. County Sheriff's election.  (ECF No. 92 ("Fourth Amended Complaint") at 3-11).  Plaintiff identifies numerous allegedly adverse employment actions taken against him in retaliation for his conduct, culminating in his constructive termination.  (*Id.* ¶¶ 47-68).  Plaintiff alleges claims under 42 U.S.C. § 1983 against all Defendants for violation of his First Amendment and Due Process rights, as well as a claim for unlawful retaliation against the County under California Labor Code § 1102.5.  (*Id.* at 26-41).

### 1.    Breacher Pay

"Breacher pay" refers to a monetary bonus paid to LASD employees who complete special training on explosive breaching tactics.  (JAF 130).  In 2018, a group of employees filed a lawsuit against the County, alleging that the County had failed to award required breacher pay.  (JAF 131).  Plaintiff, as a Lieutenant, supervised a number of deputy sheriffs, (JAF 125), and he encouraged two deputies, Mark Schultz and Edgar Bonilla, to file grievances for unpaid breacher pay, (JAF 134).  In 2020 or 2021, Plaintiff attended a meeting where he supported the two deputies in filing a grievance, (JAF 135), and he provided documents for the plaintiffs that supported the eventual $3 million award, (JAF 151, 211).  Plaintiff also relayed the deputies' allegations to higher-ups in LASD.  (JAF 136).  The parties dispute whether Plaintiff did this solely as part of his management duties or if his actions exceeded anything required by his position.  (JAF 136, 137).  Plaintiff later filed his own grievance over breacher pay in February 2021.  (JAF 139).

The parties dispute how the Individual Defendants viewed Plaintiff's actions. Williams claims that he had no opinion on, or involvement with, the breacher pay lawsuit, and that he was not aware of Plaintiff's involvement in the lawsuit.  (JAF 141, 142).

Williams also states that he never told Plaintiff that deputies should be discouraged from filing grievances regarding breacher pay. (JAF 143). Plaintiff responds that Williams purposefully hid documents and evidence from the breacher pay lawsuit, that he was only exposed because Plaintiff reported him, and that Williams was enraged by Plaintiff's actions. (JAF 141, Plaintiff's Response; JAF 212).

Villanueva, meanwhile, states that the issues regarding breacher pay all arose well before he became Sheriff, and that he neither knew of, nor was concerned with, Plaintiff's activities. (JAF 148). Plaintiff responds that many of the actions, including Plaintiff's own grievance suit, occurred after Villanueva was elected, and that Villanueva was aware of the suit. (JAF 148, Plaintiff's Response). Finally, Barragan and Giandomenico state that they supported the breacher pay lawsuit, were personally affected by the non-payment, and wrote declarations in support of a motion to intervene. (JAF 152, 154). Plaintiff responds that Barragan and Giandomenico did not support the lawsuit until after it had proven to be successful. (JAF 152, Plaintiff's Response).

### 2. K-9 Spike

Spike was a dog in the arson unit, who specialized in detecting accelerants at the sites of fires. (JAF 182). On September 29, 2020, Spike's handler left Spike unattended in a police vehicle, resulting in Spike's death from overheating. (JAF 183, 184). Upon learning of the death, Plaintiff reached out to Williams, stating, "If I were you, make sure you investigate this," to which Williams replied, "Yup, yup. Thanks, Joe." (JAF 187). The subsequent LASD investigation concluded that Spike's death was an accident. (JAF 190); *see also* (ECF No. 147-1 at 27).

Though Plaintiff initially had no evidence of foul play or negligence, by Fall of 2021, he came to suspect that the LASD was covering up the death. (JAF 189, 213). Plaintiff checked internal files and concluded that no legitimate supervisory memorandum regarding Spike's death had been written. (JAF 214). Plaintiff reported his concerns to Commander Rob Lewis ("Lewis"), (JAF 215), though he never made any formal complaint or report, (JAF 193). Plaintiff provides a sworn declaration from Dr. Yolanda Cassidy,

who attests that LASD's inquiry memo on Spike's death falsely identifies her as the treating veterinarian and attributes several false quotes to her. (ECF No. 146-1 at 48 ("Cassidy Declaration") ¶¶ 7-8). Some time later, the L.A. Times began reporting on the alleged coverup, and Williams became angry at Plaintiff, assuming that he had contacted the paper.[2] (JAF 216).

### 3. Support for Vera

Eli Vera ("Vera") was a candidate for the position of LASD Sheriff in 2022, running against Villanueva. (JAF 155). Plaintiff donated $1500 to Vera's campaign and placed lawn signs in support of Vera on his and his father's lawns on June 30, 2021. (JAF 156). No one told Plaintiff that they saw his name on a website having contributed to Vera's campaign, and Plaintiff is not aware of any LASD employees visiting his home, aside from Investigator William Morris. (JAF 157, 158). Plaintiff never told Williams that he supported Vera, never posted anything online about Vera, and did not talk about his support for Vera at work. (JAF 160, 161, 162).

However, Plaintiff provides a declaration from Robin Limon ("Limon"), an Assistant Sheriff during Villanueva's tenure, who states that she observed that "Villanueva and his top aides would regularly check online to see who donated to Vera" and would "talk angrily about employees who donated to Vera." (ECF No. 146 at 27 ("Limon Declaration") ¶ 5). Limon attests that Villanueva was aware of Plaintiff's support for Vera and that he took retaliatory actions against Plaintiff "because [Plaintiff] supported Vera and donated money to Vera's campaign." (*Id.* ¶ 8). Plaintiff also provides a declaration from Bruce Chase ("Chase"), another Assistant Sheriff during Villanueva's tenure, who attests that he observed Villanueva "on more than one occasion, discussing employees who had donated money to the Eli Vera campaign and not being happy about it," including

---

[2] Defendants argue that this statement is only supported by inadmissible hearsay. However, the sworn statement from Dr. Cassidy as to what Williams told her is admissible both because it is not being used for the truth of the matter asserted and because Williams is an opposing party. *See* Fed. R. Evid. 801.

Plaintiff. (ECF No. 146-1 at 2 ("Chase Declaration") ¶ 9). During his deposition, however, Chase could not recall any specifics of what Villanueva said regarding his dissatisfaction with Plaintiff, and Chase did not specifically speak with Villanueva about Plaintiff's support for Vera. (JAF 144, 146). Plaintiff also provides a declaration from Vera, who attests that it was well known, including by Barragan, Giandomenico, and Williams, that he and Plaintiff were close personal friends. (ECF No. 146-1 at 7 ("Vera Declaration") ¶ 13).

### 4. Alleged Retaliation

Plaintiff alleges that, because of his support for the breacher pay lawsuit, his outspokenness about Spike's death, and his support for Vera, numerous adverse employment actions were taken against him.

#### a) *Dive Training*

First, at some point in 2021, Plaintiff requested the opportunity to participate in "dive training," the completion of which would have enabled him to receive a pay bonus. (JAF 79, 81). Giandomenico informed Plaintiff that he could not participate in the training because there were no open positions for it. (JAF 82). In late 2021, Williams denied Plaintiff's dive training request, stating that there were no openings on the dive team and that he did not want to send an employee to training if they would not receive any bonus pay after completion. (JAF 83; Williams Decl. ¶ 13). No one directly told Plaintiff that Williams denied his application for dive school because of his advocacy for breacher pay. (JAF 85).

However, Plaintiff contends that the claim that there were no openings was untruthful, that prior applicants had been approved, and that the ordinary practice was to establish a waiting list for applicants. (JAF 80, 82, Plaintiff's Responses). Plaintiff argues that, while Williams never directly stated that he was denying the application because of Plaintiff's advocacy for breacher pay, the timing of the denial demonstrates that it was in retaliation. (JAF 85, Plaintiff's Response). Plaintiff states that Williams had previously screamed and cursed at Plaintiff for his participation in the breacher pay lawsuit and had

impliedly threatened to transfer Plaintiff by stating that anyone "could be moved at any time." (*Id.*; ECF No. 146 at 34 ("Garrido Declaration") ¶ 21). Williams admits to making this latter statement, but says that it was not a threat and was "in line with regular Department practice of moving employees as necessary based on staffing needs." (Williams Decl. ¶ 17).

### b) *AED Lieutenant Promotion*

At some point in 2021, Lieutenant Susanne Burakowski ("Burakowski"), who held the position of Arson Explosives Detail ("AED") Lieutenant with the SEB, informed the LASD that she intended to retire in 2022. (JAF 38). Plaintiff became interested in the position. (JAF 39). Giandomenico was informed by Chief Jack Ewell ("Ewell") that Plaintiff would be promoted into the role, (JAF 40), and Plaintiff was approved for training required for the position in December 2021, (JAF 61). Both Williams and Giandomenico sent Plaintiff text messages indicating that Plaintiff would get the AED Lieutenant position after Burakowski retired, though neither Williams nor Giandomenico had the authority to make this appointment. (JAF 46-49). In late 2021, Williams collected resumes from employees interested in the position. (JAF 50).

At the time of Burakowski's retirement in March 2022, Barragan was assigned to the AED Lieutenant position on an interim basis. (JAF 56). Barragan was qualified for the position, having previously served as a deputy explosive breacher at SEB, worked as a lieutenant watch commander, and obtained a certificate as a tactical diver. (JAF 51-54). Another Lieutenant, Santiago Cabrera, then held the AED Lieutenant position for a week or two. (JAF 70). Villanueva ultimately approved David Auner for the full-time AED Lieutenant position in 2022. (JAF 69).

The parties dispute whether Plaintiff had already received a promotion to the AED Lieutenant position or was merely being considered for the position. Plaintiff states that he was selected for the role by Ewell in September 2021 and approved by Giandomenico. (JAF 196). According to Plaintiff, Villanueva later became involved in the hiring process and reversed Plaintiff's promotion. (JAF 203). Plaintiff asserts that Villanueva reversed

the promotion because he was enraged by Plaintiff's support for the Vera campaign.  (JAF 204).  Plaintiff points to a declaration from Assistant Sheriff Limon, who attested to witnessing Villanueva reverse Plaintiff's promotion because Plaintiff gave money to the Vera campaign.  (Limon Decl. ¶ 9).  Plaintiff also points to testimony from Assistant Sheriff Chase, who stated that he heard Villanueva and other executives express dissatisfaction with people, including Plaintiff, supporting opposing candidates.  (Chase Deposition at 29:24-25, 30:5-6).

Villanueva states that he was not aware of any promise to Plaintiff that he would succeed Burakowski as AED Lieutenant.  (JAF 65).  Villanueva initiated a process to find a permanent replacement, (JAF 64), and at that time, Plaintiff was ineligible for promotion because he was out on Injury on Duty (IOD) leave as of January 2022, (JAF 76).  Defendants also state that Plaintiff was ineligible for promotion because he was under a criminal investigation.  (JAF 75).  Plaintiff contends that he was only out on temporary leave and was still eligible for promotions, (JAF 76, Plaintiff's Responses), and that the criminal investigation was a sham.

### c) *ICIB Investigation*

The Internal Criminal Investigations Bureau (ICIB) is a body within the LASD that investigates criminal matters involving LASD employees.  (JAF 5).  The Internal Affairs Bureau (IAB) is a similar entity that investigates administrative, noncriminal violations of LASD policy.  (*Id.*).  Authorization to initiate criminal investigations must be given at the Chief level or higher.  (JAF 7).  The standard for conducting an ICIB investigation is whether there are enough facts to support a reasonable suspicion that illegal conduct occurred and that the subject of the investigation is connected to the crime.  (JAF 6).

At some point in late 2021 or early 2022, LASD received a report from an anonymous informant that Plaintiff had taken a Department-issued vehicle on a personal trip to Lake Havasu, Arizona.  (JAF 18).  Ewell became aware of these allegations on April 14, 2022, and assigned Giandomenico to conduct a supervisory inquiry.  (JAF 16).  Ewell later reassigned the inquiry to Barragan, who completed a memo requesting an

"administrative investigation" on May 6, 2022.  (JAF 16, 25; ECF No. 147 at 9).  On May 11, 2022, LASD opened an ICIB investigation into Plaintiff for possible criminal wrongdoing, which was assigned to ICIB Investigator William Morris ("Morris").  (JAF 13, 32).  The investigation ultimately concluded on April 18, 2023, without charges or disciplinary action.  (JAF 27).

The parties dispute how the decision to open an ICIB investigation came about. Defendants argue that it was Ewell who made the decision to investigate Plaintiff and that he did so because the allegations, if true, were criminal in nature. (JAF 14, 15).  Defendants state that Villanueva never spoke with Ewell or Barragan regarding the investigation.  (JAF 17).  Villanueva was informed about the investigation and expressed the view that the inquiry seemed to be dragging along, but he did not otherwise participate in the investigation.  (JAF 31).

Plaintiff argues that the investigation was a sham concocted by Villanueva to punish him for his support of Vera.  Plaintiff asserts that there was no anonymous informant, and that these allegations were instead created by Villanueva's Chief of Staff John Satterfield ("Satterfield").  (JAF 221-22).  Plaintiff points out that ICIB Investigator Morris never identified any anonymous informant, and that Morris stated during his deposition that he could not "think of any other scenario . . . [where] there would be an informant without any sort of documentation."  (Morris Deposition at 29:12-14).  Plaintiff also provides a declaration from former ICIB Captain Jason Schreiner ("Schreiner"), who states that, "[i]f there had been an anonymous informant, there would have been some sort of documentation."  (ECF No. 146 at 68 ("Schreiner Declaration") ¶ 8).  Plaintiff also points to comments allegedly made by ICIB Captain Catrina Khasaempanth ("Khasaempanth") to Commander Nicole Palomino ("Palomino"), in which Khasaempanth expressed that the executives wanted the case there and suggested that, if the anonymous informant's story did not seem plausible, they could instead say the investigation arose out of a random audit of Plaintiff's vehicle.  (Palomino Deposition at 74:15-22).  Morris testified that Khasaempanth later told him to scrub his report of any discussion of his efforts to discover

whether there was an anonymous informant.  (Morris Deposition at 122:16-22).  Morris reported his concerns with Khasaempanth to Undersheriff April Tardy and to Chief Laura Lecrivain.  (JAF 302).

Plaintiff also asserts that it was Villanueva, not Ewell, who ordered that a criminal investigation be opened.  (JAF 223).  Plaintiff asserts that Villanueva and the LASD executives were planning the investigation for months beforehand.  (JAF 235).  Plaintiff suggests that Schreiner was moved from his role as ICIB Captain and replaced with Khasaempanth in March 2022 to facilitate the investigation.  (JAF 229-232).  Plaintiff points to a tip he received from Deputy Heriberto Fernandez on January 6, 2022, in which Fernandez informed him that LASD executives were planning to initiate a baseless investigation to force him out based on perceptions that he was talking to the L.A. Times about the death of Spike.  (JAF 238).

Finally, Plaintiff argues that Giandomenico and Barragan played a role in fabricating the basis for an investigation.  Plaintiff points to a May 3, 2022, memorandum by Sergeant Michael Lutter, which found that at least 228 of the 440 miles added to the vehicle were accounted for by pre-approved medical trips, meaning that Plaintiff could not have taken the vehicle to Lake Havasu.  (JAF 251-56).  Plaintiff argues that, based on this memo, Barragan and Giandomenico knew that Plaintiff could not have committed the alleged acts, yet they omitted this information from the May 6, 2022, memo.  (JAF 261-62).  In his initial memo, Barragan recommended only an administrative investigation but later changed the recommendation to a criminal investigation.  (ECF No. 147 at 9; ECF No. 148 at 9).

### d)    Competent Performance Evaluation

Next, on August 4, 2022, Giandomenico prepared a performance evaluation of Plaintiff, in which he rated Plaintiff's overall performance as "competent," two levels lower than the ratings Plaintiff had previously received.  (JAF 87).  Giandomenico stated that he felt Plaintiff was not completing his work satisfactorily because Plaintiff had failed to complete several assignments that Giandomenico had given Plaintiff before his IOD

leave. (JAF 88, 89). Plaintiff admitted to not completing the four assignments before going on leave. (JAF 91). However, Plaintiff argues that he could not have completed the work while he was out on leave and that it was against LASD policy to lower his score while he was on leave. (JAF 382, 383). Plaintiff filed a formal grievance regarding the performance evaluation, and his rating was ultimately increased by one level from "competent" to "very good" on April 9, 2024. (JAF 92-94).

### e)    Wells Fargo Investigation

On October 23, 2023, Plaintiff went to Wells Fargo Bank and withdrew $33,500 from the Sheriff's Relief Foundation (SRF) Wells Fargo bank account. (JAF 95). Plaintiff intended to withdraw the money from his own personal account, and, after realizing the funds were not withdrawn, he returned to the bank and had the money transferred from his account to the SRF account. (JAF 96, 97). Plaintiff notified the LASD and the SRF about the unintentional withdrawal and indicated that he had returned the funds on November 29, 2023. (JAF 98, 99). Barragan, who supervised the SRF account as part of his job duties, conducted a brief inquiry and learned that Wells Fargo Bank employees made a mistake when they pulled the money out of the wrong account. (JAF 100, 103). Barragan drafted an inquiry memo about the incident on December 11, 2023, and the LASD ultimately did not open a formal investigation or discipline Plaintiff in any way. (JAF 104-06).

Plaintiff argues that Barragan attempted to initiate a second criminal investigation of him, despite Barragan knowing that Plaintiff was innocent. (JAF 396). Plaintiff asserts that Barragan drafted papers to initiate the investigation but was stopped by Chief Lecrivain after Plaintiff reported the incident to her. (JAF 403-04).

### f)    Other Retaliation

Finally, Plaintiff points to a number of other actions taken against him. Giandomenico adjusted the rotation of SWAT detail duties, which Plaintiff claims was intended to impact Plaintiff's work and reduce his role. (JAF 119). Williams also reassigned K-9 duties from Plaintiff to the SEB Sergeant, which Plaintiff claims was done to make it more difficult for him to get paid a bonus. (JAF 123). In 2021, Giandomenico

added additional SWAT lieutenants, which Plaintiff also claims was intended to make it more difficult for him to get a bonus. (JAF 125-128). Plaintiff also complains that Barragan removed Plaintiff from shared SEB files at some point during Plaintiff's IOD leave. (JAF 115).

Plaintiff also identifies a number of actions by unknown individuals. At some point, several items were placed in Plaintiff's mailbox, including a printout of an article about "characteristics of a bad boss." (JAF 107). While Plaintiff does not know who did this, he asserts that it was County employees who work for SEB. (JAF 108). Plaintiff also had a plaque with his name hanging in the LASD gym that was vandalized by an unknown person. (JAF 111-12). At some point, other unknown individuals moved items on his desk and wrote "Bonilla scout," referring to Deputy Bonilla, who Plaintiff had supported in the breacher pay lawsuit. (JAF 116). At another time, an unknown individual filed a transfer request for Plaintiff and wrote "worst lieutenant at SEB." (JAF 117).

### g)    Constructive Termination

Plaintiff last worked for the LASD on January 6, 2022, and was on leave of absence from then until his retirement on March 30, 2024. (JAF 175-77). Plaintiff was diagnosed with a compressed disc and sciatica and was classified as temporarily and totally disabled during his leave of absence. (JAF 178-79). No one at LASD or the County instructed or demanded that Plaintiff submit a retirement application. (JAF 180-81).

However, Plaintiff asserts that he was forced to retire by the stress caused by the alleged acts of retaliation against him. (JAF 450). Plaintiff provides testimony from Dr. George Elias, who states that, based on an evaluation of Plaintiff conducted over video call, Plaintiff's symptoms meet the criteria for "Major Depressive Disorder, single episode, with severe anxious distress." (ECF No. 146-1 at 43 ("Elias Declaration") ¶ 5). Dr. Elias states that Plaintiff had not experienced these symptoms before the alleged adverse employment actions and that Plaintiff "ultimately retired in March of 2024 because his severe symptoms preclude him from being able to perform his job." (*Id.*).

### B.    Procedural History

Plaintiff initiated this action in Los Angeles County Superior Court on October 17, 2022.  (ECF No. 1-1).  In his initial complaint, Plaintiff raised claims for unlawful retaliation, deprivation of civil rights under 42 U.S.C. § 1983, violation of California's Bane Act, defamation/slander/libel per se, and false light.  (*Id.* at 2).  In addition to Defendants, Plaintiff named Khasaempanth and Morris as defendants.  (*Id.*).  Defendants removed the case to this Court on January 3, 2023.  (ECF No. 1).  The parties later stipulated to dismiss Morris as a defendant.  (ECF Nos. 51, 53).

On August 22, 2023, the Court granted, in part, and denied, in part, Defendants' motion to dismiss the complaint.  (ECF No. 54).  As relevant here, the Court dismissed Plaintiff's Bane Act, defamation/slander/libel per se, and false light claims with prejudice, concluding that Plaintiff could not state a claim.  The Court granted leave to amend as to the unlawful retaliation and § 1983 claims.

After Plaintiff amended his complaint, on April 26, 2024, the Court once again granted, in part, and denied, in part, Defendants' motion to dismiss.  (ECF No. 80).  To the extent that it was premised on retaliation for Plaintiff's support of Vera, the Court dismissed the § 1983 claim as to Williams, Giandomenico, Barragan, and Khasaempanth.  The Court dismissed the claim with prejudice as to Khasaempanth, who was removed as a defendant in this case.  The Court denied the motion to dismiss on qualified immunity grounds, concluding that Plaintiff had identified clearly established precedent that "the First Amendment protects a public employee's right to speak out against or petition the government—including via a lawsuit—on matters of public concern."  (*Id.* at 24 (quoting *Ballou v. McElvain*, 29 F.4th 413, 429 (9th Cir. 2022)).  The Court also denied the motion as to the unlawful retaliation claim, concluding that Plaintiff had plausibly alleged that he had engaged in a protected activity.  (*Id.* at 28).

Finally, on September 23, 2024, the Court granted, in part, and denied, in part, Defendants' motion to dismiss Plaintiff's Fourth Amended Complaint.  (ECF No. 104).  The Court granted the motion as to the § 1983 retaliation claim against Williams insofar as

it was premised on retaliation for Plaintiff's political activity. (*Id.* at 15). The Court also dismissed the First Amendment retaliation claim to the extent that it was premised on retaliation for his actions following Spike's death. (*Id.*). The Court otherwise denied the motion. Defendants filed answers to the Fourth Amended Complaint and proceeded to discovery. *See* (ECF Nos. 93, 105, 106).

The parties filed the instant Motion on July 9, 2025. (Mot.). Defendants filed a reply in support of the Motion on July 16, 2025. (ECF No. 142 ("Reply")).

## II.    LEGAL STANDARD

Summary judgment is appropriate where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing the absence of any genuine issues of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party, *Scott v. Harris*, 550 U.S. 372, 378 (2007).

To meet its burden, "[t]he moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that generic disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, "the nonmoving party must come forward with 'specific facts showing

that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted).  No genuine issue for trial exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.*

## III.    DISCUSSION

Plaintiff's remaining claims are: (1) a § 1983 claim for violations of the First Amendment by all Defendants; (2) a § 1983 claim for deprivation of due process by all Defendants; and (3) a claim for unlawful retaliation in violation of California Civil Code § 1102.5 against the County.  Defendants seek summary judgment on all three claims.  The Court will consider each claim in turn.

### A.    First Amendment

To prove his claim for First Amendment retaliation under § 1983, Plaintiff must prove: "(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).  In the government employment context, once a plaintiff has made out a prima facie case of First Amendment retaliation, the burden shifts to the government. *See Riley's Am. Heritage Farms v. Elsassar*, 32 F.4th 707, 721 (9th Cir. 2022) (citing *Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968)).  The government can avoid liability either by showing "that its legitimate administrative interests in promoting efficient service-delivery and avoiding workplace disruption outweigh the plaintiff's First Amendment interests," or that "it would have taken the same actions in the absence of the plaintiff's expressive conduct." *Id.* (internal quotation marks and citations omitted).  Applying this framework, the Court will now consider the viability of this claim as to each Defendant in turn.

#### 1.    Villanueva

First, the Court will consider the First Amendment retaliation claim against Villanueva.  The primary focus of the claim is on Villanueva's alleged retaliation against

Plaintiff for his support of Vera, including the ICIB investigation, the AED Lieutenant
promotion, and Plaintiff's eventual constructive discharge.[3]  Villanueva argues that he did
not cause any adverse actions against Plaintiff and that he is otherwise entitled to qualified
immunity for his actions.  (Mot. at 66-71).  Villanueva also joins the County's arguments
as to the other elements of the claim.  (*Id.* at 66).

### a)    Protected Activity

A public employee engages in constitutionally protected speech when speaking "on
a matter of public concern . . . as a private citizen."  *Dodge v. Evergreen Sch. Dist. #114*,
56 F.4th 767, 777 (9th Cir. 2022) (citation omitted).  Villanueva raises no argument that
Plaintiff's political support for Vera—including his campaign donation and yard signs—
was not a constitutionally protected activity.  Such activities are "quintessentially a matter
of public concern."  *Id.*  Accordingly, this element is met for purposes of summary
judgment.

### b)    Adverse Action

Next, Plaintiff must demonstrate that he suffered an adverse employment action that
was "reasonably likely to deter [him] from engaging in constitutionally protected speech."
*Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003) (citation omitted).  Such an
action "need not be severe and [] need not be of a certain kind," but "minor acts . . . that
cannot reasonably be expected to deter protected speech . . . do not violate an employee's
First Amendment rights."  *Id.* at 975-76.  Because the "purpose of protection against
retaliation for engaging in protected speech is to stop actions by a government employer
that chill the exercise of protected First Amendment rights," the key question for courts "is
whether the retaliatory activity would chill or silence a person of ordinary firmness from

---

[3] While Plaintiff does not appear to entirely concede the point, Plaintiff has put forth no
evidence of Villanueva having any role in the alleged retaliation related to breacher pay or
the death of Spike.  The Court will therefore focus its analysis solely on the alleged
retaliation for Plaintiff's support of Vera.  To the extent Plaintiff raises claims against
Villanueva for retaliation on other grounds, Plaintiff has not put forth sufficient evidence
to establish a genuine dispute of material fact.

continuing to speak out." *Dodge*, 56 F.4th at 778-79 (internal quotation marks and citations omitted).

Plaintiff identifies three allegedly adverse actions taken against him by Villanueva: the ICIB investigation, the denial of the AED Lieutenant promotion, and his constructive discharge.  Each of these actions, if proven, would qualify as an adverse employment action.  *See Freitag v. Ayers*, 468 F.3d 528, 543 (9th Cir. 2006) (holding that initiation of an investigation can constitute an adverse employment action); *Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001) (finding denial of promotion constituted an adverse employment action); *Jordan v. Clark*, 847 F.2d 1368, 1377 n.10 (9th Cir. 1988) ("If shown, constructive discharge is an adverse employment action.").

Villanueva argues that he was not responsible for any of these adverse actions.  First, as to the ICIB investigation, Villanueva argues that he had no interaction with Barragan or Ewell and that he only told Satterfield to ensure that the matter was properly investigated.  Thus, Villanueva argues that he could not have known whether the preliminary inquiry would lead to a criminal investigation or merely an IAB investigation that would not be materially adverse.  (Mot. at 67).  Second, as to the AED Lieutenant position, Villanueva argues that Plaintiff was ineligible for promotion based on IOD leave.  Third, Villanueva argues that Plaintiff has not put forth sufficient evidence to establish constructive discharge.  Villanueva also notes that Plaintiff did not retire until 16 months after Villanueva's retirement, so it was not possible for Villanueva to have caused the retirement.

The Court disagrees and finds that there is a genuine dispute of material fact as to each adverse employment action.  First, Plaintiff has put forth evidence that Villanueva was involved with the ICIB investigation.  Villanueva himself testified that it was a member of his "top five"—either Satterfield, Murakami, Limon, or Francisco—who directed Ewell to initiate the ICIB investigation.  (Villanueva Deposition at 171:20-23). Villanueva also testified that it took an "inordinate amount of time" to initiate the investigation and that he was concerned that Ewell "was sitting on it." (*Id.* at 171:18-19,

172:25).   Khasaempanth testified that Chief Ed Alvarez, who worked with Villanueva, "was constantly calling her" about initiating the investigation and that "the executives were upset" that it was taking so long to send a formal request to ICIB.   (Khasaempanth Deposition at 56:12-15, 21).  Palomino corroborated this testimony, stating that she learned of the investigation by the first week of April and agreeing that it was "already determined . . . that ICIB was going to open a criminal investigation into" Plaintiff. (Palomino Deposition at 58:24-59:5).   From this and other testimony, the Court finds that there is a genuine dispute of material fact as to whether Villanueva was involved in the initiation of the ICIB investigation.

Second, there is a genuine dispute as to whether Plaintiff was eligible for promotion during his IOD leave.  While Villanueva himself attests that LASD policy prohibited such promotions, (ECF No. 146 at 17 ("Villanueva Declaration")), Plaintiff has provided testimony from several other officials in the LASD stating that this was not the case.  *See* (Chase Decl. ¶ 3; Limon Decl. ¶ 17).  In arguing otherwise, Villanueva relies largely on deposition testimony from Assistant Sheriff Chase.  *See* (JAF 76).  However, in a subsequent declaration, Chase clarified his testimony and now unequivocally states that "Lieutenant Joseph Garrido being out IOD on temporary and total disability (TTD) did not make him ineligible for promotion." (Chase Decl. ¶ 3).  If Plaintiff was not ineligible for promotion, then there remains a genuine dispute as to whether the promotion was rescinded in retaliation for his speech.

Third, there is a genuine dispute as to whether Villanueva's actions contributed to the constructive discharge of Plaintiff.  Plaintiff himself attests that he had intended to work another ten years and that he was forced to retire because of the stress that resulted from the adverse actions taken against him.  (Garrido Decl. ¶ 97).  Plaintiff's medical expert testifies that Plaintiff developed Major Depressive Disorder with severe anxious distress, that Plaintiff had not experienced any symptoms of severe anxious distress prior to the reported adverse employment actions, and that Plaintiff ultimately retired because of his symptoms.  (Elias Decl. ¶ 5).  The fact that Plaintiff ultimately retired nearly 16 months

-18-

after Villanueva left office does not necessarily defeat this claim, since one of the major bases for the stress that allegedly caused Plaintiff's early retirement was Villanueva's actions. Villanueva argues that Plaintiff's evidence of constructive discharge is far weaker than a claim that the Ninth Circuit rejected as a matter of law in *Poland v. Chertoff*, 494 F.3d 1174 (9th Cir. 2007). However, the plaintiff in *Poland* remained in his position for eight months after the adverse actions and "never testified that he felt compelled or forced to resign." *Id.* at 1185-86. Here, Plaintiff has provided such testimony. And while Plaintiff remained employed by LASD following the adverse actions for a longer period than the plaintiff in *Poland*, Plaintiff was out on IOD leave for this entire period. Whether Plaintiff's working conditions became "so intolerable that a reasonable person in [Plaintiff's] position would have felt compelled to resign" is therefore "a factual question left to the trier of fact." *Id.* at 1184 (citation omitted).

### c)  *Causal Relationship*

Lastly, to make out a prima facie case for First Amendment retaliation, Plaintiff must show that retaliation "was a substantial or motivating factor behind a defendant's adverse employment actions." *Coszalter*, 320 F.3d at 977. To support this element, Plaintiff points primarily to testimony from Assistant Sheriff Limon, who states that she has "first-hand, personal knowledge that Sheriff Villanueva retaliated against Lieutenant Garrido and other employees because they supported the Vera campaign." (Limon Decl. ¶ 4). Limon states that "Villanueva and his top aides would regularly check online to see who donated to Vera," and that she observed "Villanueva, his second in command Undersheriff Timothy Murakami, and his Chief of Staff, John Satterfield talk angrily about employees who donated to Vera." (*Id.* ¶ 5). Limon states that "Sheriff Villanueva admitted to me point blank that he was reversing the promotion specifically because Lt. Garrido gave money to the Eli Vera campaign." (*Id.* ¶ 9). Plaintiff also points to testimony from Assistant Sheriff Chase, who states that he "observed Sheriff Villanueva, Chief of Staff John Satterfield, and Undersheriff Timothy Murakami, at weekly 'Top 5' meetings, on more than one occasion, discussing employees who had donated money to the Eli Vera campaign and not being

happy about it." (Chase Decl. ¶ 9).  Chase states that he "specifically observed those three displeased with Lieutenant Garrido's donation to Vera, and discussing that Garrido would not likely hold on to the promotion to the Arson Lieutenant position as a result."  (*Id.*).

Defendants argue that Limon's declaration testimony should be considered a "sham affidavit" and disregarded because it conflicts with her deposition testimony.  (Reply at 6). Defendants argue that, during her deposition, Limon testified that Villanueva did not provide a reason why he would not promote Plaintiff.  *See* (Limon Deposition at 28:16-18 ("Q: Did he give you a reason? A: He didn't. He did not want him to take that position.")). The Ninth Circuit has explained that "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  However, the Ninth Circuit has stressed that "the sham affidavit rule should be applied with caution."  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (internal quotation marks and citation omitted).  Courts should not invoke this rule absent "a factual determination that the contradiction was actually a sham," and any "inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id.* at 998-99 (internal quotation marks and citation omitted).

Plaintiff has not shown that the affidavit is so inconsistent with Limon's deposition testimony that it should be struck.  While Limon said that Villanueva did not provide a reason during that specific conversation, she subsequently stated that she knew Villanueva did not care for Plaintiff "[b]ecause of some of the comments he made," including comments about how Plaintiff "supports Eli Vera." (Limon Deposition at 29:3-5).  It is also not clear from the declaration that Limon is referring to the same exchange with Villanueva that was being discussed during the deposition.  Accordingly, the Court does not find any inconsistency to be clear and unambiguous.  Based on the Limon and Chase declarations, the Court finds that there is a genuine dispute of fact as to whether Villanueva acted in retaliation for Plaintiff's protected speech.

#### d)    *Pickering Analysis*

Villanueva also argues that, under the *Pickering* framework, Plaintiff cannot establish a First Amendment retaliation claim because Defendants would have taken the same actions in the absence of any protected speech. Defendants state that they had good cause to investigate Plaintiff for misuse of public funds based on the anonymous tip, and that, because the other candidates chosen for the AED Lieutenant position were qualified, Plaintiff cannot survive summary judgment.

The Court disagrees. While Defendants "may avoid liability by showing that [Plaintiff's] protected speech was not a but-for cause of the adverse employment action," this inquiry is "purely a question of fact." *Robinson v. York*, 566 F.3d 817, 825 (9th Cir. 2009). Plaintiff here has provided sufficient evidence that this claim must be presented to a jury. On the ICIB investigation, Plaintiff has provided testimony from several ICIB officers that the investigation was unusual. For example, ICIB Commander Palomino testifies that she "had never heard of an allegation" like the one against Plaintiff and that "it seemed more of an administrative issue, if anything." (Palomino Deposition at 53:12-13, 54:19-20). Former ICIB Captain Schreiner testified that "this should not have been sent to ICIB for a criminal investigation." (Schreiner Decl. ¶ 8). And ICIB Sergeant Morris testified he could not think of a legitimate reason why the investigation into Plaintiff was initiated. (Morris Deposition at 85:12-17). In combination with other evidence, this testimony could support an inference that Defendants would not have initiated a criminal investigation absent Plaintiff's protected speech. As to the AED Lieutenant position, the Court previously discussed the evidence in the record from which a jury could draw an inference that Villanueva prevented Plaintiff from getting the position because of his support for Vera. *See* (Limon Decl. ¶ 9; Chase Decl. ¶ 9). Accordingly, there is a factual question as to whether Defendants would have acted the same way absent Plaintiff's speech.

#### e)    *Qualified Immunity*

Finally, Villanueva argues that he is entitled to qualified immunity on this claim. "In § 1983 actions, qualified immunity protects government officials from liability for civil

1    damages insofar as their conduct does not violate clearly established statutory or
2    constitutional rights of which a reasonable person would have known." *Sampson v. Cnty.*
3    *of Los Angeles*, 974 F.3d 1012, 1018 (9th Cir. 2020) (internal quotation marks and citation
4    omitted).  Thus, to overcome qualified immunity, a plaintiff must show that the government
5    official (1) "violated a federal statutory or constitutional right," and (2) "the unlawfulness
6    of their conduct was clearly established at the time." *Ballentine v. Tucker*, 28 F.4th 54, 61
7    (9th Cir. 2022) (citation omitted).  "A government official's conduct violates clearly
8    established law when, at the time of the challenged conduct, the contours of a right are
9    sufficiently clear that every reasonable official would have understood that what he is doing
10   violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation
11   marks, citation, and alterations omitted).  Clearly established law need not be "directly on
12   point," but the "existing precedent must have placed the statutory or constitutional question
13   beyond debate." *Id.*

14       At the motion to dismiss stage, the Court denied Defendants' assertion of qualified
15   immunity, citing *Ballou v. McElvain*, 29 F.4th 413 (9th Cir. 2022).  (ECF No. 80 at 24).
16   In *Ballou*, the plaintiff police officer asserted a First Amendment retaliation claim based
17   on repeated internal investigations and denied promotions after she spoke out in opposition
18   to gender discrimination occurring in the police department.  *Ballou*, 29 F.4th at 430-31.
19   In affirming the denial of qualified immunity, the Ninth Circuit held that it was clearly
20   established that public employees have the "right to speak out against or petition the
21   government . . . on matters of public concern," which "inherently" included speaking out
22   about "wrongdoing [or] misconduct . . . by other government employees." *Id.* at 429-30
23   (citations omitted).  *Ballou* remains directly on point in that it shows that it is clearly
24   established that police may not initiate retaliatory internal investigations and deny
25   promotions based on protected speech.

26       Villanueva argues that the Ninth Circuit's decision in *Moore v. Garnand*, 83 F.4th
27   743 (9th Cir. 2023), should be determinative here.  (Mot. at 70).  There, the plaintiffs filed
28   suit against a police officer and city, requesting disclosures of public records.  *Moore*, 83

F.4th at 752.  The plaintiffs claimed that, in retaliation for filing the suits, the defendants "conducted a criminal investigation against Plaintiffs without any reasonable suspicion—which included interviewing two witnesses—and attempted to induce the IRS into opening a criminal investigation." *Id.*  The court concluded that the individual officers were entitled to qualified immunity on the retaliation claim because the plaintiffs failed to identify any "caselaw that clearly established that a retaliatory investigation per se violates the First Amendment." *Id.*

The Court finds *Moore* to be distinguishable.  First, *Moore* involved a criminal investigation of private citizens, not retaliation against a public employee for protected speech.  The Ninth Circuit has repeatedly recognized that public employers may not retaliate against employees based on protected speech.  *See Coszalter*, 320 F.3d at 979 (concluding that "the First Amendment protects employee speech on matters of legitimate public concern" and affirming denial of qualified immunity because "both the constitutional protection of employee speech and a First Amendment cause of action for retaliation against protected speech were clearly established" (internal quotation marks and citation omitted)); *Chateaubriand v. Gaspard*, 97 F.3d 1218, 1224 (9th Cir. 1996) ("[I]t is beyond dispute that a public employer may not retaliate against an employee for speech on a matter of public concern.").  This is equally true where the retaliation is based on the employee's political activities.  *See Hunt v. Cnty. of Orange*, 672 F.3d 606, 611 (9th Cir. 2012) ("The First Amendment ordinarily prohibits an elected official from firing or retaliating against an employee for his political opinions, memberships, or activities.").

Second, *Moore* held only that there was no clearly established law that "a retaliatory investigation *by itself* was unconstitutional." 83 F.4th at 752 (emphasis added).  Where the alleged retaliatory investigation is accompanied by other retaliatory acts, *Moore*'s rule is inapplicable on its own terms.  For example, the *Moore* court distinguished *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000), on the grounds that the decision recognizing a constitutional violation in that case was based on "the *entirety* of the officials' actions," including questioning the plaintiffs under threat of subpoena, directing them to produce documents,

telling the plaintiffs and reporting to a newspaper that they had violated the Fair Housing Act, and advising them to accept a proposal that would require them to cease all litigation. *Moore*, 83 F.4th at 752. Similarly, the court distinguished *Coszalter*, 320 F.3d at 976, on the grounds that the denial of qualified immunity in that case "rested on much more than just a retaliatory investigation." *Moore*, 83 F.4th at 753 n.12. Here, Plaintiff has identified not merely a retaliatory investigation, but also a retaliatory denial of a promotion, ultimately contributing to Plaintiff's constructive discharge.

The Court therefore concludes that there is clearly established law prohibiting public employers and elected officials from retaliating against employees based on their protected speech, including their political affiliations. This clearly established law prohibits various forms of retaliation including retaliatory investigations and denied promotions. If Plaintiff is able to establish these facts at trial, Villanueva will not be entitled to invoke qualified immunity.

### 2. Williams

Next, the Court considers the claim against Williams. In the Court's order on Williams' motion to dismiss Plaintiff's Fourth Amended Complaint, the Court dismissed the claim against Williams insofar as it was premised on retaliation for Plaintiff's political activity. (ECF No. 104 at 15). Because Plaintiff failed to oppose the argument that his speech on Spike's death was not a matter of public concern, the Court also dismissed the claim insofar as it alleged retaliation for that speech. (*Id.* at 15-16). Accordingly, the sole remaining First Amendment claim against Williams is premised on alleged retaliation for Plaintiff's role in the breacher pay lawsuit.

Plaintiff argues that his speech on the breacher pay lawsuit was protected speech because he did "far more than required by his duties." (Mot. at 51). Plaintiff states that, in addition to reporting the deputies' concerns up the ladder, he encouraged two deputies to file grievances, attended a meeting where he supported the deputies, and obtained hidden documents that he provided to the union, helping them obtain $3 million in unpaid breacher pay. (*Id.* at 52). Plaintiff has identified several allegedly adverse employment actions

taken by Williams against Plaintiff, including the denial of Plaintiff's request for dive training and the reassigning of K-9 duties to the SEB sergeant, both of which potentially deprived Plaintiff of available bonus pay.  (JAF 83, 123).

Even assuming, however, that Plaintiff has provided sufficient evidence to create a genuine dispute as to the first two elements of this claim, Plaintiff has failed to put forth any evidence of "a substantial causal relationship between the constitutionally protected activity and the adverse action."  *Blair*, 608 F.3d at 543.  Plaintiff was told that he could not participate in dive training because there were no open positions for it.  (JAF 82).  Williams reiterated in his declaration that the reason he denied Plaintiff's application for dive training was because there were no openings on the dive team, and Plaintiff would therefore have been unable to receive any bonus pay for the training.  (Williams Decl. ¶ 13).  When asked during his deposition if he had "any facts to indicate that reason wasn't true," Plaintiff responded, "No, not at all."  (Garrido Deposition at 39:3-5).  Plaintiff also acknowledged that other individuals were denied dive training because there was no open position at the time.  (JAF 84; Garrido Deposition at 38:8-12).  When asked why he believed that Williams' explanation was untrue, Plaintiff pointed to the appointment of Barragan to the AED lieutenant position several months later.  (Garrido Deposition at 611:5-6).  However, as all parties agree, Barragan had already completed the dive training by this time.  (JAF 55).  Plaintiff otherwise provides no evidence that other employees were approved for dive training during this time.[4]  Finally, Plaintiff admitted that no one ever told him that the reason for the denial of dive pay was because he advocated for breacher pay.  (JAF 85).

---

[4] In the briefing on the Motion, Plaintiff states that "another deputy, Ryan Flores, was sent to Dive Training shortly thereafter."  However, the cited portions of the JAF—JAF 367 and 368—state that they have been "[r]eserved."  Plaintiff never mentioned Flores in his deposition, and he otherwise points to no evidence to support this claim.  In his declaration, Plaintiff also states that a Lieutenant Kim was allowed to attend dive training in May 2022.  (Garrido Decl. ¶ 35).  However, the fact that a position was open more than a full year later—at which time Plaintiff was out on IOD leave—does not create a genuine dispute as to whether Williams' denial in April 2021 was based on false premises.

Plaintiff argues that a causal connection can be inferred based on Williams' anger over the breacher lawsuit. Plaintiff attests that Williams was enraged at Plaintiff for reporting on the County's breacher pay actions. (JAF 212). In his declaration, Plaintiff states that, on or about March 11, 2021, Williams yelled at Plaintiff, stating, "I ain't no punk … This [expletive] is gonna to [sic] stop … I've been dealing with your [expletive] for two years." (Garrido Declaration ¶ 33). Plaintiff requested to attend the dive training on April 30, 2021. (*Id.* ¶ 35). Based on the timing, Plaintiff argues that there is a jury question as to whether Williams' actions were taken in retaliation for Plaintiff's speech. However, in the absence of any evidence connecting the denial of dive training with Plaintiff's speech, the Court cannot conclude that Plaintiff's evidence shows anything more than "the logical fallacy of *post hoc, ergo property hoc*, literally, 'after this, therefore because of this.'" *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (citation omitted).

Moreover, even if the Court were to assume that Plaintiff could establish a prima facie case of retaliation for his speech on the breacher pay issue, Plaintiff has no evidence to rebut Defendants' argument that it would have taken the same action even absent the protected speech. The only evidence in the record here supports Defendants' argument that they would have taken the same actions regardless of Plaintiff's conduct. As discussed above, there is no evidence that Williams or the LASD treated similarly situated applicants differently or that the dive team was not, in fact, full at the time of Plaintiff's application. Accordingly, even assuming Plaintiff could make out a prima facie case, Plaintiff could not overcome the argument that Defendants would have denied his application for dive training regardless of his participation in the breacher suit.

Plaintiff has also failed to put forth sufficient evidence to support a retaliation claim based on other allegedly adverse actions. Plaintiff offers no evidence to counter Williams' claim that he reassigned K-9 duties to the SEB Sergeant to help alleviate Plaintiff's workload. (JAF 123). Absent any contrary evidence of why Williams took this action, Plaintiff cannot carry his burden to show causation. There is also a single reference in the

JAF to an investigation that Williams initiated involving the accidental discharge of a firearm by another officer.  (JAF 122).  While Plaintiff asserts that Williams investigated the officer as a vehicle to make false allegations against Plaintiff, he provides no evidence to this effect and does not otherwise mention this incident anywhere in the briefing.  The Court therefore does not find any genuine dispute as to this, or other allegedly adverse employment actions to which Plaintiff does not devote any analysis.  Because Plaintiff has not demonstrated that Williams took any adverse employment actions against Plaintiff *because of* his protected speech, Plaintiff's First Amendment claim against Williams fails.

### 3.    Barragan

Turning to the claim against Barragan, the Court similarly concludes that Plaintiff has not put forth any evidence to support the causation element.  Plaintiff has identified at least three allegedly adverse actions that Barragan participated in: preparing the ICIB inquiry memo, attempting to start a second investigation of the Wells Fargo incident, and removing Plaintiff from shared SEB work files.  But even assuming these qualify as adverse employment actions, Plaintiff provides no evidence connecting Barragan's actions to Plaintiff's protected speech.

First, there is no evidence that Barragan opposed the breacher pay suit or would have been motivated to take retaliatory action against Plaintiff based on that speech.  The only evidence in the record is that Barragan supported the suit and believed that the deputies were entitled to breacher pay.  (JAF 152; Barragan Deposition at 179:1).  Barragan also believed that he was entitled to breacher pay, and he attempted to intervene in the suit, before later filing his own grievance.  (Barragan Deposition at 179:11-16; ECF No. 146 at 2 ("Barragan Declaration") ¶ 5).  Plaintiff's only rejoinder is that Barragan made no attempt to support the deputies' breacher pay suit until he later filed his own grievance suit.  (JAF 152, Plaintiff's Response; ECF No. 146-1 at 23 ("Schultz Declaration") ¶ 5).  But the fact that Barragan did not take specific actions to support the breacher pay lawsuit does not mean that he was motivated to retaliate against Plaintiff for his support of the suit.

Second, as to Plaintiff's speech about Spike, Plaintiff does not point to any evidence that Barragan was aware of the incident or Plaintiff's involvement. Barragan himself stated that he did not learn of Spike's death, or Plaintiff's criticism of the handling of the death, until the L.A. Times article was published. (Barragan Deposition at 135:2-4, 198:17-22). Plaintiff points to a single email from Barragan to Ewell on June 9, 2022, which had the subject line "Cap to Chief Supervisor Inquiry-Tobin rev." (ECF No. 147-1 at 16). However, Plaintiff does not provide the content of the email, only the subject line, and when asked about the email, Barragan testified that he did not write or rewrite the memo about Spike's death. (Barragan Deposition at 140:1-12). On this record, no reasonable jury could find that Barragan was motivated to retaliate against Plaintiff for his speech on Spike's death.

Third, there is no evidence that Barragan was motivated to retaliate against Plaintiff based on his support for Vera. Barragan states that he considers Vera a good friend, (JAF 167), and Vera states that he considered Barragan to be "almost like a friend" up until learning of Barragan's participation in writing the ICIB inquiry memo, (Vera Decl. ¶ 11). Barragan did not work on Villanueva's campaign or support his reelection campaign. (JAF 165-66). Plaintiff's story about Giandomenico and Barragan introducing Villanueva to the boxer Sugar Ray Leonard—which Barragan disputes, (Barragan Deposition at 149:2)— does not support a finding that Barragan was motivated to retaliate against Plaintiff due to his support for Vera. The mere fact that Barragan omitted certain exculpatory information from the supervisory inquiry memo, absent any evidence of his motives for doing so, is insufficient to show the required "substantial causal relationship" between Plaintiff's protected speech and Barragan's actions. Accordingly, this claim fails.

### 4.    Giandomenico

The same is true as to Giandomenico. Plaintiff identifies the following adverse actions with respect to Giandomenico: assisting with the supervisory inquiry that led to the ICIB investigation, denying Plaintiff's application for dive training, adjusting the rotation of SWAT detail duties, adding additional lieutenants, and providing Plaintiff with a

"competent" rating on his employee evaluation. As with Barragan, Plaintiff has failed to show that, in taking these actions, Giandomenico was substantially motivated to retaliate against Plaintiff based on his protected speech.

First, Plaintiff has provided no evidence that Giandomenico opposed the breacher pay lawsuit. As with Barragan, Giandomenico attests that he supported the suit and that he later filed his own grievance because he believed he was also entitled to breacher pay. (ECF No. 146 at 7 ("Giandomenico Declaration") ¶ 5). It does not appear that Giandomenico was even asked about the breacher suit during his deposition. *See* (Giandomenico Deposition). Regardless of whether Giandomenico took affirmative actions to further the deputies' suit, *see* (JAF 154, Plaintiff's Response), there is no evidence in the record that Giandomenico actively opposed the suit or Plaintiff's role in the suit. There is therefore no genuine dispute that Giandomenico's actions were motivated in any way by Plaintiff's role in the breacher suit.

Second, while Giandomenico did have more of a role in the Spike incident than Barragan, Plaintiff provides no evidence that Giandomenico was in any way motivated to retaliate against Plaintiff for his reporting of the alleged coverup. As Plaintiff points out, Giandomenico was tasked with preparing a supervisory inquiry memo into the death of Spike after Spike's death began receiving media attention. (Giandomenico Deposition at 47:10-13). Giandomenico completed the memo on October 26, 2022. (*Id.* at 65:7-9; Villanueva Deposition, Exhibit 47). But Plaintiff provides no evidence connecting Giandomenico's role in the subsequent investigation to Plaintiff. Plaintiff does not point to any evidence that Giandomenico was upset by Plaintiff's reporting of the alleged coverup. Nor does Plaintiff identify any reason why Giandomenico would have taken offense to Plaintiff's actions. Plaintiff does not allege Giandomenico played any role in the initial alleged coverup of Spike's death—indeed, he was not even working at SEB at the time, (Giandomenico Deposition at 46:13-16)—so he was not personally implicated by Plaintiff's reporting of a coverup. Giandomenico's role in the Spike investigation did not

begin until approximately October 2022, well after all of the alleged retaliatory actions took place.

Plaintiff argues that Giandomenico was aware that Plaintiff had reported an alleged cover up in Spike's death at the time that the ICIB investigation was opened in May 2022. (JAF 217). However, Plaintiff's sole evidence of this is Giandomenico's statement that, at the time of the ICIB investigation, he and Barragan were concerned about being accused of a coverup based on similar allegations in relation to Spike. (Giandomenico Deposition at 128:6-9). Giandomenico did not state that he associated these allegations with Plaintiff. Rather, Giandomenico testified that he could not recall when he learned about the allegations as to Spike, nor did he recall ever speaking with Williams about any role that Plaintiff had in reporting Spike's death. (*Id.* at 128:10-22). Indeed, Giandomenico states that he was not aware at the time of his October 2022 inquiry that Plaintiff had alleged that Spike's death was being covered up. (*Id.* at 60:9-13). While Giandomenico was named in a lawsuit around this time, he states that he was unaware of the lawsuit until several months later. (*Id.* at 64:20-21). Absent any evidence that Giandomenico was aware of, and upset about, Plaintiff's reporting of Spike's death at the time of any of the alleged adverse actions, Plaintiff cannot demonstrate any causal connection between his speech and Giandomenico's actions.

Lastly, Plaintiff has not shown that Giandomenico acted in retaliation for Plaintiff's support of Vera. Plaintiff argues that Giandomenico supported Villanueva's election, but there is at most scant evidence for this. While Giandomenico admitted to giving a campaign contribution to Villanueva in 2018, he stated that he also gave contributions to two other candidates. (*Id.* at 33:4-6). Giandomenico explained that he only did so because he "had a family friend that was a candidate" who insisted on his help, and so, "to make it fair, [he] paid everyone because [he] wanted to stay out of politics." (*Id.* at 33:13-17). Plaintiff also states that Giandomenico introduced Villanueva to Sugar Ray Leonard, but Giandomenico disputes this. (*Id.* at 33:18-20). Giandomenico himself testified that he did

not support Villanueva's campaign for reelection in 2022 and that he did not vote for
Villanueva in the union's endorsement vote. (*Id.* at 33:1-3; 35:8-13).

Even if Giandomenico did support Villanueva's reelection, however, it does not
follow that he was motivated to retaliate against Plaintiff for his support of Vera.
Giandomenico was not a member of Villanueva's top 5, and Plaintiff points to no evidence
that Giandomenico stood to gain from assisting Villanueva. Unlike with Villanueva,
Plaintiff has no direct evidence that Giandomenico was motivated by any feelings about
Plaintiff's political views. While Plaintiff does attest that Giandomenico was aware of
Plaintiff's views, (Garrido Decl. ¶ 34), Plaintiff provides no evidence that Giandomenico
cared one way or the other about those views. Indeed, Giandomenico repeatedly testified
to wanting to "stay out of politics." (Giandomenico Deposition at 35:1-2).

The timeline of Giandomenico's actions is also inconsistent with any inference of
politically motivated retaliation. Vera announced his campaign for Sheriff on April 28,
2021. (Garrido Decl. ¶ 35). Plaintiff attests that, at that time, Giandomenico made a
reference to Vera being Plaintiff's "buddy," from which Plaintiff infers that Giandomenico
knew about Plaintiff's support for Vera. (*Id.* ¶ 34). Yet Plaintiff alleges no retaliatory
action based on the support until May 2022, when Giandomenico helped initiate the ICIB
investigation. If Giandomenico was motivated by Plaintiff's support for Vera, it would
make little sense for him to wait more than a year to retaliate. Moreover, for most of this
period, Giandomenico actively supported Plaintiff's appointment to the AED Lieutenant
position, including as of September 2021, when he informed Plaintiff of the upcoming
promotion. (JAF 40-41; Giandomenico Deposition at 19:8-15). Since Plaintiff alleges that
this promotion was rescinded because of his support for Vera, it would make little sense
for Giandomenico to continue to support Plaintiff's promotion if his actions were
motivated by retaliatory intent. Accordingly, the claim against Giandomenico fails.

5.    <u>The County</u>

Finally, the Court turns to the arguments raised as to the County.  In addition to the arguments already discussed above, the County argues that it cannot be held vicariously liable for any constitutional violations by the Individual Defendants.  (Mot. at 59).

As established in *Monell v. Department of Social Services of City of New York*, a municipal entity "cannot be held liable *solely* because it employs a tortfeasor."  436 U.S. 658, 691 (1978).  Instead, a plaintiff alleging a § 1983 claim against a municipal entity must show that "action pursuant to official municipal policy of some nature caused a constitutional tort."  *Id.*  The Ninth Circuit has recognized three types of policies that can satisfy *Monell*: (1) where the entity acts "pursuant to an expressly adopted official policy"; (2) where the entity has a "longstanding practice or custom"; and (3) where "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it."  *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973-74 (9th Cir. 2021) (internal quotation marks and citation omitted).  After establishing that one of these circumstances exists, a plaintiff must also show that the circumstance was both the "cause in fact" and the "proximate cause of the constitutional deprivation."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

First, the parties dispute whether the County has a "longstanding practice or custom" of allowing retaliation for political speech.  The County argues that Plaintiff can, at most, produce evidence of "sporadic incidences of alleged retaliation" and is therefore unable to show any longstanding practice or custom.  (Mot. at 60).  Plaintiff argues that there is ample evidence in the record, over many years, of retaliatory actions taken by Sheriffs against supporters of their political opponents.  (*Id.* at 63).

To prevail on this theory, Plaintiff must "prove 'the existence of a widespread practice that . . . is so permanent and well settled as to constitute a 'custom or usage' with the force of law.'"  *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  Whether a sufficient policy or

custom exists is "[n]ormally . . . a jury question," unless there are "no genuine issues of material fact and the plaintiff has failed to establish a prima facie case." *Trevino*, 99 F.3d at 920. Here, Plaintiff has produced sufficient evidence of an LASD policy of retaliation to create a genuine dispute as to whether such a policy or custom exists. Plaintiff has provided testimony from Eli Vera, who states that he observed "a persistent and deeply ingrained practice of retaliation by sheriffs and their administrations against employees who supported or were perceived to support rival candidates in sheriff elections." (Vera Decl. ¶ 4). Vera attests that he has witnessed this practice over the course of "decades," and he provides specific examples of such retaliation by previous sheriffs. (*Id.* ¶¶ 5-7). Vera also identifies numerous examples of alleged retaliation during the Villanueva administration, including against Vera himself. (*Id.* ¶¶ 9, 16, 20, 22-24). Plaintiff also points to testimony from Villanueva, in which he discusses numerous examples of other Sheriffs retaliating against political opponents by sending them to "less favorable assignments," digging into their personnel files, and blocking their transfers or promotions. (Villanueva Deposition at 101-05). On this record, the Court finds that there is a genuine dispute as to the existence of a longstanding practice or custom of retaliating against political opponents.[5]

While the Court agrees with Plaintiff that there is a triable issue of fact as to the County's longstanding practices or customs, the Court finds that the other two bases for *Monell* liability are inapplicable here. There is no evidence in the record that Villanueva or any officials at LASD have "final policy-making authority" over County employment policy. As the Supreme Court has explained, establishing municipal liability on this ground requires showing not only that a particular official "has discretion in the exercise of particular functions," but also that the official is "responsible for establishing final

---

[5] Because the parties raise no dispute as to the causal connection between any such policy and Plaintiff's alleged injury, the Court does not address those elements of *Monell* liability. Plaintiff will bear the burden of proving actual and proximate causation at trial. *See Trevino*, 99 F.3d at 918.

-33-

government policy respecting such activity." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83 (1986).  As an example of this principle, the Supreme Court stated, "the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy." *Id.* at 483 n.12.  Where, as here, "county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability." *Id.*  Because the focus of this inquiry is on employment "policy," rather than individual employment decisions, Plaintiff's arguments about *de facto* policymaking authority are unavailing.

Plaintiff's ratification theory similarly fails.  "To show ratification, a plaintiff must prove that the 'authorized policymakers approve a subordinate's decision and the basis for it.'" *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (quoting *Praprotnik*, 485 U.S. at 127).  Plaintiff has not put forth any evidence to show that the person with policy-making authority for the County—here, the Los Angeles County Director of Personnel, (JAF 172)—had "knowledge of the alleged constitutional violation" or "approved of the [Sheriff's] act." *Christie*, 176 F.3d at 1239.  As the Ninth Circuit has warned, holding the County liable under these circumstances "would simply smuggle *respondeat superior* liability into section 1983 law." *Gillette*, 979 F.2d at 1348.

Because there is a genuine dispute as to the existence of a longstanding policy or custom, the County remains potentially liable for the actions of its employees.  Based on the above, the only other remaining First Amendment retaliation claim is against Villanueva based on the alleged retaliation against Plaintiff for his support of Vera.

**B.    Due Process**

The Court next turns to Plaintiff's Section 1983 claim premised on a violation of Due Process.  As the Court previously noted in its order on Defendants' motion to dismiss the Fourth Amended Complaint, "it is not entirely clear from the [Fourth Amended Complaint] whether Plaintiff seeks to bring a substantive and/or procedural due process claim against Defendants." (ECF No. 104 at 17).  Because the parties brief both issues, the Court will assume that Plaintiff seeks to proceed on both theories.

1    "A section 1983 claim based upon procedural due process … has three elements:

2    (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the

3    interest by the government; (3) lack of process." *Portman v. Cnty. of Santa Clara*, 995

4    F.2d 898, 904 (9th Cir. 1993).  To make out a claim under substantive due process,

5    meanwhile, a party must show a government deprivation of "life, liberty, or property in

6    such a way that shocks the conscience or interferes with rights implicit in the concept of

7    ordered liberty." *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) (internal

8    quotation marks and citation omitted).  Thus, both claims require a threshold showing of a

9    government deprivation of life, liberty, or property.

10    Defendants argue that Plaintiff cannot make this threshold showing.  The County

11    argues that Plaintiff did not have a property interest in the AED Lieutenant position because

12    there was never any binding promise that he would receive the promotion.  (Mot. at 54).

13    The County also argues that Plaintiff had no property interest in dive training or a SWAT

14    assignment and that there was no final deprivation of status or income with respect to the

15    performance evaluation.  (*Id.*).  As to the ICIB investigation, Giandomenico and Barragan

16    add that, although there is a constitutional due process right not to be subjected to criminal

17    charges on the basis of false evidence deliberately fabricated by the government, Plaintiff

18    was never subjected to criminal charges and has failed to provide evidence of deliberate

19    fabrication.  (*Id.* at 81).

20    In response, Plaintiff argues that he was deprived of due process in two ways.  First,

21    he argues that he was promoted to the AED Lieutenant position and held the position until

22    the promotion was later reversed and blocked.  (*Id.* at 55).  Plaintiff argues that the

23    promotion was approved by Chief Ewell, who was authorized to make the promotion, and

24    that Plaintiff began the mandated training for the position.  (*Id.*).  Second, Plaintiff argues

25    that the ICIB investigation deprived him of due process.  (*Id.* at 57).  Plaintiff cites to

26    *Deveraux v. Abbey* for the proposition that "there is a clearly established constitutional due

27    process right not to be subjected to criminal charges on the basis of false evidence that was

28    deliberately fabricated by the government."  263 F.3d 1070, 1074-75 (9th Cir. 2001).

Plaintiff argues that the criminal investigation was premised on false allegations and that Giandomenico and Barragan intentionally omitted exculpatory information from their report. (Mot. at 57).

### 1.    AED Lieutenant Promotion

The Ninth Circuit has explained that, "[a]lthough one's actual job as a tenured civil servant is property, the prospect of a promotion is not in the same category." *Nunez*, 147 F.3d at 871 (internal citation omitted). Thus, "[u]ntil someone actually receives a promotion, or at least a binding assurance of a forthcoming promotion, he cannot claim a property interest in the promotion." *Id.* at 873. Where permitted by state law, such assurance "need not be formally expressed in a statute or a written contract," but "there must be rules or mutually clear understandings securing the commitment." *Id.* at 873 n.7.

Under *Nunez*, the Court finds that there is no genuine dispute of material fact as to whether Plaintiff had a property interest in the AED Lieutenant promotion. First, although Plaintiff argues otherwise, there is no evidence that Plaintiff actually received the promotion prior to it being rescinded. While Lieutenant Burakowski announced her intended retirement in 2021, the position was not vacated until March 2022. (JAF 38). Plaintiff indicates that he received various assurances in late 2021 that he *would* receive the position, but he does not argue that he ever *actually held* the AED Lieutenant position after it was vacated. It is undisputed that Plaintiff did not assume the job duties of the AED Lieutenant position, nor did he receive the pay increase associated with the position. (JAF 71). His arguments therefore suggest, at most, that he had received a binding promise of a future promotion, not that he was actually promoted and later demoted.

Second, Plaintiff has not put forth sufficient evidence to show any binding assurance of a future promotion. To be sure, Plaintiff was told by both Giandomenico and Williams that he would get the AED Lieutenant position after Burakowski's retirement. (JAF 48, 49). Plaintiff was also approved to begin necessary training for the AED Lieutenant position in December 2021. (JAF 61). However, Plaintiff points to no admissible evidence that he was ever told by anyone with authority to approve the promotion that the promotion

1   was his without any qualification.    The parties agree that neither Giandomenico nor

2   Williams had authority to grant Plaintiff the AED Lieutenant position.  (JAF 46, 47).

3   Instead, the promotion required approval from, at minimum, the level of Chief.  (JAF 45).

4        While Plaintiff argues that Chief Ewell approved him for the promotion, he does not

5   put forth any testimony from Chief Ewell to this effect.  Rather, he relies on the testimony

6   of Giandomenico, Limon, and Chase, all of whom state that Ewell's approval was

7   contingent to some degree.  *See* (JAF 45, Plaintiff's Response).  Giandomenico, for

8   example, states that Ewell told him that Plaintiff would be promoted but that LASD first

9   "had to go through the process in order to promote candidates," which consisted of

10  collecting resumes, and that the "final candidate was to be chosen by either an undersheriff

11  or an assistant sheriff."  (Giandomenico Decl. ¶ 6).  During his deposition, Giandomenico

12  stated that such decisions would normally go to the Chief first "and hopefully they'd be

13  listened to, but then the chief would take his opinions elsewhere and I'd be told who's

14  going to get the job."  (Giandomenico Deposition at 19:4-7).  Chase, meanwhile, testified

15  that, in late 2021, the Sheriff and Undersheriff "sent out directives telling us not to move

16  lieutenants without having their approval first."  (Chase Deposition at 33:24-25).  While

17  Chase found this move to be unusual, he said that it was a decision that the Sheriff "was

18  entitled to make," and that it was not "inappropriate."  (*Id.* at 33:20-21, 34:3).  Limon,

19  meanwhile, stated that it was "already assumed . . . that [Plaintiff] would be taking that

20  position," and that Ewell told her that Plaintiff was taking classes in preparation for the

21  promotion.  (Limon Deposition at 25:16-19, 30:14-16).  The parties agree that before

22  receiving any pay increase in connection with the AED Lieutenant position, Plaintiff would

23  have had to attend multiple months of FBI bomb school and complete three other required

24  courses.  (JAF 71, 72).

25       Thus, according to all the relevant witnesses, Plaintiff's promotion to the AED

26  Lieutenant position remained contingent on the final approval of the Sheriff/Undersheriff

27  and/or Plaintiff's completion of required training courses.  "Individuals do not have a

28  property interest in a promotion where the promotion is contingent on meeting certain

requirements." *Leonard v. City of Los Angeles*, 669 F. App'x 912, 912 (9th Cir. 2016).  On this record, the Court cannot conclude that Plaintiff received a binding promise of promotion from anyone with authority to make that promise or that Plaintiff had anything more than a "unilateral expectation of a benefit or privilege." *Nunez*, 147 F.3d at 872 (internal quotation marks and citation omitted); *see also Walker v. City of Pocatello, Idaho*, 764 F. App'x 646, 647 (9th Cir. 2019) ("Because of the dearth of evidence supporting [the plaintiff's] contention that [a city official] had authority to promise him a promotion, no reasonable jury could return a verdict in his favor.").

2.    ICIB Investigation

Plaintiff's other asserted due process violation is based on the ICIB investigation, which he argues was initiated based on false allegations and intentional omissions of exculpatory information.  Plaintiff argues that "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Deveraux*, 263 F.3d at 1074-75.

While Plaintiff may be correct that there is a due process right to be free from deliberately fabricated criminal *charges*, Plaintiff was never charged with any crimes here. While the Ninth Circuit does not appear to have addressed this question, other circuit courts have consistently held that there is no due process right to be free from a criminal *investigation*.  *See Aponte v. Calderon*, 284 F.3d 184, 193 (1st Cir. 2002) ("[I]nvestigations, alone, do not trigger due process rights."); *United States v. Crump*, 934 F.2d 947, 957 (8th Cir. 1991) (concluding that a defendant "has no constitutional right to be free of investigation"); *Rehberg v. Paulk*, 611 F.3d 828, 850 n.24 (11th Cir. 2010) ("The initiation of a criminal investigation in and of itself does not implicate a federal constitutional right."); *United States v. Trayer*, 898 F.2d 805, 808 (D.C. Cir. 1990) ("[T]here is no constitutional right to be free of investigation.").  District courts in this Circuit have reached the same conclusion. *See, e.g.*, *Spreadbury v. Bitterroot Pub. Library*, 862 F. Supp. 2d 1054, 1057 (D. Mont. 2012) ("There is no constitutional right not to be investigated by law enforcement for suspected violations of the law."); *In re Jordan E.*

-38-

*Taitano Sec. 1983 Claims I*, No. C 09–1804 RMW (PR), 2009 WL 2929251, at *1 (N.D. Cal. Sept. 8, 2009) ("[W]ithout more, there is no constitutional right to be free from investigation."). Accordingly, the Court concludes that Plaintiff has no due process claim on the basis of the ICIB investigation, regardless of whether the investigation was capricious. *See Nunez*, 147 F.3d at 873 ("There is no general liberty interest in being free from capricious government action.").

Plaintiff otherwise makes no specific argument as to whether other adverse actions—such as the denial of dive training or the competent performance evaluation—constitute deprivations of property or liberty. Accordingly, Plaintiff has not shown that Defendants' actions deprived him of any protected liberty or property interest. Absent a protected liberty or property interest, Plaintiff cannot prove a violation of either substantive or procedural due process.

### C. Unlawful Retaliation

Finally, Plaintiff raises a claim for unlawful retaliation under California Labor Code § 1102.5. "Section 1102.5 provides whistleblower protections to employees who disclose wrongdoing to authorities." *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703, 709 (2022). Under the statute, employers are prohibited from "retaliating against an employee for sharing information the employee 'has reasonable cause to believe . . . discloses a violation of state or federal statute' or of 'a local, state, or federal rule or regulation' with a government agency, with a person with authority over the employee, or with another employee who has authority to investigate or correct the violation." *Id.* (quoting Cal. Lab. Code § 1102.5(b)). To assert a claim under § 1102.5(b), a plaintiff must first show, by a preponderance of the evidence, that "(1) the plaintiff engaged in protected activity, (2) the defendant subjected the plaintiff to an adverse employment action, and (3) there is a causal link between the two," such that the employee's whistleblowing was a "contributing factor" to the adverse employment action. *Ross v. Cnty. of Riverside*, 36 Cal. App. 5th 580, 592 (2019); Cal. Lab. Code § 1102.6. Once an employee has made this prima facie showing, the burden shifts to the employer

"'to demonstrate by clear and convincing evidence' that the alleged adverse employment action would have occurred 'for legitimate, independent reasons' even if the employee had not engaged in protected whistleblowing activities." *Lawson*, 12 Cal. 5th at 712 (quoting Cal. Lab. Code § 1102.6)).

The County raises two arguments in favor of summary judgment on this claim. First, the County argues that Plaintiff did not engage in protected activity because he did not report the violation of any law, rule, or regulation. (Mot. at 90). Second, the County argues that Plaintiff cannot establish any causal connection between his activity and any adverse employment actions. (*Id.*). The Court will consider these arguments in turn.

### 1. Protected Activity

First, the County argues that Plaintiff was not engaged in protected activity because he did not reasonably believe "that there was a violation of a statute, rule, or regulation" at the time of any of the reporting. *Killgore v. SpecPro Prof. Servs., LLC*, 51 F.4th 973, 988 (9th Cir. 2022) (citation omitted). As to breacher pay, the County argues that Plaintiff merely relayed the allegations to higher level executives as an internal personnel matter and that he did not participate in the deputies' lawsuit. (Mot. at 91). As to the death of Spike, the County argues that Plaintiff had no reasonable belief of any violation when he first spoke with Williams, and that he was simply acting in his capacity as SEB Lieutenant when he communicated with Commander Lewis in the Fall of 2021. (*Id.*).

Plaintiff responds that he was engaged in protected activity in reporting both of these actions, as well as when he reported retaliation for his support of the Vera campaign and when he brought government tort claims and this suit. (*Id.* at 92-96). As to the breacher pay suit, Plaintiff argues that his actions constituted protected activity because he did far more than simply encourage others to file a grievance: he reported fraud and wage theft, helped the litigants by obtaining documents that LASD had hidden from the court, and succeeded in helping to secure pay for the deputies. (*Id.* at 93). As to the coverup of Spike's death, Plaintiff argues that his conversation with Commander Lewis constitutes

-40-

protected activity because he was reporting what he reasonably believed to be a violation of LASD policy.

The Court agrees with Plaintiff that there is sufficient evidence to show that he was engaged in protected activity with respect to the breacher pay lawsuit.  Section 1102.5(b) prohibits employers from retaliating against an employee "disclosing information . . . to a person with authority over the employee . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."  Cal. Lab. Code § 1102.5(b).  Plaintiff attests that he "reported to Williams that fraudulent information had been given to the court, and that the deputies were owed far more in breacher bonus pay than LASD told the court."  (Garrido Decl. ¶ 8).  At the time, Williams was Plaintiff's direct supervisor.  (Williams Decl. ¶ 6).  Given that the plaintiffs in the breacher pay lawsuit were ultimately awarded $3 million in unpaid breacher pay, the Court concludes that this is sufficient evidence for a jury to find that Plaintiff had reasonable cause to believe that he was disclosing a violation of a local or state law or rule.  While the County argues that Plaintiff made this disclosure solely as part of his role as middle management, the prohibition on retaliation in § 1102.5 applies "regardless of whether disclosing the information is part of the employee's job duties."  Cal. Lab. Code § 1102.5(b).

The Court reaches the same conclusion as to the reporting of Spike's death.  Plaintiff attests that he reported to Commander Rob Lewis that he was concerned about a cover up and obstruction of any investigation of Spike's death.  (Garrido Decl. ¶ 43).  At the time of the reporting, Lewis was staffed at the LASD's "Personnel Administration Bureau," (*id.*), and therefore qualified as "another employee who has the authority to investigate, discover, or correct the violation or noncompliance," Cal. Lab. Code § 1102.5(b).  By reporting a suspected violation of state law to Commander Lewis, Plaintiff was engaged in a protected activity, regardless of whether he did so as part of his job duties.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2.   Causation

As to causation, the County contends that Plaintiff cannot establish any causal connection between his actions on the breacher pay lawsuit and any adverse employment action because too much time elapsed. (*Id.* at 92). As to Spike's death, the County argues that there is no evidence that Defendants took retaliatory action because of Plaintiff's communications with Commander Lewis. (*Id.* at 92).

Plaintiff responds that there is sufficient evidence in the record for a reasonable jury to conclude that he was denied dive training because of his actions in supporting the breacher pay lawsuit. (*Id.* at 99). Plaintiff also contends that there is a causal connection between his reporting of Spike's death and the initiation of the ICIB investigation, the lowering of his performance evaluation, his constructive termination, the Wells Fargo investigation, and the denial of his dive bonus. (*Id.* at 100-02). Finally, Plaintiff also argues that there is a causal connection between his donation to the Vera campaign and adverse actions taken against him that should support his whistleblower claim. (*Id.* at 97-98).

Plaintiff's theories of liability all fail on the causation element. As discussed above with respect to the First Amendment claim against Williams, Plaintiff has failed to put forth sufficient evidence connecting the denial of dive training to his protected activity. Plaintiff was told that he could not participate in dive training because there were no open positions, and he admitted that he lacked any evidence that this was not true. (JAF 82; Garrido Deposition at 39:3-5). Plaintiff also admitted that no one ever told him that the reason for the denial of dive pay was because he advocated for breacher pay. (JAF 85). Others were rejected from dive training because there was no open position, and Plaintiff fails to put forth any evidence that other similarly situated employees were approved for dive training during the same time period. *See* (JAF 84; Garrido Deposition at 38:8-12). Thus, there is no evidence that Defendants treated similarly situated applicants differently or that the dive team was not, in fact, full at the time of Plaintiff's application. On this record, no

1  reasonable jury could find that Plaintiff was denied dive training because of his protected
2  activity.

3  Second, as to the reporting of the purported coverup of Spike's death, Plaintiff has
4  not provided any evidence that his reporting to Lewis was a contributing factor in any
5  retaliatory actions.  Plaintiff provides no information that Williams or any other official
6  ever learned of Plaintiff's reporting to Lewis, let alone that they were motivated to retaliate
7  against Plaintiff because of this reporting.  Plaintiff's theory of causation is instead
8  premised on Williams' alleged belief that Plaintiff had reported the coverup to the L.A.
9  Times.  *See* (Garrido Decl. ¶¶ 45-46).  But § 1102.5 only protects against retaliation for
10 disclosure to specific entities—government or law enforcement agencies, persons with
11 authority over the employee, other employees with the authority to investigate, and public
12 bodies conducting an investigation, hearing, or inquiry, *see* Cal. Lab. Code § 1102.5(b)—
13 not including the press.  *See Erhart v. Bofi Holding, Inc.*, 612 F. Supp. 3d 1062, 1116 (S.D.
14 Cal. 2020) (reiterating conclusion that "purported disclosures to the press are not shielded
15 by the relevant whistleblower statutes," including § 1102.5(b)); *see also Tides v. Boeing
16 Co.*, 644 F.3d 809, 815 (9th Cir. 2011) (concluding in analysis of federal whistleblower
17 statute that employees are protected from retaliation only when providing information to
18 "one of three individuals or entities," not including "[m]embers of the media").  Absent
19 any evidence that Williams or others retaliated against Plaintiff because of his reporting to
20 Lewis—rather than because of their belief that he was in contact with the media—Plaintiff
21 has no claim under § 1102.5(b) premised on his reporting of Spike's death.

22 Finally, as to Plaintiff's support for Vera, Plaintiff fails to show that he was retaliated
23 against because of his protected activity.  Plaintiff argues that he engaged in protected
24 activity by reporting retaliation for his support of the Vera campaign. (Mot. at 92).  But
25 Plaintiff does not argue that he was retaliated against because of this *reporting*; instead, he
26 highlights the causal connection between his donations to Vera and various adverse actions.
27 (*Id.* at 97-98).    Section 1102.5 prohibits retaliation against employees for their
28 whistleblowing activities, not their political activities.  *See* Cal. Lab. Code § 1102.5(b).

While Plaintiff's reporting of retaliation might qualify as a protected activity, Plaintiff does not argue that any adverse actions were taken against him because of this reporting. Plaintiff's claim therefore fails on this theory as well.

Because Plaintiff has not put forth sufficient evidence to show that he was retaliated against because of his whistleblowing activity, the Court GRANTS summary judgment as to Plaintiff's § 1102.5 claim.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS, in part, and DENIES, in part, Defendants' Motion for Summary Judgment. The Court GRANTS summary judgment to Defendants on the due process and unlawful retaliation claims. The Court also GRANTS summary judgment to Williams, Giandomenico, and Barragan as to the First Amendment retaliation claim. The Court DENIES the Motion as to the First Amendment retaliation claim against Villanueva and the County, insofar as it is premised on retaliation for Plaintiff's political activity.

**IT IS SO ORDERED.**

DATED:  September 10, 2025

_____
HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE